## SHURBERG BROADCASTING OF HARTFORD, INC., Appellant,

v.

## FEDERAL COMMUNICATIONS COMMISSION, Appellee,

**Astroline Communications Co., Intervenor.**

No. 84–1600.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 8, 1986.

Decided March 31, 1989.

As Amended March 31, 1989.

Order Denying Rehearing June 16, 1989.

Order Denying Rehearing En Banc June 16, 1989.

Harry F. Cole, Washington, D.C., was on the brief for appellant.

C. Grey Pash, Jr., Counsel, F.C.C., with whom Jack D. Smith, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on the brief, for appellee.

Lee H. Simowitz, with whom Thomas A. Hart, Jr., Washington, D.C., and Merilyn M. Srailman were on the brief, for intervenor Astroline Communications Co.

Andrew Jay Schwartzman, Washington, D.C., was on the brief for amici curiae Dept. of Communications of the Capital Region Conference of Churches, et al., urging affirmance.

David Honig, was on the brief for amici curiae Nat. Black Media Coalition, et al., urging affirmance.

Before WALD, Chief Judge, and SILBERMAN, Circuit Judge, and MacKINNON, Senior Circuit Judge.

Opinion PER CURIAM.

Separate Opinions filed by Circuit Judge SILBERMAN and Senior Circuit Judge MacKINNON.

Dissenting Opinion filed by Chief Judge WALD.

PER CURIAM:

The opinions by Judges Silberman and MacKinnon in some respects differ in analysis. However, both conclude that the FCC's minority distress sale program unconstitutionally deprives Alan Shurberg and Shurberg Broadcasting of their equal protection rights under the Fifth Amendment because the program is not narrowly tailored to remedy past discrimination or to promote programming diversity. Specifically, the program unduly burdens Shurberg, an innocent nonminority, and is not

reasonably related to the interests it seeks to vindicate.

The cause is remanded to the Federal Communications Commission for further proceedings not inconsistent with this opinion.

*Judgment accordingly.*

SILBERMAN, Circuit Judge:

Alan Shurberg, a long-time resident of the Hartford, Connecticut area, and Shurberg Broadcasting Company of Hartford, Inc., have been trying since 1982 to replace Faith Center, Inc., as the licensee of Channel 18 in Hartford. Shurberg appeals from an FCC Memorandum Opinion and Order granting Faith Center permission to sell its broadcast properties to a minority-controlled enterprise pursuant to the Commission's distress sale policy. After Faith Center's second unsuccessful attempt at a distress sale, Shurberg sought to file with the FCC a construction application that was mutually exclusive of Faith Center's renewal application and to have his application set for comparative hearing with Faith Center's renewal application. As the FCC could grant either Shurberg's request for comparative consideration or Faith Center's petition for permission to assign its broadcast license to a third distress sale buyer—intervenor Astroline Communications Company Limited Partnership ("Astroline")—but not both, the FCC considered the two requests together. Deciding in favor of Faith Center, the FCC gave slightly greater weight to its distress sale policy than to the statutory policy favoring competition in licensing. *Faith Center, Inc.,* 99 F.C.C.2d 1164, 1170 (1984). The Commission also held that the racial preference embodied in the distress sale policy did not violate the Constitution because the policy was meant to remedy past discrimination and to promote diversity of ownership and programming. *Id.* at 1170–72. And the Commission sustained the *bona fides* of Astroline's minority status, dismissing Shurberg's contention that Astroline's purported minority ownership was a sham. *Id.* at 1172–73.

Our resolution of Shurberg's appeal in this matter has been delayed for some time. After oral argument in this case, developments in a related case, *Steele v. FCC,* 770 F.2d 1192 (D.C.Cir.1985), led us to ask the FCC if it still fully supported the constitutionality of its distress sale policy. The Commission acknowledged that it had doubts and requested that we remand in order for it to reconsider the matter fully. In the midst of that reexamination, however, Congress passed and the President signed a continuing resolution forbidding, *inter alia,* the expenditure of funds for reconsideration of the distress sale policy. The Commission promptly terminated its proceedings and reinstated the policy, and therefore we must now consider Shurberg's challenges.

Shurberg argues that: the FCC's decision is inconsistent with the governing statute, regulations, and judicial precedents, which he asserts required the Commission to consider his competitive application; the FCC's proceedings were marred by *ex parte* contacts and other irregularities; the distress sale policy unconstitutionally discriminated against him on the basis of race. I discern no substantive or procedural flaw in the FCC's action in this case that would require reversal if the agency's distress sale policy were constitutional. I nevertheless vote to overturn the Commission's decision because I have concluded, for the reasons set forth below, that the distress sale policy, as applied to bar Shurberg's opportunity to compete for the license, is unconstitutional.

I.

A.

As a general rule, a licensee whose qualifications to hold a broadcast license come into question may not assign or transfer that license until the FCC has resolved its doubts in a noncomparative hearing. This policy is premised on the notion that "a licensee ... has nothing to assign or transfer unless and until he has established his own qualifications...." *Northland Television, Inc.,* 42 Rad.Reg.2d (P & F) 1107, 1110 (1978); *see also Jefferson Radio Co.*

v. FCC, 340 F.2d 781, 783 (D.C.Cir.1964). The distress sale policy is an exception to that general rule, developed initially as a way of avoiding time-consuming hearings when expeditious action to oust the licensee was desirable—for example, when the licensee was bankrupt or disabled. *See Statement of Policy on Minority Ownership of Broadcasting Facilities*, 68 F.C. C.2d 979, 983 (1978) ("1978 Policy Statement"); *see generally Stereo Broadcasters, Inc. v. FCC*, 652 F.2d 1026, 1028–29 (D.C.Cir.1981). The policy allows one whose license has been designated for revocation hearing, or whose renewal application has been designated for hearing, to assign his license to an FCC-approved assignee. *See id.*

In 1978, the FCC expanded the applicability of the distress sale policy. It would continue to be available "in circumstances similar to those now obtaining," but, in addition,

> in order to further encourage broadcasters to seek out minority purchasers, [the FCC would] permit licensees whose licenses have been designated for revocation hearing, or whose renewal applications have been designated for hearing on basic qualification issues ... to transfer or assign their licenses at a "distress sale" price to applicants with a significant minority ownership interest, assuming the proposed assignee or transferee meets our other qualifications.

1978 Policy Statement, 68 F.C.C.2d at 983 (footnote omitted). A holder whose license the FCC indicated it might terminate or refuse to renew due to basic qualification issues would be eligible, with FCC approval, to sell its assets and transfer its license to a qualified minority enterprise.[1] Licensees have a substantial incentive to exercise this option, because once a license has been designated for a revocation hearing, a licensee may not transfer the license other than through a distress sale. *See Northland Television, Inc.*, 42 Rad.Reg.2d at 1110. The licensee may either gamble that he will prevail in the noncomparative hearing or make an early exit via a distress sale, which will allow him to salvage some portion of the license's value. The distress sale price, to be approved, must be no higher than seventy-five percent of the station's and license's combined fair market value. This cap ensures the distress sale will involve a substantial loss for the licensee—and a substantial discount for the purchasers. *See Grayson Enterprises, Inc.*, 47 Rad.Reg.2d (P & F) 287, 293 (1980).[2]

### B.

This case has a long and complicated procedural history that reaches back to a period before the proceedings on Faith Center's Hartford license and forward beyond the time of oral argument here. In addition to the Hartford license, Faith Center also held broadcast licenses for three California stations. In 1978, the FCC designated Faith Center's renewal application for its San Bernardino station for hearing because of allegations of fraud in Faith Center's over-the-air solicitation for funds and failure to cooperate with an FCC investigation. In 1980, the Administrative Law Judge in the San Bernardino proceeding dismissed Faith Center's renewal application because of Faith Center's refusal to cooperate in the proceeding. The Commission affirmed that decision, as did this court. *Faith Center, Inc.*, 82 F.C.C.2d 1 (1980), *reconsid. denied*, FCC 81–235 (1981), *aff'd mem., Faith Center, Inc. v. FCC*, 679 F.2d 261 (1982), *cert. denied*, 459

---

1. The FCC has stated that a qualified minority enterprise is one that meets the Commission's basic qualifications and in which the minority ownership interest exceeds 50% or is controlling. *See Commission Policy Regarding the Advancement of Minority Ownership in Broadcasting*, 92 F.C.C.2d 849, 853 (1982) ("1982 Policy Statement"). A special policy applies to limited partnerships: If there is a general partner who is a minority with a 20% interest in the partnership, the enterprise qualifies as one with "significant minority involvement." *Id.* at 855.

2. The distress sale policy is not without attraction to the station owner whose license has been designated for hearing. By selling his station, even at a 25% discount, the owner avoids the "costs of a renewal hearing and the risk of a revoked license." Comment, *FCC Minority Distress Sale Policy: Public Interest v. The Public's Interest*, 1981 Wisc.L.Rev. 365, 366 (1981).

U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 435 (1983).

In December 1980, the FCC designated Faith Center's renewal application for its WHCT–TV Channel 18 license in Hartford for noncomparative hearing. Faith Center had filed a renewal application in 1977, but it had been held in deferred status pending the outcome of the San Bernardino proceedings. After the San Bernardino proceedings were dismissed, the FCC reactivated the Hartford proceedings to consider issues left unresolved in the San Bernardino proceedings. The FCC's order reactivating the Hartford proceedings acknowledged Faith Center's interest in making a distress sale, which it could do while its application was in designated-for-hearing status, but not while in deferred status.

Faith Center filed with the FCC, in February 1981, a petition for special relief requesting permission to make a distress sale to Television Corp. of Hartford. The FCC granted the petition and the renewal application on condition that the proposed assignee be "found fully qualified ... and that the contemplated assignment is in fact consummated within 90 days following such determination." *Faith Center, Inc.*, 88 F.C.C.2d 788, 795 (1981). The FCC's order further stated, "[s]hould either condition not occur, this proceeding will return to its status prior to the filing of the above described Petition for Special Relief." *Id.* The proposed sale to Television Corp., however, was not consummated, and the application was withdrawn. On September 29, 1982, Faith Center again petitioned for special relief, seeking approval for a distress sale to Interstate Media Corp. The FCC again granted Faith Center's petition and application—this time over the opposition of Shurberg and others—and again conditioned its approval upon the proposed assignee's being found fully qualified and upon the sale's being consummated within ninety days of the qualification determination. If either of these conditions failed, the application was to revert to its prior designated-for-hearing status.

Shurberg, on December 1, 1983, filed an application for a construction permit to build a television station in Hartford, an application that would be mutually exclusive with the Channel 18 renewal application. The FCC rejected this filing on the ground that its regulations precluded it from accepting applications in competition with designated-for-hearing renewal applications until the resolution of the noncomparative proceedings. *See* 47 C.F.R. § 73.3516(e) (1987); *City of Angels Broadcasting v. FCC*, 745 F.2d 656, 662–64 (D.C. Cir.1984).

In February and April of 1984, Faith Center and Interstate Media informed the FCC they could not consummate the proposed distress sale. Faith Center said, however, that it had "an excellent opportunity to consummate an assignment to other minority parties," and it requested another chance to pursue a distress sale. Letter from Kenneth E. Robertson (Counsel for Faith Center) to Allan Glasser (FCC Mass Media Bureau), March 29, 1984. Faith Center's renewal application reverted to designated-for-hearing status, and the ALJ scheduled a prehearing conference. On April 19, 1984, Shurberg in turn filed a petition for extraordinary relief requesting that the construction permit application he had attempted to file in December 1983 be designated for comparative hearing with Faith Center's renewal application. Then on June 25, 1984, before the FCC had acted on Shurberg's petition, Faith Center petitioned the Commission for approval of a distress sale to Astroline. The FCC's General Counsel solicited comments from all parties on the conflicting requests for relief. Astroline, the Department of Communications of the Capital Region Conference of Churches, and the FCC's Mass Media Bureau submitted comments in favor of the distress sale; Shurberg recorded his opposition to the sale and urged his application be set for comparative hearing.

The Commission announced its decision on the petitions for relief in a Memorandum Opinion and Order released December 7, 1984. *Faith Center, Inc.*, 99 F.C.C.2d 1164. It first addressed Shurberg's argument that he was entitled to a comparative hearing against Faith Center's renewal application because the FCC's September

1983 order regarding the second proposed distress sale had *granted* Faith Center's renewal application and thereby opened a "window" for the filing of competitive applications. *See* 47 C.F.R. §§ 73.3516(c), (e), 73.3539 (1987). The Commission also rejected Shurberg's argument that *New South Media Corp. v. FCC*, 685 F.2d 708 (D.C.Cir.1982), required the Commission to grant its request for a comparative hearing. 99 F.C.C.2d at 1168–70. It did note, however, that if Faith Center failed to accomplish the distress sale on its third try, the FCC would require Faith Center to file a supplemental renewal application. This would operate to open a window for all competitive applications, including Shurberg's. 99 F.C.C.2d at 1170.

Shurberg's argument that the distress sale policy violated his constitutional right to equal protection was rejected by the Commission as "without merit." In reaching that conclusion, the FCC relied both on its findings of "underrepresentation" of minorities in the broadcast industry and its view that increased minority ownership would increase programming diversity. *Id.* at 1170–71. The Commission also drew support from the 1982 amendments to the Communications Act in which Congress had approved the use of a lottery system that incorporated significant preferences for minority applicants as an alternative to the comparative hearing process. *Id.* at 1171–72. The conference report accompanying those amendments contained a statement that "the effects of past inequities stemming from racial and ethnic discrimination have resulted in a severe underrepresentation of minorities in the media of mass communications, as it has adversely affected their participation in other sectors of the economy as well." H.R.REP. No. 765, 97th Cong., 2d Sess. 43 (1982) U.S. Code Cong. & Admin.News 1982 pp. 2237, 2281. Noting that the conference report also referred to the FCC's 1978 policy statement, which expanded the distress sale policy, in establishing the need for preferential treatment of minorities, the

Commission reasoned that "Congress ... has recognized the need for and approved the implementation of the minority ownership policies set forth in the 1978 policy statement." 99 F.C.C.2d at 1172.

Shurberg also failed in his attack based on Astroline's qualifications as a *bona fide* minority to participate in a distress sale. The Astroline partnership had two general partners and one limited partner. Richard P. Ramirez, the general partner whose Hispanic surname was the predicate for Astroline's participation in the distress sale as a minority enterprise, held a twenty-one percent ownership interest and a seventy percent voting interest in the partnership. WHCT Management, Inc., the second general partner, held a nine percent ownership interest and a thirty percent voting interest. Astroline Co.—not to be confused with the Astroline partnership—owned the remaining seventy percent of the company. The Astroline partnership represented to the FCC that the general partners would control the partnership's affairs and would vote in accordance with their respective partnership interests. Shurberg attacked the *bona fides* of this arrangement, pointing to records indicating Ramirez had contributed less than one percent of the station's operating capital; Shurberg asserted it was patently incredible that such a small contributor would be given control of the enterprise. Shurberg alleged that Ramirez was included in the partnership only as a device to permit the real party in interest, Astroline Co., to participate in the distress sale. The Commission determined, however, the Astroline partnership satisfied the basic requirements of minority control. *Id.* at 1173.

Shurberg filed this petition for review.[3] Thereafter, this court issued its decision in *Steele v. FCC*, 770 F.2d 1192 (D.C.Cir. 1985), which involved the FCC's policy of extending preferential treatment to female applicants in comparative hearings for FM radio station licenses. A majority of the panel held the preferences invalid as ex-

---

**3.** This court has jurisdiction pursuant to section 402(b) of the Communications Act, 47 U.S.C. § 402(b) (1982).

ceeding the FCC's statutory authority. The court *en banc* subsequently vacated the panel opinion and set the case for rehearing. The FCC requested, however, that we remand the case without considering the merits to allow the FCC to reconsider the basis for those preferences, since in the meantime it had "concluded that race, sex or national origin *per se* should not be a basis for licensing determinations." Accompanying its motion for remand, the Commission filed a lengthy brief on the merits—in the event we might deny its motion and reach the merits—apparently conceding that its race and gender preferences violated the Constitution. We remanded the case, in October 1986, to allow the FCC to reexamine the bases of its racial and gender preference policies.

In light of these developments, we asked the FCC to file a supplemental brief in this case clarifying its position on the constitutionality of the minority distress sale provision. Instead of filing a brief, the Commission responded that the "distress sale policy raises many of the same questions that are present in the *Steele* case," and requested a remand to allow inquiry into the distress sale policy along with consideration of the comparative preference policies raised in *Steele*. We granted the motion and remanded the record in June 1987.

On December 22, 1987, the President signed into law a continuing resolution appropriating funds for the federal government for fiscal year 1988. Pub.L. No. 100–202, 101 Stat. 1329 (1987). Among its provisions was the following:

> That none of the funds appropriated by this Act shall be used to repeal, to retroactively apply changes in, or to continue a reexamination of, the policies of the Federal Communications Commission with respect to comparative licensing, distress sales and tax certificates granted under 26 U.S.C. 1071, to expand minority and women ownership of broadcasting licenses, including those established in Statement of Policy on Minority Ownership of Broadcast Facilities, 68

F.C.C.2d 979 and 69 F.C.C.2d 1591, as amended 52 R.R.2d 1313 (1982) [sic [4]] and *Mid–Florida Television Corp.*, 60 F.C.C.2d 607 Rev.Bd. (1978) [sic [5]], which were effective prior to September 12, 1986, other than to close MM Docket No. 86–484 with a reinstatement of prior policy and a lifting of suspension of any sales, licenses, applications, or proceedings, which were suspended pending the conclusion of the inquiry....

In compliance with this provision, the FCC ended reconsideration of its comparative preference and distress sale policies, without issuing any conclusions, and announced it would reinstate such policies as they existed prior to September 12, 1986. *See, e.g., Faith Center, Inc.*, 3 F.C.C.Rcd. 868 (1988).

Shurberg promptly moved the court for expedited resolution on the merits. Shurberg noted that the case was fully briefed and argued more than two years ago, and that the termination of the *Steele* inquiry precluded any further evolution of the case. We granted the motion in part, agreeing to render our decision on the merits in the normal course of business. The FCC's request for a remand to allow it to reexamine the distress sale policy, as well as its brief in *Steele*, suggested that it may now essentially agree with Shurberg's constitutional arguments.

On the other hand, I also recognize that the FCC's brief in *Winter Park Communications v. FCC*, Nos. 85–1755 and 85–1756, (D.C.Cir. argued Nov. 21, 1988) is supportive of the Commission's minority preference policy as used in its comparative licensing procedures. The FCC asserted that approach is constitutional because it is based on the compelling government interest in the enhancement of diversity of programming—a contention which appears inconsistent with its brief in *Steele*. Still, in *Winter Park*, the FCC argued that its policy was narrowly tailored because "race is one of several factors to be considered rather than a decisive factor in and of itself." Therefore, since race is only one

---

**4.** 52 Rad.Reg.2d (P & F) 1301 (1982).

**5.** 69 F.C.C.2d 607 (Rev.Bd.1978).

consideration among many in the comparative license practice challenged in *Winter Park*, it is distinguishable from the distress sale policy in *Shurberg*. *See infra* at 913, 924–25.[6]

The continuing resolution apparently has prevented the formal expression of any further views by the FCC in this case, and the distress sale policy, reinstated by the FCC, is still operative and has an effect on Shurberg's interests. We therefore must consider his challenge, looking to the various briefs, which paradoxically include both the FCC's defense and repudiation of its policy.

## II.

Turning first to Shurberg's nonconstitutional challenge to the Commission's action, the major issue presented is the propriety of the Commission's decision that Shurberg was not entitled to a comparative hearing. Giving appropriate deference to the FCC's construction and application of its rules, *see San Luis Obispo Mothers for Peace v. NRC*, 789 F.2d 26, 30 (D.C.Cir.) (en banc), *cert. denied*, 479 U.S. 923, 107 S.Ct. 330, 93 L.Ed.2d 302 (1986), I discern no basis for overturning the FCC's determination on this ground.[7]

The Communications Act of 1934, as amended, provides that licenses in hearing status shall remain in effect pending final disposition of the hearing. *See* 47 U.S.C. § 307(c). The FCC's regulations, moreover, provide that the Commission will not accept competitive applications after a certain time, in order to allow the Commission to designate renewal applications for hearing and to conduct such hearings in an orderly fashion. *See* 47 C.F.R. § 73.3516(e) (1987); *City of Angels Broadcasting v. FCC*, 745 F.2d 656, 662–64 (D.C.Cir.1984). In my view, the Commission properly applied the statute and its regulations when it refused to accept Shurberg's competitive application while a hearing on Faith Center's qualifications was pending. Shurberg

argues that the posture of Faith Center's renewal application was really more akin to deferred status than to designated-for-hearing status and under the rule of *New South Media*, 685 F.2d 708, the substance and not the form of a license's status is controlling. As I have mentioned, designated-for-hearing applications are protected from competitive filings, but deferred applications are not. Deferred applicants are required to submit supplemental renewal applications at every interval during the time of their deferred status when a regular renewal application would be due. And those supplemental filings operate to open a window for competitive applications.

In *New South Media*, the FCC had granted several renewal applications conditioned upon the outcome of a comparative renewal proceeding involving another of the licensee's licenses. Later the FCC denied renewal of that other license and decided to hold noncomparative hearings to determine how to treat the conditionally renewed licenses. Instead of waiting for the remaining licenses to expire and evaluating each at that time against competing applications, the Commission decided to reopen the earlier conditional renewals by designating those applications for hearing. *Id.* at 710. As the hearings were to begin after completion of all court appeals involving the unrenewed license, the FCC could fix no specific date for the hearings. This court overturned the FCC's decision to hold the applications in designated-for-hearing status, shielded from competition for an interval longer than the license period itself. We found the situation analogous to that in *Carlisle Broadcasting Associates*, 59 F.C.C.2d 885 (1976), in which the FCC ruled that when a renewal application had remained in deferred status for three years (which was the license term), the Commission would entertain competing applications. *See New South Media*, 685 F.2d at 716. Between the time the FCC had designated the licenses for hearing and the com-

---

6. I express no opinion as to the validity of the minority preference policy in the comparative license practice raised in Winter Park.

7. The dissent, although agreeing with the FCC that this issue presents a "close question," seems to concur on this point, dissent at 935 n. 3; otherwise the dissent presumably would not reach the constitutional question.

pletion of the judicial appeals involving the nonrenewed license, "all but one of the thirteen license renewals [had] run well beyond three years, with no renewal hearing ongoing at the Commission, no evidence-taking underway, no proceeding in midstream or even launched." *Id.* We said: "In fact then, if not in form, the extended 'conditional renewals' in this case are like the renewal deferred for three years in *Carlisle.*" *Id.*

Shurberg argues that under *New South Media* the mere designation of a hearing is not sufficient to preclude competing applications, that there must actually be an ongoing renewal proceeding which would otherwise be hampered. Faith Center's attempts to consummate a distress sale, it is asserted, cannot themselves be regarded as "administrative activity" sufficient to justify the Commission's treatment of the Faith Center renewal proceeding as ongoing.

I disagree with Shurberg's view of *New South Media*'s bearing on this case. *New South Media* treated the absence of ongoing administrative proceedings as a factor militating against keeping the renewal applications in protected status, but did not rule out the possibility that other interests might warrant continued protection against competitive applications. That competitive applications might disrupt ongoing proceedings is only one facet of a larger concern for administration of the FCC's mandate. For the distress sale policy to work, the FCC must have the discretion to hold a renewal application in designated-for-hearing status long enough to permit the licensee to explore the possibility of such a sale. In this case, the FCC exercised its discretion to hold the application in designated-for-hearing status not once, but three times. All in all, the application was in deferred status for over three years and then in designated-for-hearing status for

four years. Admittedly, that is a long time for competitors to be precluded from filing their applications, but I do not see here the total absence of administrative activity that was apparent in *New South Media.* The Commission's efforts to allow Faith Center to avail itself of an FCC policy were not so unreasonable as to require reversal.

As Shurberg acknowledges, *New South Media* recognized that not all limitations on the *Ashbacker* policy of favoring competition are impermissible, especially insofar as they advance the FCC's orderly administration of its work. *See* 685 F.2d at 716. If the distress sale policy were constitutional, it would present sufficiently weighty grounds for a limited exception to the *Ashbacker* policy. Because an agency's balancing of competing policy considerations is entitled to considerable deference from a court, *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), I would be obliged to respect the Commission's decision to implement the distress sale policy despite attendant delays. Accordingly, I do not quarrel with the Commission on this basis.[8]

### III.

Shurberg challenges the distress sale policy as *ultra vires* on both statutory and constitutional grounds. We are, of course, normally obliged to consider the statutory question first—whether the policy exceeds congressional authorization—and I am mindful of the maxim that we construe statutes narrowly to avoid constitutional infirmities. *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 297, 76 L.Ed. 598 (1932). Still, the Commission operates under a broad statutory mandate to consider the "public interest, convenience and necessity." 47 U.S.C. § 309(a) (1982). Congress

**8.** I also reject Shurberg's argument that the FCC's proceedings were fatally tainted by *ex parte* communications and other irregularities. None of the alleged communications warrants a remand. FCC regulations prohibit only *ex parte* communications "directed to the merits or outcome of a proceeding." 47 C.F.R. § 1.1202(a) (1987). Only one of the alleged communications, a memorandum to the Commissioners

from a non-decisionmaking employee, went to the merits of the Faith Center proceeding. The Commission has since included that memorandum in the record of this proceeding. It is obvious from reading the memorandum that the Commission's failure to make it public before it acted did not harm Shurberg in any meaningful respect. *See PATCO v. Federal Labor Relations Authority,* 685 F.2d 547, 564–65 (D.C.Cir.1982).

has not disapproved the use of racial preferences as a means of carrying out the Commission's view of the "public interest," and has, in fact, authorized their use in certain licensing decisions. *See* 1982 Amendments to the Communication Act of 1934, 47 U.S.C. § 309(i)(3)(A). I think, therefore, that the FCC did not exceed its statutory authority when it adopted the distress sale policy.

### A.

The constitutional issue is whether or not the distress sale policy, by creating a preference for minority purchasers, violates the equal protection component of the Fifth Amendment. *See Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The Supreme Court has struggled with the constitutionality of government-sponsored minority preferences four times in the last ten years,[9] in *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); and *City of Richmond v. J.A. Croson Co.,* —— U.S. ——, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Those cases have produced twenty-three opinions (some of which do not reach the constitutional issue). In their aftermath, I would be less than candid not to concede that discerning and applying constitutional principles in this area is difficult; in none of the first three cases does a majority of the Court join any one opinion. Under these circumstances, a lower federal court must do its level best to extract the holding that commanded a majority in each case to arrive at the governing principles and limitations. *See Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977). In *Croson,* a majority of the Court did agree on the requirements for the constitutionality of a state or local affirmative action program. That opinion provides more guidance than the earlier cases, but the contours of its reasoning

must still be fleshed out in future cases. I begin by briefly reviewing the four cases.

*Bakke* struck down a university admissions policy that set aside a fixed percentage of each class for minority candidates. In the majority, only Justice Powell's opinion reached the constitutional issue, and in discussing the possible justifications for the admissions program, he firmly rejected the notion that a racial classification could be based on a mere desire to assure that the student body contained specified percentages of particular racial and ethnic groups. 438 U.S. at 307, 98 S.Ct. at 2757. He also rejected the use of a preference as a remedy for past discrimination, because the university had not made any findings of discrimination, and indeed was not competent to make such findings. *Id.* at 307–09, 98 S.Ct. at 2757–58. Justice Powell's opinion, however, did recognize that an academic institution has a compelling interest in promoting a diverse educational environment. *Id.* at 311–14, 98 S.Ct. at 2759–60. Bringing together students from diverse ethnic and cultural backgrounds allows them "to learn from their differences and to stimulate one another to reexamine even their most deeply held assumptions about themselves and their world." *Id.* at 313 n. 48, 98 S.Ct. at 2760 n. 48 (citation omitted). Racial diversity is a legitimate aspect of a diverse student body, but it is only one part of the "genuine diversity" that is a compelling state interest. *Id.* at 315, 98 S.Ct. at 2761. Thus, the university could have used race as one factor in a multi-factor admissions decision. But simply employing a racial set-aside was inconsistent with the attainment of "genuine diversity," an interest that would necessarily require consideration of factors other than race. *See id.* at 315–18, 98 S.Ct. at 2761–62.

*Fullilove* is the only case in which the Court has sustained the constitutionality of a governmentally-imposed minority preference not occasioned by a court's remedial

---

**9.** A fifth case, *Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986), is distinct both

because it involved a *court-ordered* remedy to discrimination and because it dealt primarily with Title VII.

action.[10] The Court considered a *facial* challenge to the constitutionality of a set-aside provision in an Act of Congress authorizing funding for public works construction.[11] In his plurality opinion, Chief Justice Burger stressed Congress' special constitutional authority under the Fourteenth Amendment to enact measures to remedy past discrimination. *See* 448 U.S. at 472–78, 100 S.Ct. at 2771–74. Justice Powell's concurrence also stressed that Congress had made the finding of past discrimination and that Congress had selected the particular remedy. *See id.* at 503–06, 100 S.Ct. at 2787–89 (Powell, J., concurring). The evidence before Congress demonstrated specific practices in the public procurement process that resulted in discrimination or an exacerbation of the effects of past discrimination. *See id.* at 477–78, 100 S.Ct. at 2774 (plurality); *id.* at 506, 100 S.Ct. at 2789 (Powell, J., concurring). Of key importance, it seems to me, was the Court's determination that the set-aside was narrowly tailored to its remedial purpose. The Court prominently discussed features of the legislative history, *id.* at 463–67, 100 S.Ct. at 2767–69, and of the implemented program, *id.* at 486–88, 100 S.Ct. at 2779–80. The program was designed by Congress to assure that preference would be awarded only to *disadvantaged* minority enterprises: those enterprises that could show in the face of challenge that they were continuing to suffer the competitive effects of past discrimination (albeit discrimination not necessarily directed specifically at them). The Court also emphasized that the set-aside was likely to impose only a slight burden on nonminorities since its reach was small in proportion to the overall amount of funds expended in the construction industry and because the effects were diffused rather than concentrated on particular individuals. *See id.*

at 484 n. 72, 100 S.Ct. at 2778 n. 72; *id.* at 514–15, 100 S.Ct. at 2793 (Powell, J., concurring).

In *Wygant,* the Court held unconstitutional a school layoff policy that accorded minority teachers a preference over nonminorities with seniority. As Justice O'Connor concurred in the Court's judgment on narrow grounds and no other opinion was joined by five justices, one may take Justice O'Connor's separate concurrence, and those parts of Justice Powell's opinion in which she also concurred, to represent the holding of the Court. *See Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993. The Court found that the school board had failed to establish the necessary factual predicate—*i.e.,* evidence of past discrimination—for remedial action. *See* 476 U.S. at 277–78, 106 S.Ct. at 1848–49. The Court, however, relaxed its previous requirement that the governmental body make "findings" of discrimination. Recognizing that such findings might subject a government to liability, the Court authorized preferences to be predicated on substantial evidence of discrimination. *Wygant,* 476 U.S. at 289–92, 106 S.Ct. at 1854–56 (O'Connor, J., concurring). Flatly rejected, though, as a legitimate justification for the preferences was the school's asserted need to provide minority role models; such a theory, the Court maintained, has "no logical stopping point." *Id.* at 275–76, 106 S.Ct. at 1848. Essentially, the Court (Justice O'Connor) held that the layoff provision was not narrowly tailored to achieve its remedial purpose, because the hiring goal that the provision was designed to protect was calculated as a ratio of black teachers to black students, rather than as a ratio of black teachers to qualified minority teach-

**10.** Court-ordered racial classifications have been sustained when used to remedy proven discrimination. *See, e.g., Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986); *Swann v. Charlotte-Mecklenburg Bd. of Educ.,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

**11.** The plaintiffs in *Fullilove* did not seek damages or other specific relief for injuries caused

by the application of the program, but only declaratory and injunctive relief striking down the program *in toto. Fullilove,* 448 U.S. at 480–81 & n. 71, 100 S.Ct. at 2775–76 & n. 71. The Court was not asked to consider the fairness of the burden borne by particular individuals; it observed that "questions of specific application must await future cases." *Id.* at 486, 100 S.Ct. at 2779.

ers within the relevant labor pool. *Id.* at 294, 106 S.Ct. at 1857.

*Croson,* the Court's most recent pronouncement, held unconstitutional Richmond's Minority Business Utilization Plan, which required prime contractors awarded city construction contracts to subcontract at least thirty percent of the dollar amount of each contract to one or more "Minority Business Enterprises." The Court ruled that a racial preference, at least when implemented by a state or local government, is subject to "strict scrutiny" review under the Equal Protection Clause. *Croson,* at ——, 109 S.Ct. at 721; *id.* at ——, 109 S.Ct. at 734–35 (Scalia, J., concurring). Given this standard of review, the Richmond plan was not supported by a sufficient factual predicate for remedial action. The City Council's evidence was deficient, because "a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Id.* at ——, 109 S.Ct. at 723–24. In particular, the Court ruled that mere assertions of a "benign" purpose for the racial classification were "entitled to little or no weight," *id.,* and that a comparison between the number of prime contracts awarded to minority firms and the minority population of the city (as opposed to the number of qualified minority firms) is inappropriate. *Id.* at ——, 109 S.Ct. at 725–26. The Richmond plan also failed the test of narrow tailoring because there had been no "consideration of the use of race-neutral means to increase minority business participation in city contracting," *id.* at ——, 109 S.Ct. at 727, nor did the plan provide for an "inquiry into whether or not the particular MBE seeking a racial preference ha[d] suffered from the effects of past discrimination...." *Id.* at ——, 109 S.Ct. at 729–30.

Some general propositions may be gleaned from these four cases. Governmentally-imposed minority preferences are constitutionally permissible under certain limited circumstances, but they may not be based on the desirability *per se* of achieving racial balance or proportional representation of minorities in selected institutions. The Court has recognized that the objective of remedying past discrimination may justify the use of minority preferences, *see Fullilove,* 448 U.S. at 475, 100 S.Ct. at 2773, and at least one Justice has viewed promoting diversity in an educational context as a second compelling state interest. *See Bakke,* 438 U.S. at 311–15, 98 S.Ct. at 2759–61 (opinion of Powell, J.).

The nature of the evidence required to establish the existence of prior discrimination varies with the authority of the governmental body imposing the remedial preference. *See Fullilove,* 448 U.S. at 515 n. 14, 100 S.Ct. at 2793 n. 14 (Powell, J., concurring). Congress is clearly the institution with the most latitude to make findings of discrimination and authorize remedies on the basis of the evidence before it. *See Croson,* at ——, 109 S.Ct. at 719–20; *Fullilove,* 448 U.S. at 472, 483, 100 S.Ct. at 2771, 2777; *id.* at 499–502, 100 S.Ct. at 2785–87 (Powell, J., concurring).[12] A state or local government must have stronger evidence of discrimination before it can employ racial classifications, *Croson,* at ——, 109 S.Ct. at 720, and that evidence must "approach[ ] a prima facie case of a constitutional or statutory violation." *Id.* at ——, 109 S.Ct. at 723–24.

Assuming the factual predicate for remedial action by any governmental body has been established, a reviewing court must still ensure that the use of race is narrowly tailored to the remedial purpose. *Croson,* at ——, 109 S.Ct. at 728; *Wygant,* 476 U.S. at 274, 106 S.Ct. 1847. Most important, a racial preference plan must allow for case-by-case consideration of applicants to ensure that each minority has in fact suffered from the effects of past discrimination. *See Croson,* at ——, ——, 109 S.Ct. at 719, 727–30; *Fullilove,* 448 U.S. at 486–87, 100 S.Ct. at 2779. The preference

---

**12.** For a discussion of Congress' special role under the enforcement provision of the Fourteenth Amendment, see Nathanson, *Congressional Power To Contradict the Supreme Court's Constitutional Decisions: Accommodation of Rights in Conflict,* 27 Wм. & Mary L.Rev. 331, 356–57 (1986).

also must be structured in a way that minimizes the burden on nonminorities, so that innocent people are not asked to shoulder an undue share of the cost of remedying discrimination. *Wygant*, 476 U.S. at 282–84, 106 S.Ct. at 1851–52; *Fullilove*, 448 U.S. at 514–15, 100 S.Ct. at 2793 (Powell, J., concurring). When a remedy is limited and properly tailored, some sharing of the burden by innocent third parties may be unavoidable and does not render a remedial program unconstitutional. *See Fullilove*, 448 U.S. at 515, 100 S.Ct. at 2793 (Powell, J., concurring); *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 774–75, 96 S.Ct. 1251, 1269, 47 L.Ed.2d 444 (1976). But the government's compelling need to employ a race-conscious remedy must outweigh the unfairness to innocent nonminorities. *See Fullilove*, 448 U.S. at 515, 100 S.Ct. at 2793 (Powell, J., concurring).

Aside from remedying past discrimination, the only other state interest heretofore identified in a Supreme Court opinion and upheld as sufficiently compelling to support race-conscious policies is the promotion of diversity in a school's student body. *Bakke*, 438 U.S. at 311–12, 98 S.Ct. at 2759 (opinion of Powell, J.). In *Bakke*, Justice Powell emphasized the special role and characteristics of institutions of higher learning and the First Amendment protections afforded them. *Id.* at 312–13, 98 S.Ct. at 2759–60 Pursuit of diversity, in his view, is a compelling basis for affirmative discrimination only in circumstances and settings, such as those found in academia, where "a countervailing constitutional interest, that of the First Amendment," in the selection of students "is of paramount importance in the fulfillment of [the institution's] mission." *Id.* at 313, 98 S.Ct. at 2760. Seeking racial or ethnic diversity for its own sake in a governmental or government-regulated institution has been soundly rejected. It is synonymous with the illegitimate objective of racial balance or proportional representation and is thus equivalent to "discrimination for its own sake." *Id.* at 307, 98 S.Ct. at 2757. Preferring minorities in order to create role-models has been similarly rejected because it too leads inexorably to explicit racial

balancing. *See Wygant*, 476 U.S. at 274–76, 106 S.Ct. at 1847–48 *Britton v. South Bend Community School Corp.*, 819 F.2d 766, 767–68 (7th Cir.) (en banc), *cert. denied*, —— U.S. ——, 108 S.Ct. 288, 98 L.Ed. 2d 248 (1987). The goal of racial diversity might be compelling then only when that greater diversity itself serves one of society's fundamental goals. *See Bakke*, 438 U.S. at 311–15, 98 S.Ct. at 2759–61.

Even if the government is seeking racial diversity for a legitimate educational purpose, a court must still ask if the form and manner of the racial classification used is appropriate to achieve that purpose—again, whether the race-conscious measure is narrowly tailored. *Id.* at 315, 98 S.Ct. at 2761. The constitutional test for "narrow tailoring" appears to be slightly different when the government's justification for a racial preference is the promotion of diversity (so far recognized only in an academic setting) rather than the remedy of past discrimination. The Court has rejected the use of minority set-asides as a means of promoting diversity. *See id.* at 315–18, 98 S.Ct. at 2761–62. Because ethnic (or racial) origin is just one of many factors that combine to create "genuine diversity" in an educational environment, the state's interest is better promoted when ancestry is one element of a multi-factor evaluation that takes into consideration a variety of characteristics and attributes. *Id.* According to the Court (Justice Powell), the crucial requirement for a program that uses a racial preference to enhance legitimate diversity is that each applicant must receive individualized consideration. *Bakke*, 438 U.S. at 318 & n. 52, 98 S.Ct. at 2762 n. 52.

The FCC appears to justify its policy both as a means to foster diverse programming and as a remedy for past discrimination. Although the Commission's brief emphasizes that the distress sale policy is "based principally" on its authority to promote diversity of programming, and the dissent suggests that the policy rests "exclusively on the diversity rationale," dissent at 953, I feel obliged to address the

remedial justification as well.[13] In its Memorandum Opinion and Order that rejected Shurberg's constitutional claims, the agency also relied on the remedial justification, arguing that preferential treatment of minorities was needed to address the "underrepresentation of minorities" in the broadcasting industries. *Faith Center, Inc.*, 99 F.C.C.2d at 1171. It further cited congressional statements that minority underrepresentation was the result of past racial and ethnic discrimination, and discussed the remedial power of Congress. *Id.* at 1171–72. I treat the remedial justification first, because constitutional law is more fully developed on that subject than it is with respect to the pursuit of diversity.

### B.

The Court in *Croson* reaffirmed the plurality's view in *Wygant* that, when considering actions by state and local governments, "[s]ocietal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy." *Croson*, at ——, 109 S.Ct. at 723–24 (quoting *Wygant*, 476 U.S. at 276, 106 S.Ct. at 1848). In dicta, however, three members of the majority read *Fullilove* to mean that, in certain circumstances, Congress, in the exercise of its powers under section five of the Fourteenth Amendment, could constitutionally "identify and redress the effects of society-wide discrimination." *Croson*, at ——, 109 S.Ct. at 720. If we are to conclude that the FCC has provided a sufficient factual predicate for the distress sale policy, we must rest on that dicta, because the indications of past discrimination used by the FCC to justify its program are only of the most general nature. Four years after the FCC implemented its distress sale policy, Congress commented that "the effects of past inequities stemming from racial and ethnic discrimination have resulted in a severe underrepresentation of minorities in the mass media communication, *as it has adversely affected their participation in other sectors of the economy as well.*" H.R.CONF.REP. No. 765, 97th Cong., 2d Sess. 43 (1982) (emphasis added). The report cited statistics showing that minority-owned broadcasting stations accounted for less than two percent of commercial broadcasting stations. *See id.* The FCC had made similar findings of minority "underrepresentation"[14] in 1978 in the course of developing its 1978 Policy Statement, 68 F.C.C.2d at 981, which announced the new distress sale policy's minority preference.

Neither Congress nor the FCC ever found any evidence to link minority "underrepresentation" to discrimination by the FCC or to particular discriminatory practices in the broadcasting industry.[15] Indeed, the FCC in its brief in the *Steele* case to the *en banc* court states "[t]here has never been a finding, nor so far as we know even an allegation, that the FCC engaged in prior discrimination against racial minorities or women in its licensing process." Even in its *Winter Park* brief, which seeks to defend a (albeit distinguishable) minority preference policy, the FCC offers no proof of particular discrimination in the broadcast industry. And Congress, in the 1982 conference report, suggested that minority underrepresentation in broadcasting is merely part of the larger phenomenon of minority underrepresentation in certain professions and occupations. As a remedial measure, then, the distress sale policy appears to be based solely on evidence of societal discrimination.

---

**13.** The dissent appears to agree, albeit for different reasons, that the distress sale policy cannot be sustained as a remedial program. *See* dissent at 935, 953. That is not entirely clear, however, since at other times the dissent characterizes the distress sale policy as "an effort to remedy the effects of past discrimination," *id.* at 942, and relies on "the broad remedial powers of Congress." *Id.* at 942.

**14.** By "underrepresentation," Congress and the FCC seem to have meant that the percentage of stations owned by minorities was less than the percentage of minorities in the population as a whole.

**15.** The Minority Ownership Task Force report, to which the FCC's 1978 Policy Statement refers, suggests that minority entry into the broadcasting industry is primarily hindered by difficulties in obtaining financing. But, minorities' lack of money is not linked to specific discriminatory practices.

The decision in *Croson* does not clearly explain whether there are any evidentiary requirements imposed by the Fifth Amendment on Congress before it can authorize a remedy for societal discrimination, nor does it define exactly what is meant by "societal discrimination." The Court noted that "Congress made national findings that there has been societal discrimination in a host of fields," *Croson*, at ——, 109 S.Ct. at 727, but it is not evident whether all of those findings would support race-conscious remedies, remedies which are "ageless in their reach into the past, and timeless in their ability to affect the future." *Wygant*, 476 U.S. at 276, 106 S.Ct. at 1848 (plurality opinion). As Justice Kennedy remarked, "[t]he process by which a law that is an equal protection violation when enacted by a State becomes transformed to an equal protection guarantee when enacted by Congress poses a difficult proposition." *Croson*, at ——, 109 S.Ct. at 734 (Kennedy, J., concurring).

I do not read the Court's dicta in *Croson* to mean that Congress may act without *some* quantum of particularized evidence of the effects of societal discrimination in the relevant industry, and in that regard the general findings of minority underrepresentation in the broadcasting field differ, in my view, from the congressional findings the Court encountered in *Fullilove*. In that case, Congress had "abundant evidence from which it could conclude that minority businesses have been denied effective participation in public contracting opportunities by procurement practices that perpetuated the effects of prior discrimination." *Fullilove*, 448 U.S. at 477–78, 100 S.Ct. at 2774. In the case of broadcasting, the evidence before Congress of the treatment of minorities in the broadcast industry was considerably less particularized. Underrepresentation alone cannot be sufficient proof of the effects of past societal discrimination. There is, of course, the possibility that minorities may be "disproportionately attracted to industries other than [broadcasting]." *Croson*, at ——, 109 S.Ct. at 725–26; *see also Johnson v. Transportation Agency*, 480 U.S. 616, 668, 107 S.Ct. 1442, 1471, 94 L.Ed.2d 615 (1987) (Scalia, J., dissenting) (phenomena of discrimination and underrepresentation due to social attitudes are "certainly distinct"). If we were to hold that Congress may authorize a racial set-aside based on the meager evidence presented here, I do not see what would prevent Congress from mandating proportional racial representation in all publicly-controlled employment opportunities.[16]

Nevertheless, assuming arguendo that the broadcasting field has been plagued by the type of "societal discrimination" to which the Court referred in *Croson* and that Congress has the power to authorize its redress, the FCC's program does not conform to the stricture of the Constitution because it is not narrowly tailored to remedy past discrimination. That a remedial preference must be narrowly tailored implies, as I understand the concept, three distinct limitations. The degree of preference must be tied to the effects of past disadvantages or discrimination, *see Fullilove*, 448 U.S. at 486–88, 100 S.Ct. at 2779–80; *Croson*, at ——, 109 S.Ct. at 719, 727–30; there must be prior consideration of the use of race-neutral means to increase minority participation, *see Croson*, at ——, 109 S.Ct. at 727; *Fullilove*, 448 U.S. at 463–67, 100 S.Ct. at 2767–69; *id.* at 511, 100 S.Ct. at 2792 (Powell, J., concurring); and the burden the preference imposes on innocent third parties must not be unfair. *See Wygant*, 476 U.S. at 282–84, 106 S.Ct. at 1851–52; *Fullilove*, 448 U.S. at 484, 100 S.Ct. at 2777. The distress sale policy is deficient in each respect.

16. Recently, the Court suggested that the analysis in *Croson* is relevant to federally-mandated racial preference policies when it vacated for reconsideration in light of *Croson* the Eleventh Circuit's decision in *H.K. Porter Co. v. Metropolitan Dade County*, 825 F.2d 324 (11th Cir.1987). *See* —— U.S. ——, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989). In *H.K. Porter*, the court upheld Dade County's policy of requiring five percent participation by minority business enterprises in the construction of a federally-funded transit system. The Surface Transportation Assistance Act of 1978 made such percentage goals for minority business participation an absolute condition precedent to the receipt of federal funds. *See* 825 F.2d at 325, 331.

The FCC's policy operates in a manner that bears only a fortuitous relationship to any effects of past disadvantage or discrimination. In *Fullilove*, Congress incorporated a detailed administrative waiver procedure to ensure that the set-aside did not extend beyond its remedial purpose. Under the waiver policy, a contractor could avoid subcontracting with a minority business enterprise at an "unreasonable" price. *See Fullilove*, 448 U.S. at 469–71, 100 S.Ct. at 2770–71. An "unreasonable" price was described as "a price above competitive levels which cannot be attributed to the minority firm's attempt to cover costs inflated by the present effects of disadvantage or discrimination." *Id.* at 471, 100 S.Ct. at 2771. Without this "fine tuning to remedial purpose, the statute would not have 'pass[ed] muster.'" *Croson*, at ——, 109 S.Ct. at 719 (quoting *Fullilove*, 448 U.S. at 487, 100 S.Ct. at 2779). Under the distress sale policy, by contrast, the degree of the preference is not at all tied to disadvantage or discrimination.

The price of the distress sale is set by bargaining between a minority purchaser who is insulated from nonminority competition and a seller who is presumably anxious to salvage some value for his license and assets. The discount to the minority purchaser—in one sense, the degree of the preference—is likely to be substantial. Indeed, in order to preserve some deterrent against violating basic qualification requirements, the Commission prescribes that a distress sale price may not exceed seventy-five percent of the station's fair market value, *see Lee Broadcasting Corp.*, 76 F.C.C.2d 462, 463 (1980), thus guaranteeing the minority purchaser a discount of at least twenty-five percent. In this case, Astroline purchased WHCT at a forty-seven percent of the average appraised value.[17] Any limited partnership with a minority general partner who owns more than a twenty percent share of the partnership may qualify for this preference. *See* 1982 Policy Statement, 92 F.C.C.2d at 855.

The FCC rules in no way require the preference to be tied to the extent of disadvantage suffered by the minority enterprise. There is no opportunity here to ensure that participating minority enterprises have actually been disadvantaged by past discrimination or its effects. *See Croson*, at ——, 109 S.Ct. at 730; *Fullilove*, 448 U.S. at 487–89, 100 S.Ct. at 2779–80. The Commission apparently found Astroline to be eligible to participate in the distress sale simply because of Ramirez's Hispanic surname.[18] As far as I can tell, there was no procedural mechanism that would allow Shurberg or anyone else with an economic interest in the proceeding to prompt an inquiry into the economic status or the source of any disadvantage of Ramirez or his forebearers, nor did the FCC undertake any such investigation on its own initiative. *Cf. Fullilove*, 448 U.S. at 489, 100 S.Ct. at 2780 (waiver scheme "gives reasonable assurance that application of the MBE program will be limited to accomplishing the remedial objectives contemplated by Congress"). Under *Fullilove* and *Croson*, ancestry alone[19] cannot be determinative in

---

**17.** The value of the license and other assets of WHCT was appraised three times at an average value of $6,520,000. The purchase price, however, was only $3,100,000.

**18.** The need for case-by-case consideration to ensure that participants are truly disadvantaged is highlighted by the groups, in addition to blacks, who are included as "minorities" under the distress sale policy. They include those of Hispanic Surnamed, American Eskimo, Aleut, American Indian and Asiatic American extraction. 1978 Policy Statement, 68 F.C.C.2d at 980 n. 8. It should be obvious that the scope of the problem for each of these groups will "vary from market area to market area." *See Croson*, at ——, 109 S.Ct. at 719.

**19.** The Court has not yet found it necessary specifically to address appropriate criteria for determining membership in a preferred minority group or class. Indisputably, millions of Americans, not generally thought by their fellows to be minorities, carry some percentage of minority blood and genes. When the preference for minority status is as economically valuable as here, is it not inevitable that some who can make a case for membership in a minority group will assert such claims despite relative affluence or good fortune? (In India, false claims of "untouchable" status, which can give access to jobs and university places, are apparently a serious problem. *See* Greenawalt, *Judicial Scrutiny of "Benign" Racial Preference in Law School Admissions*, 75 COLUM.L.REV. 559, 572 n. 84 (1975)). It simply cannot be that

deciding who is entitled to a minority preference. There must be some opportunity to exclude those individuals for whom affirmative action is merely another business opportunity. For that reason, in my view, the FCC has failed sufficiently to target the preference to those actually entitled to a remedy.

Unlike the plan in *Fullilove*, it does not appear that Congress or the FCC chose adoption of a racial preference only after consideration and rejection of race-neutral means to increase minority ownership of broadcast stations. *See Croson*, at ——, 109 S.Ct. at 719; *Fullilove*, 448 U.S. at 463–67, 100 S.Ct. at 2767–69 (Congress carefully examined and rejected race-neutral alternatives before enacting the MBE set-aside); *id.* at 511, 100 S.Ct. at 2792 (Powell, J., concurring). After identifying lack of information and lack of financing as the principal entry barriers working against people outside the "old-boy network," *see* dissent at 937 the FCC did not consider race-neutral measures to increase dissemination of information about stations up for sale or to provide financing for prospective purchasers. Instead, the FCC opted immediately for racial preferences, both in the granting of tax-deferred certificates and in the authorization of distress sales. 1978 Policy Statement, 68 F.C.C.2d at 982–84. The agency's conduct, therefore, is contrary to the direction of the Court in *Croson* and *Fullilove* that racial classifications may be employed only as a last resort.[20]

I also believe that the distress sale policy requires innocent third parties to shoulder an excessive burden. The important question in the case of a remedial racial preference appears to be how directly and harshly a disadvantage falls on a nonminority. *See Wygant*, 476 U.S. at 282–83, 106 S.Ct. at 1851 (opinion of Powell, J.); *Fullilove*, 448 U.S. at 484, 100 S.Ct. at 2777. In *Fullilove*, for instance, the Court found the "actual 'burden' shouldered by nonminority firms is relatively light." *Id.; see also id.* at 521, 100 S.Ct. at 2797 (Marshall, J., concurring). This was so because the public construction funds at issue constituted only two and one-half percent of all funds spent on contracting each year in the United States. The ten percent set-aside reserved for minorities amounted to only one-fourth of one percent of all construction contracting opportunities. *Id.* at 484 n. 72, 100 S.Ct. at 2777 n. 72. Similarly, in *Wygant*, the plurality opinion struck down a race-conscious layoff provision, in large part because "layoffs impose the entire burden of achieving racial equality on particular individuals." 476 U.S. at 283, 106 S.Ct. at 1851. The employees in *Wygant* had developed a web of associations that would have made involuntary separation particularly painful even if other jobs were readily available. The uniqueness of the existing job made its potential deprivation an unconstitutional burden.

The distress sale policy imposes an unconstitutional burden on Shurberg because it deprives him of a unique opportunity to own a broadcasting station, solely because of his race. Unlike the construction-industry plaintiffs in *Fullilove*, whose prospective opportunities in the private sector greatly mitigated the theoretical hardship on any hypothetical individual contractor,

administrative and judicial determinations of minority status can or would turn on genealogical inquiries. Besides the horrifying historical associations that would accompany such proceedings, *see, e.g.,* Justice Stevens' citation in his dissent of the Reichs Citizenship Law of November 14, 1935, defining Jews, *Fullilove,* 448 U.S. at 534 n. 5, 100 S.Ct. at 2804 n. 5, there are no appropriate objective criteria that could be applied. Furthermore, it seems rather flimsy to claim that a wealthy, well-educated, sophisticated individual, undeniably a member of a minority group, may constitutionally be preferred in the government's distribution of broadcast licenses solely on account of his or her ancestry. Therefore, when the government

grants preferences to individuals on the basis of "minority status," determinations of that status, it seems to me, must depend on some notion of individual disadvantage, if not discrimination.

**20.** The race-neutral measures to which the dissent refers—equal employment opportunity rules and ascertainment policies—were not designed to deal with the most significant barriers to minority ownership—lack of information and financing. *Compare* dissent at 947 *with id.* at 937. I thus disagree with the dissent's conclusion that race-neutral methods to address these entry barriers have been found wanting. *See id.* at 948.

no equivalent to a distress sale is available to Shurberg.[21] Although there are five other television stations in the Hartford area, this is by no means a situation in which Shurberg has merely lost one of six comparable opportunities. If the distress sale policy had not been invoked and Faith Center had lost its license, Shurberg could have competed for Channel 18 in a comparative hearing. Because the incumbent licensee, Faith Center, had allegedly violated numerous FCC rules, Shurberg's chances of being awarded (free of charge) the Channel 18 license were much greater than they would have been in the typical comparative renewal evaluation where the FCC awards the incumbent an "enhancement" based on the strength of the renewal expectancy. *See Central Florida Enterprises v. FCC*, 683 F.2d 503, 506–07 (D.C.Cir. 1982), *cert. denied*, 460 U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983).[22] Shurberg's only alternatives would be to purchase a station in the open market, assuming one is available, or hope that a new station is licensed in Hartford—something the Commission has indicated no intention of doing.[23] To label, as does the dissent, Shurberg's lost opportunity for a license as a mere potential "windfall" is to belittle the hardship that he suffers in losing that unique opportunity solely because of his race.

The dissent argues that the policy is narrowly tailored because only thirty-three stations were transferred to minorities through this technique since 1978. Dissent at 36. That is, as the dissent observes, a small percentage of the total broadcast licenses held in the United States, although I do not know what percentage of recent license transfers this number represents. But, in any event, this is not a facial challenge as in *Fullilove*, and these statistics are of little consequence to Shurberg; the burden on him is not lessened because only thirty-three other stations have been transferred by this technique. There is no reason to conclude that he shares a community of interest with other nonminority station owners spread throughout the country that might cushion his adverse treatment. It is a Hartford station Shurberg wants and, after all is said and done, he has been absolutely denied an opportunity to compete for one merely because of his race. A chance to compete for a license elsewhere in the country is not an equivalent opportunity for Shurberg. As an applicant for a license outside of Hartford, he would be at a material disadvantage because of the competitive enhancement the FCC accords applicants with ties to the local community. *See West Michigan Broadcasting Co. v. FCC*, 735 F.2d 601, 606 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1027, 105 S.Ct. at 1392, 84 L.Ed.2d 782 (1985).

Shurberg's situation is also analogous to the nonminority employees in *Wygant*. Like the layoff provision in *Wygant*, the operation of the distress sale policy places a direct burden on a small group of individuals: those seeking to enter the broadcast industry in a particular market. The dissent, drawing on *Wygant*, contends that Shurberg's posture is to be compared to a

---

21. A nonminority may be eligible to buy a station at a distress sale price only if the revocation hearing involves bankruptcy or disability. If, as in this case, those particular issues are not implicated, only minority-controlled enterprises are eligible as buyers if the licensee elects to pursue a distress sale. The state of the record makes it difficult for me even to guess at the extent to which nonminorities are excluded, except to say that it is potentially limitless and completely within the control of the FCC. It is, after all, the FCC's exercise of discretion that determines which and how many licenses are designated for revocation hearing, which and how many renewal applications are designated for noncomparative hearing, and which issues are to be heard.

22. The incumbent also has the considerable advantage of being a known quantity, ordinarily one with a record of proven performance, while the challenger usually has to rely on projections and promises. *See Central Florida Enterprises*, 683 F.2d at 507.

23. It is also suggested, dissent at 952, that if Shurberg had conveyed management and control of his company to a qualified minority and retained only a financial interest then that new organization would have been permitted to bid for the station. For that matter he could also have invested in CBS stock or moved to New York and sought a broadcast license there. I fail to see how any of these possible alternatives affect his constitutional claim.

potential new hire, rather than an employee faced with layoff, because Shurberg seeks *entry* into the Hartford broadcast market. Dissent at 951. As noted above, however, the operative distinction cannot be whether one is faced with the loss of a new economic opportunity or loss of an existing one but rather how directly the disadvantage falls on the nonminority. The constitutional distinction between a tolerable and intolerable burden on the innocent turns on the uniqueness and value of the opportunity lost. An existing job has unique characteristics not normally associated with new employment opportunities. But if a nonminority were disqualified from the *only* job currently available in a given community solely because of his or her race, I believe *Wygant*'s reasoning would apply. *See Associated General Contractors v. City and County of San Francisco*, 813 F.2d 922, 936 (9th Cir.1987) (whether a wide-ranging set-aside provision spreads its burden sufficiently depends on each industry's characteristics; if government procurement is important and there are only a few nonminority firms, the burden may be crippling). I conclude that under the standards set forth in *Fullilove* and *Wygant*, the distress sale policy imposes an unfair burden on innocent nonminorities and specifically on petitioner.

## C.

The FCC also justifies the distress sale policy as a means of promoting programming diversity.[24] As I have noted, Justice Powell has recognized that a state interest in the promotion of diversity in an educational setting may be sufficiently compelling to support the use of race-conscious measures in furthering that interest. *See Bakke*, 438 U.S. at 311–15, 98 S.Ct. at 2759–61 (opinion of Powell, J.). Bringing together students from different cultural backgrounds promotes "[t]he atmosphere of 'speculation, experiment and creation' ... so essential to the quality of higher education." *Bakke*, 438 U.S. at 312, 98 S.Ct. at 2759 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring)). In *Bakke*, the state's interest in promoting diversity was strengthened by the First Amendment interests of the school in structuring its educational environment as it sees fit. "Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *Id.* The policy decisions of a school are accordingly entitled to special deference, especially when the school seeks to "achieve a goal that is of paramount importance in the fulfillment of its mission." *Id.* 438 U.S. at 313, 98 S.Ct. at 2760.

At the outset, I recognize that racial or ethnic diversity has been formally identified as a compelling government interest by only one Justice of the Supreme Court in *Bakke*.[25] It is not at all clear, therefore, whether a majority of the Court would concur in that judgment, even in the narrow context of higher education. Indeed, in *Croson*, a plurality of the Court stated that classifications based on race should be "strictly reserved for remedial settings." *Croson*, at ——, 109 S.Ct. at 721; *see also*

24. In addition, the FCC seeks to rationalize its minority distress sale policy with the distinct goal of promoting diversity of ownership without regard to diversity of programming. In its policy statements, the FCC has contended that diversity of ownership is a goal that in and of itself justifies racial preferences. 1978 Policy Statement, 68 F.C.C.2d at 981. Economic diversity of ownership may well be part of the "public interest" that the Commission is authorized to promote. I do not doubt that the Commission may limit multiple ownership so as to diversify control of the public airwaves. But a desire to prevent concentration of ownership cannot justify diversification along racial lines. By itself, racial diversity of ownership is conceptually no different from racial balance in the workplace.

25. Justice O'Connor did make reference to the diversity rationale in her concurring opinion in *Wygant*, 476 U.S. at 286, 106 S.Ct. at 1853, but her opinion for the Court in *Croson* suggests that she would not consider promotion of racial diversity a sufficient justification for a racial set-aside. *See Croson*, at ——, 109 S.Ct. at 721. Justice Stevens does appear to have endorsed Justice Powell's discussion in *Bakke*. *See Croson* at —— n. 1 109 S.Ct. at 733 n. 1 (Stevens, J., concurring).

*id.* at ——, 109 S.Ct. at 735 (Scalia, J., concurring); *cf. id.* at —— & n. 1, 109 S.Ct. at 733 & n. 1, 735 (Stevens, J., concurring in part) (objecting to Court's "premise ... that a governmental decision that rests on a racial classification is never permissible except as a remedy for a past wrong" and stating that "[u]nlike the Court" he would not prohibit race-based decisions for other purposes, such as promotion of diversity.). In light of that, I doubt that the FCC may employ a racial preference in order to promote diverse programming.[26] But even were a majority of the Court to embrace Justice Powell's reasoning in *Bakke*, that holding could not sustain the distress sale policy.

In *Bakke*, Justice Powell saw diversity in institutions of higher education as a compelling state interest that justified racial preferences. It is vital to the educational mission, he concluded, that all students have " 'wide exposure' to the ideas and mores of students as diverse as this Nation of many peoples." *Bakke*, 438 U.S. at 313, 98 S.Ct. at 2760. Crucial to his analysis was the fact that diversity benefited not just the preferred group, but *all* students and eventually the entire nation. Essentially, Justice Powell felt that the state has a compelling interest in requiring students to be exposed to a wide variety of people during their higher education.

We considered the suggested analogy between diversity of student bodies in institutions of higher education and diversity of broadcast programming in *West Michigan Broadcasting Co. v. FCC*, 735 F.2d 601, 614–15 (D.C.Cir.1984). At that time, we concluded that "the FCC's goal of bringing minority perspectives to the nation's listening audiences would reflect a substantial government interest ... that could legitimize the use of race as a factor in evaluating permit applications." *Id.* at 614. For the time being, therefore, our precedent compels the conclusion that there is a compelling government interest in increasing diversity of programming.[27]

Whatever the legal validity of the FCC policy at issue in *West Michigan*, that precedent cannot support the Commission's desire to promote diversity through the distress sale policy, because the FCC itself has determined that there no longer is an inadequate diversity of viewpoints in television programming. The FCC recently determined that the fairness doctrine, aimed at promoting balanced broadcast presentations on matters of public interest, was

**26.** Even under Justice Stevens' broader view of acceptable governmental interests, I doubt whether the FCC's policy is legitimate. The melting pot notion, which Justice Stevens expressed in *Wygant* and reiterated in *Croson,* suggests that "one of the most important lessons that the American public schools teach is that the diverse ethnic, cultural, and national backgrounds that have been brought together in our famous 'melting pot' do not identify essential differences among the human beings that inhabit our land." *Wygant,* 476 U.S. at 313–15, 106 S.Ct. at 1867–68 (Stevens, J., dissenting) (quoted in *Croson,* at ——, 109 S.Ct. at 733 n. 2 (Stevens, J., concurring)). Unlike the state's goal in *Bakke,* which arguably served to *break down* racial and ethnic stereotypes, the FCC's policy does not reinforce the "melting pot" because television viewers never have any knowledge of the race or ethnicity of the various station owners.

**27.** Were I free to reach the question anew, I would find the analogy wanting. It is simply unacceptable, in my view, to say that the government has a role in educating the general public through television broadcasts that is par-allel to its interest in promoting diversity in the educational setting. That is a somewhat Orwellian notion. Through public education, the government has assumed a special function in preparing our youth for participation in society. Justice Powell reasoned that because "[t]he atmosphere of 'speculation, experiment and creation'" is "so essential to the quality of higher education," a university has a compelling interest in ensuring that students are exposed to a diverse group of peers during their formative years. 438 U.S. at 312, 98 S.Ct. at 2759. But there is no indication that Justice Powell contemplated that his reasoning would extend beyond the distinctive context of education where the state legitimately engages in a form of indoctrination. Indeed, Justice Powell indicated that the state's interest in fostering diversity is stronger when students are younger:

It may be argued that there is greater force to these views at the undergraduate level than in a medical school where the training is centered primarily on professional competency. *But even at the graduate level,* our tradition and experience lend support to the view that the contribution of diversity is substantial. *Id.* at 313, 98 S.Ct. at 2760 (emphasis added).

violative of the First Amendment and inimical to the public interest. Obviously, the FCC cannot claim a compelling interest in fostering diversity of programming if such diversity already exists. Yet in disavowing the fairness doctrine, the FCC acknowledged the growth of media outlets that provide information to the citizenry, and abandoned the scarcity rationale as a justification for regulating the broadcast media more stringently than the printed press. *Syracuse Peace Council v. Television Station WTVH*, 2 F.C.C. Rcd. 5043, 5054–55 (1987), *aff'd sub nom. Syracuse Peace Council v. FCC*, 867 F.2d 654 (D.C.Cir. 1989). Similarly, in its brief to this court sitting *en banc* in the *Steele* case, the FCC stated that "[w]ith changes in the broadcast industry over the last decade, the basis for the [race and gender] preference scheme becomes even more remote and the justification even less persuasive."[28] If other media are substitutes for broadcasting for purposes of presenting diverse viewpoints on controversial issues of public importance, thereby rendering the fairness doctrine violative of the First Amendment in the view of the FCC, it seems implausible that the FCC at the same time can have a compelling interest in continuing to promote diverse programming through the distress sale policy.[29]

But, assuming that *West Michigan* survives both *Croson* and the renunciation of the fairness doctrine, and is binding precedent on this point—that the FCC has a compelling interest in seeking racial or ethnic programming diversity when distributing broadcasting licenses—I am still faced with the issue whether a preference for minority ownership (or management) is an appropriate (narrowly tailored) means with which to achieve such programming diversity. The minority distress sale policy does not award a preference for diverse programming. Instead, the policy seeks to promote diversity of programming indirectly by limiting minority distress sale opportunities to broadcasting entities "with a significant minority ownership interest." 1978 Policy Statement, 68 F.C.C.2d at 983. As a means to promote diverse programming, the distress sale policy rests on the questionable premise that minority ownership will by itself lead to minority programming (or programming that might be thought to have a minority perspective).[30] In its brief to us in the *Steele* case, however, the FCC conceded "no record has been established on which to base an assumption that a nexus exists between an owner's race or gender and program diversity."[31] If one of the advantages of racial diversity is to dispel invidious racial generalizations, *see Wygant*, 476 U.S. at 316, 106 S.Ct. at 1869 (Stevens, J., dissenting), it seems passing strange that a policy purporting to promote diversity should itself rest on a racial generalization. Presumably, a wide variety of factors determine a

28. The FCC did not entirely repudiate this position in its *Winter Park* brief, but it came close by defending its preference scheme in a comparative license procedure as a constitutionally sound method of "achieving the compelling government interest—diversity of programming." The FCC also praised its policy implicated in *Winter Park* as a "structural method[ ]" designed to "avoid[ ] government intrusion into regulation of program content."

29. I do not reach the question of whether the broadcast media continue to possess unique qualities sufficient to justify content regulation. I note the FCC's inconsistency on the need for content regulation only because it undermines the "compelling need" of the agency's diversity-based rationale for the distress sale policy. The dissent argues that the 1987 continuing resolution, which prohibited the FCC from reconsidering the distress sale policy, takes precedence over the FCC's decision to discontinue the fair-

ness doctrine and renders the FCC's inconsistency unimportant. The continuing resolution, however, can hardly be characterized as a "congressional determination that the public need for diversity in programming still warrants affirmative protection." Dissent at 944 n. 25. Congress made no factual findings whatsoever concerning the existence or nonexistence of diverse programming in 1987.

30. The dissent terms the distress sale policy "thoughtfully conceived and monitored," dissent at 934, yet there is no evidence that once a sale was concluded the FCC made even the slightest effort to monitor the new station's contribution to minority programming.

31. Once again, I am obliged to point out the FCC's brief in *Winter Park* offers only scanty evidence in support of the existence of such a nexus.

broadcaster's programming proclivities. It seems impossible to say in the abstract that a person's race or ethnic ancestry has a greater effect on his tastes than his profession, religion, or education.

My dissenting colleague insists that our decision in *West Michigan* controls this issue as well, but I find that contention unpersuasive. The Supreme Court's subsequent decisions in *Wygant* and *Croson* undermine *West Michigan*'s determination of a nexus between ownership and programming, and we are thus not bound by *West Michigan* on that issue. *See Dellums v. NRC,* 863 F.2d 968, 978 n. 11 (D.C.Cir. 1988).

The dissent maintains that it is "entirely foreseeable" that minority broadcasters "will have distinct perspectives to convey." Dissent at 944. That statement more-or-less reflects the analysis of *West Michigan,* which held that the FCC may rely on a "[r]easonable expectation" that minority owners are likely to increase diversity of content. *West Michigan,* 735 F.2d at 610 (reaffirming *TV 9, Inc. v. FCC,* 495 F.2d 929, 937–38 (D.C.Cir.1973), *cert. denied,* 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974)).[32] I take that reasoning to be an assertion of common sense rather than an empirically supported proposition; as such it is simply another way of expressing racial or ethnic stereotypes. That kind of "sense," it seems to me, is all *too* common and has been explicitly disavowed by the Supreme Court. In *Wygant,* the Jackson Board of Education sought to justify a racial preference in teacher layoffs by citing the need to provide minority role models for its minority students. The Court rejected the Board's justification and re-

fused to subscribe to the theory that "black students are better off with black teachers." 476 U.S. at 276, 106 S.Ct. at 1848. This kind of stereotyping, the plurality remarked, "could lead to the very system the Court rejected in *Brown v. Board of Education.*" *Id.; see also Bakke,* 438 U.S. at 310–11, 98 S.Ct. at 2759 (opinion of Powell, J.) (rejecting proposition that minority doctors are more likely than nonminority doctors to be interested in the medical problems of disadvantaged minorities).

The Court in *Croson* reiterated the impermissibility of stereotyping. Justice Stevens remarked that "the Richmond City Council has merely engaged in the type of stereotypical analysis that is a hallmark of violations of the Equal Protection Clause." *Croson,* at ——, 109 S.Ct. at 733–34 (Stevens, J., concurring). In my view, that is exactly what this court in *West Michigan* (and subsequently the FCC) has done by relying on a "reasonable expectation," without any supportive findings, that every minority owner will produce minority programming. As the Supreme Court aptly put it, "[a]bsent such findings, there is a danger that a racial classification is merely the product of unthinking stereotypes or a form of racial politics." *Id.* at ——, 109 S.Ct. at 732. And certainly, a desire to avoid the bureaucratic effort required to consider whether individual license applicants will increase diversity of programming cannot justify a racial generalization. *Id.*

If we simply assume that individual minority members have a comparative advantage in devising programs that appeal to their own racial or ethnic group, we would

---

**32.** Ironically, the FCC itself formerly took the position that minority preferences should be granted only after the minority applicant demonstrated a nexus to program diversity, but it was ordered by this court to assume that minority ownership would foster program diversity. *TV 9, Inc. v. FCC,* 495 F.2d 929, 937–38 (D.C.Cir. 1973), *cert. denied,* 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974); *Garrett v. FCC,* 513 F.2d 1056, 1062–63 (D.C.Cir.1975); *see* Notice of Inquiry, MM No. 86–484, 52 Fed.Reg. at 596 (1987). Our decision in *TV 9,* which did not involve a constitutional question and was rendered before any of the Supreme Court's affirm-

ative action decisions, offered no support for such a nexus. Its only authority for the proposition that ownership influences content was a citation to commentary which conceded that "the proposition does not lend itself to empirical analysis," and, in any event, only addressed whether diversity would be enhanced by increasing the *number* of owners (thereby minimizing concentration of ownership) not whether the *race* of an owner somehow affected programming content. *TV 9,* 495 F.2d at 938 n. 31; *see* Note, *Media and the First Amendment in a Free Society,* 60 Geo.L.J. 871, 896, 1006 (1972).

be obliged to accept the dangerous corollary assumption that members of the white majority have the opposite comparative advantage. But we have encountered and rejected that assumption in *Beaumont Branch of the NAACP v. FCC*, 854 F.2d 501, 510 (D.C.Cir.1988). There, we remanded and directed the FCC to hold a hearing, *inter alia*, to determine whether a station owner's excuse for his sharply-reduced black employment—that blacks were not interested in or suitable for a new country and western music format—was supportable.

In any event, it is not at all apparent why a station owner, be she minority or nonminority, would make programming decisions according to her personal tastes rather than in response to the demands of the marketplace. In its *Steele* brief, for example, the FCC explained that it has determined in a series of rulemaking proceedings that market forces are the primary creators of diverse programming.[33]

It is also argued that Congress made findings that support the nexus between program diversity and minority ownership when it approved a lottery system for the selection of broadcast licenses. *See* H.R. REP. No. 765, 97th Cong., 2d Sess. (1982). Although the holding of *Fullilove* is that Congress may act to remedy past discrimination based upon less particularized historical evidence than would be required of another governmental body or a court of law, it is not clear whether the same authority exists outside the remedial context.

Whatever its authority, the House conference report regarding the lottery system is not instructive as to the existence of a nexus between program diversity and minority ownership. Significantly, the report does not purport to make historical findings of fact, as did Congress in enacting the set-aside plan at issue in *Fullilove*. Rather, the statements concerning the existence of a nexus between ownership and programming are in the nature of *predictions* as to future behavior. Nowhere in the House report is there evidence presented of a nexus between program diversity and minority ownership, nor is there reference to evidence upon which the committee drew. There are simply assertions that the former will follow from the latter. *See, e.g., id.* at 40 ("The nexus between diversity of media ownership and diversity of programming services has been repeatedly recognized by both the Commission and the courts.");[34] *see also* dissent at 946 (conceding that evidence is merely "anecdotal").

The closest thing to an actual historical finding is that "the Conferees find that the effects of past inequities stemming from racial and ethnic discrimination have resulted in a severe underrepresentation of minorities in the media of mass communications, as it has adversely affected their participation in other sectors of the economy as well." H.R.Rep. No. 765, 97th Cong., 2d Sess. 43 (1982). This finding of "underrepresentation" does nothing to establish the nexus between minority owner-

---

**33.** The dissent complains that Congress is "between a rock and a hard place," dissent at 946, because, on the one hand, it cannot under the First Amendment directly ensure a certain kind of programming or viewpoint diversity, and, on the other hand, the distress sale policy violates the Fifth Amendment because there is no evidence that the policy *will* ensure diverse programming. The rock and the hard place hardly seem so ominous, however, when one realizes that they are actually two constitutional provisions. It may simply be that diversity of programming is not a sufficient basis to justify this racial preference, because ensuring diverse content of radio broadcasts is not a permissible goal under the First Amendment, much less a compelling governmental interest under the Fifth. The apparent implication of Chief Judge Wald's reasoning is that Congress and the FCC

may *indirectly* do what the First Amendment prevents them from doing *directly* in order to justify a plan that would otherwise violate the Fifth Amendment.

**34.** As noted above, *see supra* note 32, the FCC originally insisted on a case-by-case determination as to whether a minority owner would enhance programming diversity, but was ordered by this court, without supporting evidence, to assume that nexus. *See TV 9, Inc. v. FCC*, 495 F.2d 929, 937–38 (D.C.Cir.1973), *cert. denied*, 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974); *Garrett v. FCC*, 513 F.2d 1056, 1062–63 (D.C.Cir.1975). In an unfortunate parody of reasoning, Congress apparently relied on the *TV 9* decision, and its progeny in the FCC and this court, to document the disputed nexus.

ship and diverse programming. Indeed, the report goes on from there to discuss the role of minorities in the economy rather than in the programming area. *Id.* at 44.

I respectfully submit that my position—concerning the effect to be given the House conference report—is hardly "judicial presumptiveness," dissent at 940, or a "belittlement of Congress," dissent at 946 n. 29, as the dissent accuses. Rather, to defer to such *ipse dixit* would be judicial abdication. If my dissenting colleague is correct, and mere congressional assertion without the support of any material developed in congressional hearings is adequate to justify a system of distribution of broadcast licenses based on race, then the Supreme Court's language in *Fullilove* focusing on the evidence of discrimination in government contracting that was brought before Congress was just empty rhetoric.[35] Congress, under that view, can instead command that government agencies award benefits or privileges to American citizens based on simple racial stereotypes. I do not believe that is sound constitutional law.

In my view, therefore, the FCC's attempt to justify the distress sale policy through analogy to the diversity goal recognized as compelling by Justice Powell in *Bakke* is inadequate. However, even assuming the dissent's view that the FCC has cleared all the hurdles I have described, the distress sale policy clearly fails the *Bakke* test for narrow tailoring.

In *Bakke,* Justice Powell condemned the use of a racial preference designed to promote diversity when race was the *only* factor considered in certain admissions decisions:

> The diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element. Petitioner's special admissions program, focused *solely* on ethnic diversity, would hinder rather than further attainment of genuine diversity.

*Bakke,* 438 U.S. at 315, 98 S.Ct. at 2761 (footnote omitted).[36] Justice Powell distinguished more flexible programs for promoting academic diversity. In particular, he pointed to the Harvard admissions policy, which considered race as one factor in a multi-factor decision, as one that promoted ethnic diversity without disregarding individual rights. Such a program would survive constitutional scrutiny because it would operate in a manner "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant." *Id.* at 317, 98 S.Ct. at 2762. Whatever we might think of the constitutional distinction between a racial quota and a racial "plus-factor," Justice Powell found the difference crucial, and we must look to his opinion—the only one to find promotion of "diversity" a compelling state interest—for guidance.

The distress sale policy shares the same flaw as the special admissions quota struck down in *Bakke.* Instead of considering the broad range of factors that would lead a prospective station owner to contribute to diverse programming, the policy singles out one aspect of diversity and elevates it to determinative status. Shurberg was "foreclosed from all consideration for [the

---

**35.** The dissent mistakenly suggests that I have adopted the approach of Justice Stevens' dissenting opinion in *Fullilove.* Dissent at 940 & n. 15. My concern is not that "judicial review should include a consideration of the procedural character of the decisionmaking process." *Fullilove,* 448 U.S. at 551, 100 S.Ct. at 2812 (Stevens, J., dissenting). That contention has been properly rejected by this court. *National Treasury Employees Union v. Devine,* 733 F.2d 114, 117 n. 8 (D.C.Cir.1984). The problem with Congress' "findings" on the nexus between diversity of ownership and diversity of programming is not that they were made without adequate deliberation but that Congress did not have before it the kind of "direct evidence" that

provided an "abundant historical basis" for the set-aside plan in *Fullilove.* 448 U.S. at 478, 100 S.Ct. at 2774 (opinion of Burger, C.J.). Indeed, Congress did not even purport to rely on any evidence.

**36.** For a telling analytical parallel, see Comment, *FCC Minority Distress Sale Policy: Public Interest v. The Public's Interest,* 1981 Wisc.L.Rev. 365, 389 ("[B]y approving the assignee ... solely on the basis of its minority ownership and basic qualifications, the Commission does a great disservice to its ultimate goal of increasing diversity of programming.").

Hartford station] simply because he was not the right color or had the wrong surname." *Bakke,* 438 U.S. at 318, 98 S.Ct. at 2762 (opinion of Powell, J.). In a particular market, diversity of programming might be best promoted by factors other than a broadcaster's race or ancestry, but the policy makes no provision for taking those factors into account.[37] The FCC does not consider whether aspects of a nonminority's application other than his race suggest that he would add diversity to existing programming. Nor does it examine a minority applicant to determine whether a sale to him or her would indeed lead to an increase in diverse programming.[38]

### D.

What is truly extraordinary about this case is that after the FCC (the creator of the distress sale policy) admitted that it had not adequately established a nexus between minority status and broadcast diversity to withstand constitutional scrutiny and this court, in light of that admission, ordered a remand to enable the FCC to reconsider the issue, Congress intervened with a continuing resolution to prevent the FCC from expending funds to pursue that inquiry in accordance with our remand order. The conference report accompanying the resolution said "[t]he Committee also instructs the Commission to resolve within 60 days all proceedings that have been remanded by the court of appeals, including ... *Shurberg Broadcasting of Hartford, Inc. v. Federal Communications Commission,* No. 84–1600 (D.C.Cir. ordered remanded June 25, 1987)." S. REP. No. 182, 100th Cong., 1st Sess. 77 (1987). Not surprisingly, the FCC complied with congressional direction rather than our remand order, closed the docket in which the *Shurberg* case was considered, and, in accordance with the continuing resolution, reinstated its prior distress sale policy.[39]

---

**37.** This is in contrast to the manner in which minority status is taken into account in comparative licensing hearings. As noted, *supra* at 908 n. 6, I offer no opinion on the constitutionality of minority preference schemes in comparative licensing procedures such as those at issue in *Winter Park,* which are called into question by recent Supreme Court cases. But even in *West Michigan,* we upheld the constitutionality of the FCC's comparative evaluation process largely because "it explicitly provides for examination of a wide variety of traits to assess an applicant's potential for increasing diversity and quality of programming." 735 F.2d at 615. Race is also only a partial determinant in the random selection alternative provided for by Congress in the 1982 amendments to the Communications Act of 1934. *See* 47 U.S.C. § 309(i) (1982).

**38.** When discussing the distress sale policy's effect on nonminorities, the dissent states that "no pre-determined number of stations is reserved exclusively for minority ownership." Dissent at 948. However, a specific, albeit random, group of licenses *are* set aside: all those placed in designated-for-hearing status. Analytically, there is little difference between a specific number being set aside and a specific group being set aside for minority-use only insofar as the set-aside has an impact on nonminorities. In either case, nonminorities are absolutely barred from bidding on some predetermined number of licenses. Whether that number is calculated by percentage or by fortuity—all those stations which are designated for hearing—is of no moment.

**39.** The congressional action is especially troubling because it prevented the FCC from complying with a direct order of this court to resolve the issues described in its Notice of Inquiry concerning the justification for the distress sale policy. The continuing resolution commanded that no funds shall be used "to continue a reexamination of" the distress sale policy, and the Senate Appropriations Committee explicitly directed the FCC "to resolve within 60 days all proceedings that have been remanded by the court of appeals ..., including *Shurberg,* ... in a manner consistent with the policies that mandated incentives for minorities and women in broadcast ownership." S.Rep. No. 182, 100th Cong., 1st Sess. 77 (1987). By its action, not only has Congress prevented the FCC from attempting to muster factual support for a position that it conceded was impermissible on the present record, but it has placed the FCC in a situation where it was obligated to disregard an order of this Court. Congress' action thus carries serious constitutional implications, because there is little difference between stripping a court of jurisdiction and stripping the Executive Branch or an independent agency of authority to comply with orders of the court. *Cf. United States v. Klein,* 80 U.S. (13 Wall.) 128, 145, 20 L.Ed. 519 (1872) (Congress exceeds power under exceptions clause when "language of the [statute] shows plainly that it does not intend to withhold jurisdiction except as means to an end."); *Ex Parte McCardle,* 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1869).

My dissenting colleague draws on the continuing resolution to support the claim that there is a nexus between diversity of ownership and diversity of programming. I fail to see, though, how congressional statements made in 1987 can be relevant to the question whether the distress sale policy was constitutional as applied to Shurberg in 1984. Congress cannot, after the fact, change a law that had effect three years earlier.[40] Moreover, the terse 1987 report of the Senate Appropriations Committee would add little foundation for the distress sale policy even if it were relevant, because it consists merely of an assertion that "[d]iversity of ownership results in diversity of programming and improved service to minority and women audiences." S. REP. No. 182, 100th Cong., 1st Sess. 76 (1987). The 1987 report itself relies primarily on the House conference report from 1982, *see* opinion of MacKinnon, J., at 931–33, which fails to establish the required nexus for reasons discussed earlier. *See supra* at 923–24.

\* \* \* \* \* \*

In sum, the FCC has a policy in search of a justification. While the Commission claims to be principally pursuing diversity of programming, it uses racial stereotypes as a proxy for such diversity, and alternatively relies for support on congressional authority to remedy the effects of past racial discrimination. The dissent purports to rely exclusively on the diversity rationale, but seeks to strengthen the FCC's position with references to remedial goals and authority. Whichever purposes actually motivated the FCC, the policy cannot withstand equal protection scrutiny.

It is doubtful that the FCC has a compelling interest in fostering programming diversity, and even if it does, the agency has failed to show that there exists a nexus between minority ownership and diversity of program content. Nonminorities interested in particular licenses are completely excluded by the operation of the policy, and

it therefore fails the requirement of narrow tailoring enunciated in *Bakke*.

The remedial rationale fares no better. The historical basis for the plan is only general findings of underrepresentation, which might not even be a result of "societal discrimination" as used by the Court in *Croson*. If "remedial," as used in *Croson*, carries the soft imprecise meaning that Chief Judge Wald suggests, *see* dissent at 953 n. 48, there really is no constitutional barrier to Congress legislating racial and ethnic proportional representation for beneficiaries of government programs or federal employees. In any event, the distress sale policy is not narrowly tailored to remedy past discrimination, because its effect is unrelated to the need for such a remedy, and it provides no procedures for ensuring that the policy's beneficiaries have actually suffered from the effects of past discrimination. There is no indication, moreover, that the FCC sought to employ race-neutral programs to aid minorities before resorting to a racial set-aside. Finally, the distress sale policy imposes a heavy burden on innocent minorities by completely depriving them of opportunities to compete for unique television outlets.

Shurberg challenged the constitutionality of the distress sale policy only as a last resort in this proceeding and only after years of seeking an opportunity to compete openly and fairly for a television license in Hartford. We too have sought, procedurally and analytically, to avoid deciding this important constitutional question. I think, however, that I have no alternative now but to conclude that the FCC's distress sale policy as applied to Shurberg is unconstitutional.

MacKINNON, Senior Circuit Judge (concurring in judgment):

Alan Shurberg and Shurberg Broadcasting Company of Hartford, Inc. (Shurberg) petition for review of the decision of the

---

**40.** It is the impossibility of retroactive effect that renders the continuing resolution irrelevant to this litigation. Congress might be able to dictate a new rule for *prospective* application to a pending dispute. *See Multi–State Communi-* *cations, Inc. v. FCC,* 728 F.2d 1519 (D.C.Cir. 1984). In saying that I "dismiss[ ] the entire episode," dissent at 946, my colleague apparently overlooks the distinction between prospective and retroactive effect.

Federal Communications Commission (FCC or Commission) permitting Faith Center, under the Commission's minority distress sale program,[1] to sell its Hartford broadcast properties to Astroline Communications Company Limited Partnership (Astroline), a minority (Hispanic) controlled enterprise. Shurberg challenges the FCC decision on several grounds. His constitutional challenge alleging that the sale to Astroline under the distress sale program violates equal protection as guaranteed by the Fifth Amendment[2] warrants a reversal of the Commission's decision on the ground that it does not satisfy the "narrowly tailored" requirement of equal protection analysis.

## I. Facts

Prior to 1977 Faith Center, Inc. (Faith Center) held licenses in various cities to operate three television stations and one FM station. However, Faith Center solicited funds that were not used for the purpose described in its broadcasts which re-

sulted in the revocation of all its licenses except WHCT–TV in Hartford, Connecticut whose license had been designated for revocation hearing. The first two attempts by Faith Center to make distress sales of WHCT–TV failed due to the minority purchasers' inability to obtain financing. After these two failed attempts, Shurberg attempted to have an open comparative hearing but his petition was denied by the FCC. Subsequently, the Hartford station and license were transferred to Astroline in a non-competitive proceeding pursuant to the Commission's distress sale policy which promotes minority participation in the ownership of broadcast properties.[3] The transaction was consummated on January 23, 1985. Thereafter the case came before this court for review on a Petition by Shurberg and eventually, in response to the request of the Commission, the *record,* not the "case," was remanded to the FCC. With the case in that status at the end of the

---

**1.** The FCC's distress sale policy to promote Minority Ownership of Broadcasting Facilities, 68 F.C.C.2d 979, as expanded and reaffirmed in 1982 provides:

> The distress sale policy allows broadcasting licensees whose licenses have been designated for revocation hearing, prior to the commencement of a hearing, to sell their station to a minority-owned or controlled entity, at a price "substantially" below its fair market value. A licensee whose license has been designated for hearing would ordinarily be prohibited from selling, assigning or otherwise disposing of its interest, until the issues have been resolved in the licensee's favor. Thus, extension of the tax certificate and distress sale policies fosters minority ownership by providing broadcast licensees with an incentive to transfer their interests to minority-owned or controlled entities. *Id.,* at 851.

*In the Matter of Commission Policy Regarding the Advancement of Minority Ownership in Broadcasting,* 92 F.C.C.2d 849, 861. The stated objective was to increase diversity programming to serve First Amendment principles and to reflect minorities' tastes and viewpoints. *Id.* at 850. The Commission also reported:

> Since 1978, we have approved 27 distress sales and 55 tax certificates,* which have contributed significantly to increased minority ownership in broadcasting.... [The amendment of the] distress sale policy marks a departure from our long established practice of prohibiting a licensee in a renewal or revocation hearing from disposing of its interests prior to the resolution of issues in its favor.

---

* Tax certificates authorized by 26 U.S.C. § 1071 permit sellers of broadcast properties to defer capital gains taxation on a sale whenever the sale was "necessary or appropriate to effectuate a change in a policy or the adoption of a new policy by the Commission with respect to the ownership and control of radio broadcasting stations ..." The policy arose originally in connection with divestitures imposed by the Commission's multiple ownership rules. *Id.* at 852, 858.

The 1978 policy statement requiring the distress sale price to be substantially below its fair market values was expanded in 1980 to limit the licensee's recovery to not more than 75% of the station's fair market value. *Lee Broadcasting Corp.,* 76 F.C.C.2d 462 (1980).

**2.** *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

**3.** *See* n. 1. Since its adoption in 1978, 38 distress sales have been approved by the Commission and the overall effort of fostering minority ownership has been moderately successful. See *Distress Sales Approved,* copies available from FCC Consumer Assistance and Small Business Division, Office of Public Affairs (updated October 18, 1988). Astroline states that the number of minority controlled stations acquired by all means has nearly doubled from less than one (1) percent in 1977 to now close to two (2) percent of all broadcast properties licensed by the Commission. (Astroline Brief, p. 5, n. 3).

1987 term of Congress, the following rider was attached to Congress' Continuing Resolution, approved December 22, 1987:

> That none of the funds appropriated by this Act shall be used to repeal, to retroactively apply changes in, or to continue a reexamination of, the policies of the Federal Communications Commission with respect to comparative licensing, distress sales and tax certificates granted under 27 U.S.C. 1071, to expand minority and women ownership of broadcasting licenses, including those established in Statement of Policy on Minority Oownership of Broadcast Facilities, 68 F.C.C.2d 979 and 69 F.C.C.2d 1591, as amended 52 R.R.2d 1313 (1982) [sic [4]] and *Mid–Florida Television Corp.*, 60 F.C.C.2d 607 Rev. Bd. (1978) [sic [5]], which were effective prior to September 12, 1986, other than to close MM Docket No. 86–484 with a reinstatement of prior policy and a lifting of suspension of any sales, licenses, applications, or proceedings, which were suspended pending the conclusion of the inquiry....

On February 9, 1988 the FCC issued an Order in *Faith Center, Inc.* BC Docket No. 80–730 which included the following:

> In compliance with this litigation [set forth above], the Commission has ordered MM Docket No. 86–484 closed, thereby terminating the reexamination of its licensing policies based on racial, ethnic or gender preferences. *Order*, FCC 88–17, adopted January 14, 1988. In order to comply with the legislation fully, the Commission also ordered that its licensing policies based on racial, ethnic or

gender preferences that were in effect prior to September 12, 1986, be reinstated and that the presiding Administrative Law Judges, the Review Board, and the Office of the General Counsel process all licensing cases in a manner consistent with Commission policy in effect prior to September 12, 1986. *Id.*[4]

The FCC then denied Shurberg's application for a comparative hearing and Shurberg now seeks review by this court of the Commission's Order. Shurberg complains of being denied a comparative hearing, alleges that *ex parte* contacts tainted the validity of the proceedings, and attacks the Commission's application of its minority distress sale policy to him. However, the case has leveled down to a constitutional attack on the distress sale policy.

## II. CONSTITUTIONAL ANALYSIS

As others have noted,[5] the Supreme Court opinions on the constitutionality of minority preference programs are unclear and disjoined. The four principal cases— *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); *City of Richmond v. J.A. Croson Co.*, —— U.S. ——, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (citations to Slip Opinion) have spawned a multitude of separate and diverse opinions. Only portions of Justice O'Connor's *Croson* opinion commanded a majority of the Court.[6] Con-

---

**4.** The congressional ban on reexamination of the FCC's distress sale policy was reenacted in 1988. 134 Cong.Rec. S–10,004 (Daily ed. July 7, 1988).

**5.** *See*, Silberman, at 910. Dissent at 934.

**6.** *Johnson v. Transportation Agency*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), is not strictly applicable to the constitutional analysis that is required here. *Johnson* is a Title VII case which expressly recognized that Title VII analysis differs from constitutional analysis. 480 U.S. at 627–28 n. 6, 107 S.Ct. at 1449–50 n. 6. However, applying *Johnson*'s Title VII requirements, which are analogous to constitutional analysis required here, the FCC's minority dis-

tress sale program is flawed. In *Johnson*, the Transportation Agency implemented an affirmative action program in which the sex of a job applicant could only be taken as one factor in an employment decision, and the Court relied heavily on the fact that, under the program, sex or race was considered as a mere plus factor in the evaluation process:

> [T]he Plan merely authorizes that consideration be given to affirmative action concerns when evaluating qualified applicants.... [T]he Agency Plan requires women to compete with all other qualified applicants. *No* persons are automatically excluded from consideration; *all* are able to have their qualifica-

sequently, my colleagues have drawn differential conclusions from those wide ranging opinions. The task, therefore, is to fashion an opinion based on the soundest reasoning in the minority preference cases. In my opinion, generally following Justice Powell's reasoning in the first three principal cases [7] and the *Croson* majority is the superior approach to solving the troublesome issues presented by minority preference programs.

Some broad settled principles can be sifted from the Court's decisions on minority preference programs. First, "benign" racial or ancestoral distinctions are given the same standard of review as invidious classifications. *Croson*, — U.S. at ——, 109 S.Ct. at 721 (O'Connor, J.), 109 S.Ct. 735 (Scalia, J.). *Wygant*, 476 U.S. at 273, 106 S.Ct. at 1846; *Fullilove*, 448 U.S. at 491, 100 S.Ct. at 2781 (Burger, C.J.); *Bakke*, 438 U.S. at 291–299, 98 S.Ct. at 2748–53 (Powell, J.).[8] That standard is

strict scrutiny. *Croson* at ——, 109 S.Ct. at 721 (O'Connor, J.), ——, 109 S.Ct. 735 (Scalia, J.). Such examination has two phases: 1) "The racial classification 'must be justified by a compelling government interest.'" *Wygant*, 476 U.S. at 224, 106 S.Ct. at 1818 quoting *Palmore v. Sidoti*, 466 U.S. 429, 432, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984); *Croson* at ——, 109 S.Ct. at 720 (O'Connor, J.). 2) The government program used to achieve its objective must be "narrowly tailored." *Croson* at ——, 109 S.Ct. at 728; *Fullilove*, 448 U.S. at 480, 100 S.Ct. at 2775; *Wygant* at 274, 106 S.Ct. at 1847. A narrowly tailored preference program must have two characteristics.[9] First, the program must bear some relationship to the compelling state interest it seeks to vindicate. *Fullilove*, 448 U.S. at 514–15, 100 S.Ct. at 2793 (Powell, J.).[10] Second, the program must operate to minimize its burden on innocent nonminorities. *Wygant*, 476 U.S. at 282–84,

tions weighed against those of other applicants.
*Johnson*, 480 U.S. at 638, 107 S.Ct. at 1455 (emphasis in original).
The FCC's minority distress sale program works precisely to the opposite end since it takes a broadcast license completely out of the normal competitive licensing process and all nonminority individuals, Shurberg included, are automatically excluded from competing. The minority's status here is not merely a small plus factor. Rather, it is the determinative factor that deprives all nonminorities of any opportunity to compete. Thus, the virtues Justice Brennan found in the narrowly tailored Transportation Agency Plan point out the vices in the untailored FCC minority distress sale program.

7. Choper, *Continued Uncertainty as to the Constitutionality of Remedial Racial Classifications: Identifying the Pieces of the Puzzle*, 72 Iowa L.Rev. 255 (Jan. 1987).

8. As stated in *Croson*: "[T]he mere recitation of a 'benign' or legitimate purpose for a racial classification, is entitled to little or no weight." *Croson* at ——, 109 S.Ct. at 724. (Citing *Weinberger v. Wiesenfeld*, 420 U.S. 636 at 648, n. 16, 95 S.Ct. 1225 at 1233, n. 16, 43 L.Ed.2d 514 (1975) which, as here, involved the due process clause of the Fifth Amendment.). Thus, there is no difference, in this respect, between pronouncements of "benign" purpose by Congress or state legislatures.

9. The Supreme Court has not explicitly held that a race conscious program aimed at promoting diversity must be structured to minimize the burden on innocent nonminorities. It is quite

difficult, however, to conclude that the Court would not impose such requirement where the constitutional right to equal protection is involved. The best explanation for the Court's failure to so act is that Justice Powell's opinion in *Bakke* is the only prior consideration given to the issue as to whether promoting diversity is a justification for a race conscious program. Consequently, the Court has not had the occasion to develop or apply the narrowly tailored doctrine explicitly to promoting diversity. Because the minority distress sale policy imposes the same injury on innocent nonminorities regardless of whether the justification asserted for the affirmative action program is to promote diversity or to remedy past discrimination, it is logical that the no undue burden test would apply with equal force in both cases.

10. The dissent in n. 46 recognizes "that Faith Center's misconduct was unrelated to racial discrimination. [And then asserts] [S]urely this can make no difference." But it does. It points out that this award does not even remedy one instance of racial discrimination. While it is not required that the "resources themselves must be the product of past discrimination," if they had been, the minority distress sale program would have remedied some identifiable past discrimination, but not even that justification exists here. The minority distress sale program presents opportunities that are not dependent on any past discrimination—societal or specific. Therefore, the program bears no relationship to the asserted governmental interest in remedying past discrimination as required by *Fullilove*. 448 U.S. at 514–15, 100 S.Ct. at 2793 (Powell, J.).

106 S.Ct. at 1851–52; *Fullilove,* 448 U.S. at 515, 100 S.Ct. at 2793. (Powell, J.).

The two contentions asserted in support of the constitutionality of the Commission's distress sale policy are that it remedies past societal discrimination and promotes programming diversity. Dissent op. 939, 952.[11] Because the Commission's distress sale program is not narrowly tailored to achieve either of its required objectives, the program, in my opinion, fails to meet constitutional requirements.

### A. The Untailored Effect

The distress sale program is not only not "narrowly tailored," it is a completely untailored program. That is, the program is open-ended in that circumstances may cause it to be applied to any broadcast licensee without regard to any past discrimination and thereby deprive all nonminorities of their right to equal access to a broadcast license. The FCC program thus

denies the equal protection of the law to innocent nonminorities.

The licenses of thirty-eight stations have been subjected to the minority distress sale program.[12] While the number of stations is not great, the value of the stations involved run well into the millions. For instance the license renewals of RKO's highly valuable TV stations in Boston, New York and Los Angeles were denied,[13] (not on grounds of discrimination), and they could have been transferred under the minority distress sale program, the FCC consenting. Had the program been in effect in 1971, the *Greater Boston* station could also have been brought under the distress sale program.[14] Rupert Murdoch's television station in Boston might also have been brought under the distress sale policy as a result of the well publicized legislative intervention in the application of the FCC's change of policy with cross-ownership rules. *See, News America Publishers, Inc. v. FCC,* 844 F.2d 800 (D.C.Cir.1988).

---

**11.** The question of whether promoting programming diversity and remedying societal discrimination constitute compelling government interests need not be reached here. In *City of Richmond v. Croson Co., supra,* Justice O'Connor's plurality opinion held open the possibility that Congress, pursuant to its power under Section 5 of the 14th Amendment, may legislate race-conscious programs on grounds which the several states may not. *Croson* at ——, 109 S.Ct. at 720. Justice Kennedy's concurrence, however, pointedly challenged Justice O'Connor's assertion that Congress may legislate to remedy society discrimination and noted that such a case "is not before us, any reconsideration of that issue must await some further case." *Croson,* at ——, 109 S.Ct. at 734 (Kennedy, J.).

On the issue of promoting programming diversity, the dissent and Judge Silberman have some disagreement. In *Bakke,* Justice Powell held that promotion of diversity in the school/university context constituted a compelling state interest. 438 U.S. at 311–313, 98 S.Ct. at 2759–60 (Powell, J.). Outside of past governmental discrimination, the Court has not recognized any other governmental interest as compelling. Yet, as the dissent observes, Justice O'Connor's *Wygant* opinion explicitly holds open the possibility that "lower courts" could rely on other interests sufficiently compelling "to sustain the use of affirmative action policies." *Wygant,* 476 U.S. at 286, 106 S.Ct. at 1853 (O'Connor, J.). The dissent contends that this Circuit's holding in *West Michigan Broadcasting v. FCC,* 735 F.2d 601, 614–15 (D.C.Cir.1984), recognized the promotion of programming di-

versity as an interest sufficiently compelling to "sustain the use of affirmative action policies" and this court is bound by *West Michigan.* Dissent at 941. Judge Silberman reluctantly accepts the holding in *West Michigan* that programming diversity constitutes a compelling state interest. He considers such contention to be "a somewhat Orwellian notion." Silberman, J. at 920, n. 27. In this context, it is significant to note that Justice O'Connor's *Croson* plurality opinion indicates that racial classifications should be "strictly reserved for remedial settings" in order to avoid fueling racial animosities. *Croson* at ——, 109 S.Ct. at 721 (O'Connor, J.). This case does not involve a "remedial setting."

Because the minority distress sale program is not narrowly tailored, it is not necessary in this opinion to reach the question whether either promoting programming diversity or remedying societal discrimination are a sufficiently compelling governmental interest to support the use of government sponsored minority preference programs.

**12.** *See Distress Sales Approved,* copies available from FCC Consumer Assistance and Small Business Division, Office of Public Affairs (updated October 18, 1988).

**13.** *See RKO General, Inc. v. FCC,* 670 F.2d 215 (D.C.Cir.1981) (license renewal denied for corporate misconduct).

**14.** *Greater Boston Television Corporation v. FCC,* 463 F.2d 268 (D.C.Cir.1971) (license renewal denied for improper *ex parte* contacts).

Thus, in judging whether the program is narrowly tailored consideration should be given not only to the number of stations that have been affected but also to the value and share of the broadcast market of the stations that could be brought under the program with a resulting large subsidy.[15] The minority distress sale program presents opportunities for minorities to be insulated from all competition and to receive very substantial subsidies that are not in any way related to past discrimination. The number of licenses which become available for distress sales under the minority program is wholly fortuitous, being dependent upon decisions by third party licensees whose practices run afoul of FCC requirements.[16]

This case presents a good example of a license becoming subject to the minority distress sales program independent of any past discrimination. Here, Faith Center was alleged to have fraudulently solicited funds by not using the funds for the stated purpose in violation of 18 U.S.C. § 1343. 82 F.C.C.2d 1 (1980), *reconsid. denied,* F.C.C. 81–235 (1981), *aff'd mem., Faith Center Inc. v. FCC,* 679 F.2d 261 (1982), *cert. denied,* 459 U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 435 (1983). There is no connection between Faith Center's violation and any past discrimination that is in any way related to the number of licenses which may become available to minorities under the distress sale program. Although, in prac-

tice, only a small number of licenses have been transferred pursuant to the policy, there is no actual limitation, in theory or in practice, on the number of licenses that may be so transferred. Nor is there any requirement that the offense of the licensee be in any way related to any act of unlawful discrimination. The distress sale program bears no relationship to any alleged past discrimination and, therefore, violates the *Croson* majority position that:

> [B]ecause racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classification be clearly identified and unquestionably legitimate.

*Croson* at ——, 109 S.Ct. at 727, quoting *Fullilove, supra,* 448 U.S. at 533–35, 100 S.Ct. 2903–04 (Stevens, J., dissenting) (footnotes omitted).[17]

Likewise, because the distress sale program has no limits of any character it is not sufficiently tailored to the goal of promoting programming diversity. Compliance is voluntary and the program contains no assurance that any programming diversity will be achieved.[18] Thus, the FCC, subject only to the broad public interest standard, has unfettered discretion in approving distress sales.

The Silberman opinion also contends that the distress sale program, as a means of

**15.** The dissent contends that objecting to the minority distress sale program on the grounds that there is no limit to the number of licenses the program may reach is "perverse" in light of the relatively few distress sales over the previous ten years. Dissent at 950 n. 40. This attack misses the thrust of the argument; the lack of numerical limits on the program is but one aspect of the untailored nature of the minority distress sale policy. In addition to the lack of any numerical limit on the program, there is no limitation whatsoever as to the value, size or market share of affected stations, or the need for prior discrimination by the licensee. In this way, the program is untailored in any respect and completely obliterates the constitutional rights of all nonminorities seeking a license. It never places minority status as merely one plus factor for the Commission to weigh in licensing as *Johnson v. Transportation Agency,* 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), did

in employment. Rather minority status is elevated to the determinative factor.

**16.** All distress sales of broadcast licenses must be approved by the FCC.

**17.** The classification of American Eskimos, Aleuts and Hispanic *surnamed* individuals as minorities who have been discriminated against in the broadcast licensing field cannot be said to be unquestionably legitimate. "The gross overinclusiveness of Richmond's [the FCC's] racial preference strongly impugns the ... claim of remedial motivation." *Croson* at ——, 109 S.Ct. at 728. *See infra,* at 933 n. 26.

**18.** The dissent states that the small number of distress sales are insufficient to provide empirical data as to whether proper programming diversity is achieved. Dissent at 946. In my view, the small number of distress sales provides a perfect group for such study.

promoting diversity, is not a means that is reasonably related to its goal. Specifically, this argument is that there has been no demonstration of a nexus between minority ownership and programming diversity. In reasoning to its conclusion, this contention discounts Congress' decision expressed in the 1987 appropriations rider [19] to prohibit the Commission from expending funds to investigate whether a nexus exists between programming diversity and minority ownership. The Committee Report stated Congress so acted because it found that there was such a nexus. S.Rep. No. 182, 100th Cong., 1st Sess. 76 (1987).[20] The Silberman opinion doubts whether "mere congressional assertions" may be taken to embody a congressional finding to which courts must defer. Silberman at 922. I have no such doubt. Congress is not required to write legal opinions to justify its legislation. Chief Justice Burger stated in *Fullilove:* "Congress, of course, may legislate without compiling the kind of 'record' appropriate with respect to judicial or administrative proceedings." *Fullilove* at 478, 100 S.Ct. at 2774. *See,* Dissent at 940.

In stating that the 1987 Senate Committee Report was merely assertive, the Silberman opinion is certainly correct. However, the Report also made reference to H.R.REP. No. 765, 97th Cong., 2d Sess., 40 (1982), which clearly, and at some length, detailed the support for the legislative conclusion that there was a nexus between minority ownership and programming diversity. H.R.Rep. at 42.[21] The 1987 Senate Report incorporated the 1982 Report by reference. Given such incorporation, it is difficult to dispute the assertion that Congress found there was a nexus between minority ownership and programming diversity. Such finding, however, does not completely insulate a minority preference program from judicial review.[22] And, as previously stated, that review must be conducted with strict scrutiny.[23] *Croson* ——, 109 S.Ct. at 721 (O'Connor, J.), 109 S.Ct. at 735 (Scalia, J.).

**19.** *Supra,* at 927–28.

**20.** The Report of the Appropriations Committee states:

> The Congress has expressed its support for (minority preference) policies in the past and has found that promoting diversity of ownership of broadcast properties satisfies important public policy goals. Diversity of ownership results in diversity of programming and improved service to minority and women audiences.

S.Rep. No. 182, 100th Cong., 1st Sess. 76 (1987).

**21.** The Report of the Senate Appropriations Committee cites H.R.Conf.Rep. No. 97–765, 97th Cong., 2d Sess. 37–44, 1982, as authority for its assertion that Congress in the past supported minority preference programs for the broadcasting industry. S.Rep. No. 182, 100th Cong., 1st Sess. 76–77 (1987). The cited House Conference Report (1982) is replete with statements outlining its finding that minority preference programs in broadcast licensing promotes diversity in programming. For example, the Report states: "The nexus between diversity of media ownership and diversity of programming services has been repeatedly recognized by both the Commission and the courts." H.R.Conf.Rep. No. 765, 97th Cong., 2d Sess. at 40 (1982). My personal view, which is identical to that asserted by the FCC brief in *Steele v. FCC,* No. 84–1176, discussed below, is that, while undoubtedly there may be some exceptions, market forces largely predominate programming—but the congressional finding controls.

Judge Silberman relies on the FCC's brief in *Steele* as support for his assertion that there is no nexus between minority ownership and programming diversity. Silberman op., at 922–23. The FCC *Steele* brief states:

> No record has ever been developed to support the critical, underlying assumption upon which this preference scheme is necessarily based—that the racial or gender characteristics of a station's [sic] owner will have a significant effect on a station's programming. FCC *Steele* brief at 22.

The brief concluded that "market forces are now and will continue to be, principally responsible for providing diversity of programming and viewpoint." *Id.* at 22–23. The congressional finding, however, eclipses the FCC's argument in *Steele* and the FCC's brief in *Winter Park Communications v. FCC,* Nos. 85–1755 and 85–1765, appears to repudiate its *Steele* brief. In *Winter Park,* the Commission states that its minority preference policy on the competitive licensing process promotes diversity as minority ownership enhances "the public's exposure to significant, diverse groups that make up the nation." FCC *Winter Park* brief at 30.

**22.** *Fullilove* at 473, 100 S.Ct. at 2772. Chief Justice Burger, speaking in a minority preference case, remarked: A congressional program choice or finding does not "render it (the program) immune from judicial scrutiny."

**23.** TAN 5.

## B. Undue Burden on Nonminorities

As a remedy of past discrimination and a means to promote diversity, the minority distress sale program unduly burdens innocent nonminorities. It operates so as to necessarily impact on a discrete class of nonminorities—i.e., every nonminority applicant for a broadcast license in a particular market that is designated for revocation hearing. The effect of this FCC program is particularly damaging because it removes the opportunity to obtain a license in a competitive market that is unlikely to be repeated.[24] Normally, a broadcast license is retained by an incumbent licensee if he so desires; thus, a broadcast license designated for revocation hearing that is unlikely to be renewed presents a rare opportunity for individuals such as Allen Shurberg to attempt to obtain a license in a particular market.[25] The distress sale program takes this opportunity away from every individual who is not classified as a minority as defined by the FCC.[26]

The dissent asserts that since Shurberg did not have a vested ownership interest in the station, he lacked a reasonable expectation of acquiring any license and hence cannot succeed in a constitutional attack on the policy. Dissent at 951–52. This is peculiar reasoning. In my view the fact that he is a valid applicant denied a hearing to his damage permits him to successfully attack the unconstitutional character of the

denial. The dissent analogizes the distress sale program to an affirmative action hiring plan as opposed to a firing plan. Justice Powell's *Wygant* opinion expressed a preference for remedying employment discrimination through hiring plans because they diffused the burden of a race conscious program throughout society instead of disrupting the expectations of a small group with an established interest. 476 U.S. at 282, 106 S.Ct. at 1851.

The dissent's analysis is unpersuasive. While the minority preference plan does not neatly fit into Justice Powell's dichotomy of hiring and firing plans outlined in *Wygant,* the program operates more like a firing plan in that it imposes its burden squarely on a small group of innocent people, like Shurberg, denying them a unique and tangible benefit—the opportunity to compete for a broadcast license that would normally under applicable decisions, the statute and rules be open to a comparative hearing. Communications Act of 1934, 47 U.S.C. § 309(e), amended; *Ashbacker Radio Corp. v. FCC,* 326 U.S. 327, 330, 66 S.Ct. 148, 150, 90 L.Ed. 108 (1945).[27] Thus, the distress sale program completely foreclosed Shurberg from his best and perhaps only genuine prospect of obtaining an ownership interest in Hartford. In this way, the FCC always concentrates the burden of its minority preference program on a single

---

**24.** The dissent "acknowledge[s]" at p. 948 that the minority distress sale program acts to "reserve certain opportunities to minority purchasers alone" and thus, "more closely resembles" the university admissions plan struck down in *Bakke,* rather than a "plus factor" scheme the Court has approved of in other contexts. *See, Bakke,* 438 U.S. at 316–19, 98 S.Ct. at 2761–63; *Johnson v. Transportation Agency,* 480 U.S. 616, 637–39, 107 S.Ct. 1442, 1455–56, 94 L.Ed.2d 615 (1987) (under Title VII analysis).

**25.** Since the FCC implemented the minority distress sale program in 1978, eleven applications for license or license renewals were denied by the Commission. As of Fiscal Year 1987, the FCC licensed 11,493 broadcast stations, 9,847 of which were commercial stations. *See,* Federal Communications Commission 53rd Annual Report/Fiscal Year 1987, p. 21, 36–37. Additionally, the FCC Report notes that there are 1,489 translator and booster FM stations, and 5,568 translator and low power television stations

which are subject to minority preference programs. *Id.* at 20–21.

**26.** The FCC's 1978 Statement of Policy on Minority Ownership of Broadcasting Facilities defines the groups recognized as having minority status for purposes of the distress sale program as follows: "Black, Hispanic Surnamed, American Eskimo, Aleut, American Indian and Asiatic American Extraction." 68 F.C.C.2d at 781, n. 8 (1978).

**27.** Section 309(e) provides, in part, that upon the Commission finding that a licensee has violated FCC rules, shall: "[F]ormally designate the application [of the licensee] for hearing on the ground or reasons then obtaining and shall notify the applicant and all other known parties in interest of such action.... Any hearing subsequently held upon such application shall be a full hearing in which the applicant and all other parties in interest shall be permitted to participate."

individual or small group in a community that desires a broadcast license and are able to finance the acquisition without being subsidized.

The dissent also argues that the distress sale program does not unduly burden nonminorities because it affects only a fractional percentage of broadcast licenses. Dissent at 952. This argument is a nonstarter because regardless of the impact of the program on the entire market, the burden of hopefully correcting some discrimination and achieving some diversity in programming falls largely on Shurberg in this case and will necessarily exclude *every* nonminority individual in *every* distress sale. These burdened individuals are entitled to the equal protection guaranteed by the Fifth Amendment even though constitutional violations by the program have not yet reached substantial proportions. *Supra*, n. 2.[28] The rights of every man are violated when the rights of one are diminished.[29]

### CONCLUSION

The FCC minority distress sale program thus deprives Alan Shurberg and Shurberg Broadcasting of their equal protection rights under the Fifth Amendment. The program is not narrowly tailored to remedy past discrimination or to promote programming diversity because it unduly burdens Shurberg, an innocent nonminority, and is not reasonably related to the interest it seeks to vindicate.

For the foregoing reasons I join in the judgment of the court, that the minority distress sale program denies Shurberg equal protection under the due process clause of the Fifth Amendment.

WALD, Chief Judge, dissenting:

Congress, governmental agencies, and federal courts have struggled for nearly two decades to define the constitutional limits on affirmative efforts to improve access of minority groups to the mainstream of American life. This case involves a unique type of governmental access program not heretofore passed on by the Supreme Court. The majority's invalidation of the Commission's ten-year old minority distress sale program in my view impermissibly overturns a considered congressional judgment as to the appropriate means of assuring diversity of viewpoint over the national airwaves. In casting off a thoughtfully conceived and monitored program aimed at attaining a legitimate congressionally mandated end, the majority has too rigidly applied Supreme Court affirmative action guidelines designed for other types of programs, ignored firm precedents in this circuit, and failed to credit the explicit intent of Congress.

### I. THE CONSTITUTIONAL STATUS OF GOVERNMENT-SPONSORED MINORITY PREFERENCE PROGRAMS

The United States Supreme Court has issued four decisions concerning the constitutional limitations on voluntary government-sponsored affirmative action programs. *See Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *City of Richmond v. J.A. Croson Co.*, — U.S. —, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).[1] A majority of the Court has squarely held that the remediation of prior racial discrimination is a sufficiently compelling interest to justify the use of racial preferences. Justice Powell's opinion in *Bakke* also recognized as compelling the state's interest

---

**28.** The stakes to the parties involved are certainly substantial. If Shurberg eventually prevails, he will be awarded a license for a station appraised at $6,520,000; if the FCC prevails, Astroline will preserve a $3,420,000 subsidy and Faith Center will salvage $3,100,000 from its lost license.

**29.** President John F. Kennedy.

**1.** *See also Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) (court-ordered plan directed at employment discrimination); *United States v. Paradise*, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (same).

in promoting diversity within the context of higher education.

Within this circuit, moreover, a third interest has been recognized as sufficiently compelling to justify the use of racial preferences. In *West Michigan Broadcasting Co. v. FCC,* 735 F.2d 601 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1027, 105 S.Ct. 1392, 84 L.Ed.2d 782 (1985), this Court upheld the use of race in comparative licensing procedures as part of the Commission's effort "to obtain a diverse mix of broadcasters." 735 F.2d at 613. That decision, of course, is binding precedent except insofar as it is called into question by subsequent decisions of the Supreme Court.[2] In my view, the identification of broadcasting diversity as a compelling government interest is entirely consonant with Supreme Court precedent. The Court has never limited the diversity rationale to the makeup of student bodies. Nor has it held that there exist only two governmental interests sufficiently compelling to justify race-conscious affirmative action. Indeed, Justice Powell's landmark opinion in *Bakke* itself notes three separate state interests in a public university medical school that, if supported by an adequate record, could be considered "compelling": the elimination of identified discrimination, the improvement of public health services, and the promotion of student body diversity. 438 U.S. at 307–14, 98 S.Ct. at 2757–60. Justice O'Connor has also provided a perspective wider than the panel's for our review of this case:

> [A]lthough its precise contours are uncertain, a state interest in the promotion of racial diversity has been found sufficiently "compelling," *at least* in the context of higher education, to support the use of racial considerations in furthering that interest ... *And certainly nothing the Court has said today necessarily forecloses the possibility that the Court will find other governmental interests which have been relied upon in the lower courts but which have not been passed on here to be sufficiently "important" or "compelling" to sustain the use of affirmative action policies.*
> *Wygant,* 476 U.S. at 286, 106 S.Ct. at 1853 (O'Connor, J., concurring) (citations omitted) (emphasis added).

The Supreme Court's recent decision in *Croson* imposed stringent requirements on state and local governments seeking to institute affirmative action programs for the purpose of providing increased economic opportunities for minorities. *Croson,* however, differs from the present case in two fundamental respects. First, *Croson* involved the initiative of a local governmental body, while continued enforcement of the distress sale policy has been mandated by an Act of Congress. Second, the distress sale policy was intended by Congress to enhance public access to diverse broadcast programming—a goal that is quite different from that which the Court addressed in *Croson.* We must therefore bear in mind that the limitations announced in that decision cannot be applied mechanically to the present controversy. Rather, we must carefully analyze the objective the distress sale policy serves, and the constitutional fit of the chosen means to that end, bearing in mind Congress' repeated authorization and endorsement of this program's specific method and goal.[3]

---

**2.** This court's decision in *West Michigan* antedated the Supreme Court's decisions in *Wygant* and *Croson,* and of course *West Michigan* is no longer binding insofar as it conflicts with the higher Court's pronouncements. I do not believe, however, that either *Wygant* or *Croson* undermines our earlier views concerning the compelling nature of the state's interest in broadcasting diversity. *See infra,* pp. 941–43.

I also recognize that the distress sale policy differs in significant respects from the use of race as one element in comparative licensing proceedings. *See infra,* pp. 948–50. Both policies, however, start from the premise that broadcast diversity is a sufficiently compelling state interest to justify the use of racial preferences.

**3.** Appellant argued strenuously before this court that the FCC, in this case, did not follow its own distress sale policy rules and exceeded permissible limits on its discretion to apply the policy in the licensing process. Indeed, in granting Faith Center a third successive opportunity to arrange a distress sale rather than requiring a renewal hearing, the FCC acknowledged that its balancing of the public interest in minority-ownership policies against the public interest in permitting comparative hearings was a "close ques-

## II. DEVELOPMENT OF THE DISTRESS SALE POLICY

In 1965, the FCC[4] publicly proclaimed its commitment to the concept of diversification in ownership and control of the media on the premise that "diversification of control is a public good in a free society." *Policy Statement on Comparative Broadcast Hearings*, 1 F.C.C.2d 393, 394 (1965) [hereinafter *1965 Policy Statement*]. The Supreme Court has upheld the FCC's ownership diversification policies as consistent with the public interest standard and the first amendment goal of promoting diversity of viewpoint:

It was not inconsistent with [the Communications Act of 1934,] therefore, for the Commission to conclude that the maximum benefit to the "public interest" would follow from allocation of broadcast licenses so as to promote diversification of the mass media as a whole.

... "The 'public interest' standard necessarily invites reference to first amendment principles" ... and, in particular, to the First Amendment goal of achieving "the widest possible dissemination of information from diverse and antagonistic sources."

*FCC v. National Citizens Committee for Broadcasting* [*NCCB*], 436 U.S. 775, 795, 98 S.Ct. 2096, 2112, 56 L.Ed.2d 697 (1978) (citations omitted).

The Commission found achievement of its goal of viewpoint diversity through ownership diversity hampered by the dearth of minority broadcasters. As a result of the "exhaustively documented" underrepresentation in the ownership of mass media broadcast facilities, *West Michigan*, 735 F.2d at 603 n. 5, the FCC expanded its diversification policy to encompass a positive effort at attaining minority representation in broadcasting:

Full minority participation in the ownership and management of broadcast facilities results in a more diverse selection of programming. In addition, an increase in ownership by minorities will inevitably enhance the diversity of control of a limited resource, the spectrum.

*Statement of Policy on Minority Ownership of Broadcasting Facilities*, 68 F.C.C.2d 979, 981 (1978) [hereinafter *1978 Policy Statement*].[5] The FCC concluded that "[a]dequate representation of minority viewpoints in programming ... enhances the diversified programming which is a key objective not only of the Communications Act of 1934 but also of the First Amendment." *Id.*

In implementing its policy of diversity of viewpoint through diversity of ownership, the FCC designed the distress sale program as part of a broader strategy for dealing with the "extreme disparity between the representation of minorities in our population and in the broadcasting industry." *1978 Policy Statement* at 982.[6]

---

tion." J.A. at 5, citing *New South Media Corp. v. FCC*, 685 F.2d 708 (D.C.Cir.1982), and *Ashbacker Radio Corp. v. FCC*, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). Had the majority concluded that the FCC acted arbitrarily or exceeded its authority in authorizing the third attempt at a distress sale, it would have avoided the constitutional question altogether. Indeed, it is hard to set how anything short of a fairly compelling interest could justify such repeated postponement of *Ashbacker* comparative hearings.

I note in passing my disagreement with Judge Silberman's contention, *see* Silberman op. at 908 n. 7, that I would not be entitled to address the constitutional question if I did not adopt the FCC's position on the statutory issue. Since a majority of the panel has determined that the constitutional question must be resolved, I reserve my right to express my views, whether or not I would have reached the issue if the choice were mine alone to make.

**4.** In the Communications Act of 1934 Congress empowered the FCC to allocate broadcast licenses in such a way as to serve the "public convenience, interest, or necessity." 47 U.S.C. § 307(a).

**5.** The FCC also reiterated its earlier concern that "diversification ... is additionally desirable where a government licensing system limits access by the public to the use of radio and television facilities." *1978 Policy Statement, supra,* at 981 (quoting *1965 Policy Statement, supra,* at 394).

**6.** The FCC had previously noted that "[d]espite the fact that minorities constitute approximately 20 percent of the population, they control fewer than *one percent* of the 8500 commercial radio and television stations currently operating in this country." FCC Minority Ownership Taskforce, *Minority Ownership in Broadcasting* 1 (1978) [hereinafter *Minority Ownership Taskforce Report*] (emphasis in original).

It added the distress sale policy only after other approaches to increasing minority representation in programming, such as equal employment opportunity rules and ascertainment policies, had not achieved significant results. *Id.*

Administrative law judges had previously been instructed to award a competitive preference to minority license applicants in comparative hearings if the minority owners would actively participate in running the station. Several pending license applications involving a significant minority ownership interest had been expedited. Minority underrepresentation persisted, however, and the FCC's Minority Ownership Taskforce, after careful study, identified the cause in several structural impediments to minority access to broadcasting facilities.

The Minority Ownership Taskforce concluded that the most significant barriers to minority ownership were lack of knowledge of stations up for sale, attributable largely to an "old-boy network" monopoly on such information, and the unavailability of adequate financing for potential minority owners. *See Minority Ownership Taskforce Report, supra,* at 9, 11. Lack of broadcasting experience among potential minority applicants, an inevitable concomitant of persistent underrepresentation in the industry, also blocked their access. As long as these formidable impediments to entry existed, the Taskforce felt that the market would not self-correct so as to afford adequate opportunities for minority ownership.

Responding to the Taskforce Report, the FCC decided that it must deal directly with the identified entry barriers—lack of information and financing. It announced policies to grant capital gains tax deferral certificates to those selling to minority firms [7] and to authorize distress sales to qualified minority purchasers. The FCC designed the distress sale policy to create an incentive for minority-controlled entities to enter the broadcasting field.[8] Pursuant to the policy, the licensee designated for a revocation hearing or one whose renewal application might be in jeopardy on basic qualification issues could, instead of proceeding normally through the hearing process, elect to sell its station to a minority-controlled applicant at a "distress price." [9] Through the distress sale policy, a qualified minority

---

7. The FCC has the authority under § 1071 of the Internal Revenue Code to grant sellers tax certificates to defer capital gains taxation on the transaction. These certificates may be used as incentives to induce sales of broadcast properties to minority owners. *See* 26 U.S.C. § 1071; *Issuance of Tax Certificates,* 19 Rad.Reg. 2d (P & F) 1831 (1970).

8. The distress sale policy is essentially an administrative exception to the general rule that once a licensee's basic qualifications have been called into question by designation for either a revocation or a renewal hearing, the licensee may not voluntarily transfer the license. There have, however, always been exceptions to this rule for bankrupt or disabled licensees. The minority distress sale policy expanded these exceptions to include licensees who would agree to sell at a discount to qualified minority-controlled purchasers.

By 1982, the FCC had approved only 27 distress sales in four years. Finding that the continued underrepresentation of minorities was still a "serious concern" and financing still posed "the single greatest obstacle" to increased minority participation, the FCC modified the distress sale policy further. After reviewing the recommendations of its Advisory Committee on Alternative Financing for Minority Opportunities in Telecommunications, the Commission announced that it would authorize distress sales to limited partnerships so long as the general partner was a member of a minority group and owned more than 20% of the enterprise. The purpose of the amendment was to allow minority entrepreneurs easier access to the necessary capital. *See Commission Policy Regarding the Advancement of Minority Ownership in Broadcasting,* 92 F.C.C.2d 849, 855 (1982) [hereinafter *1982 Policy Statement* ].

In 1985, the FCC began consideration of a further revision of the distress sale policy to allow a licensee to exercise a distress sale option at a later stage in the renewal proceeding. *See* Notice of Inquiry, 50 Fed.Reg. 42,047 (1985). Nonetheless, in the past six years, the Commission has only approved 11 more distress sales, for a modest total of only 38 in ten years.

9. The distress sale policy requires that the sale price reflect no more than 75% of the market value of the broadcast property and license in order to retain the deterrent effect of license revocation hearings. *See Lee Broadcasting Corp.,* 76 F.C.C.2d 462 (1980). Nonetheless, the prospect of even greater loss if a license is revoked gives the current licensee an economic incentive to sell at this discount price to a minority buyer.

applicant would obtain a *special* opportunity to buy a station at a reduced price.

On several occasions Congress has endorsed the FCC's efforts to diversify media control through programs to encourage minority ownership and control.[10] For example, amending the Communications Act in 1982 to authorize the FCC to employ lotteries in lieu of comparative license hearings, Congress specifically provided for special media ownership and minority ownership preferences in order to encourage diverse voices on the airwaves. "The underlying policy objective of these preferences is to promote the diversification of media ownership and consequent diversification of programming content. This diversity principle is grounded in the First Amendment." H.R.Conf.Rep. No. 765, 97th Cong., 2d Sess. 40 (1982). Specifically citing the FCC's *1978 Policy Statement,* in which the FCC announced the minority distress sale policy, the Conference Committee concluded that:

> [An] important factor in diversifying the media of mass communications is *promoting ownership by racial and ethnic minorities* —groups that traditionally have been extremely underrepresented in the ownership of telecommunications facilities and media properties. *The policy of encouraging diversity of information sources is best served* by not only awarding preferences based on the number of properties already owned, but also *by assuring that minority and ethnic groups that have been unable to acquire any significant degree of media ownership are provided an increased opportunity to do so.*

*Id.* at 43 (emphasis added).

Congress again reaffirmed its strong support for the FCC's programs to foster minority ownership in 1987. In its appropriations law for 1988, Congress prohibited repeal or reconsideration of the distress

sale policy and two other minority preference programs. Pub.L. No. 100–202, 101 Stat. 1329 (1987).[11] *See also* H.R.Conf. Rep. 498, 100th Cong., 1st Sess. 504 (1987). The Senate Appropriations Committee, which reported out this provision, explained:

> The Congress has expressed its support for such policies in the past and has found that promoting diversity of ownership of broadcast properties satisfies important public policy goals. *Diversity of ownership results in diversity of programming and improved service to minority and women audiences.*

S.Rep. 182, 100th Cong., 1st Sess. 76 (1987) (emphasis added). The discourse at the hearings with then-FCC Chairman Fowler made clear the Committee's view that "the Commission [has] a responsibility to make sure that [the airwaves] are used to reflect the diversity of views and the diversity of background and interests in our country." *Departments of Commerce, Justice, State, the Judiciary and Related Agencies Appropriations for Fiscal Year 1988: Hearings on H.R. 2763 Before a Subcommittee of the Senate Committee on Appropriations,* 100th Cong., 1st Sess. 17 (1987) (statement of Senator Lautenberg) [hereinafter *1987 Hearings* ].

### III. ANALYSIS

#### A. *Scope of Review*

Whatever its status at prior stages of this litigation, the distress sale program is today a deliberately chosen congressional policy, embodied in legislation passed by the House and Senate and signed by the President. In my view, the distress sale policy is a constitutional means of pursuing Congress' objective: ensuring greater diversity in programming. As Judge Silberman recognizes, "the breadth of discretion in the choice of remedies may vary with the nature and authority of a governmental

---

10. "It is the firm intent of the Conferees that traditional Commission objectives designed to promote the diversification of control of the media of mass communications be incorporated in the administration of a lottery system." H.R. Conf.Rep. No. 765, 97th Cong., 2d Sess. 40 (1982).

11. The congressional ban on FCC reconsideration of these programs was recently extended through fiscal year 1989. *See* Pub.L. No. 100–459, 102 Stat. 2186, 2216–17 (1988).

body." *Fullilove,* 448 U.S. at 515–16 n. 14, 14, 100 S.Ct. at 2793–94 n. 14 (Powell, J., concurring).[12] *See* Silberman op. at 912. It is clear in my view that the distress sale policy remains in place—and this controversy remains before our court—as a direct result of legislation enacted by Congress. Although Judge Silberman suggests that this legislation need not be given the respect ordinarily owed to Acts of Congress, his position is unconvincing.[13]

Noting that the 1987 statute forbade the Commission to reexamine the distress sale policy, and thus precluded compliance with our previous remand order, Judge Silberman suggests that the statute impermissibly constricted the jurisdiction of the court of appeals. *See* Silberman op. at 925 n. 39. The statute, however, says nothing about jurisdiction: it simply directs the agency to apply a particular rule of law to disputes before it. Congress plainly has the power to establish substantive rules to be applied in agency adjudications; moreover, Congress may insist that a new rule be applied to a pending dispute. *See Multi–State Communications, Inc. v. FCC,* 728 F.2d 1519 (D.C.Cir.1984).[14] This principle is simply the application to administrative agencies of the more general rule that an adjudicative body "is to apply the law in effect at the time it renders its decision,

unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. School Board of the City of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). *See also Thompson v. Sawyer,* 678 F.2d 257, 279 (D.C.Cir.1982). The fact that the statute superseded this court's remand order is of no consequence: it is clearly within the power of Congress to overrule judicial decisions, at least within the statutory sphere, and this "nullification" of judicial precedent does not constitute an infringement on the court's jurisdiction.

Nor did the statutory change work any unjust surprise on the parties to this case. The 1987 statute did change the applicable law, since it eliminated the agency's prior discretion to abrogate or modify the distress sale policy. The statute did not, however, require that the rights of Shurberg or Astroline be adjudicated on the basis of standards which were unforeseen at the time this dispute began. To the contrary, the law by its terms required only that the agency continue to apply its preexisting rules. It therefore seems clear to me that this is not a case in which the application of a new statute to a pending proceeding will create "manifest injustice" to the litigants.

---

**12.** The application of *Fullilove* to this case is complicated by the fact that in *Fullilove*—as in *Bakke* and *Wygant*—no opinion commanded a majority of the Court. I rely principally on Chief Justice Burger's opinion, joined by Justices Powell and White. The Chief Justice's opinion plainly occupied a middle ground between the position of Justices Brennan, Marshall, and Blackmun, who announced fairly deferential standards for review of affirmative action programs generally, and that of Justices Stewart, Rehnquist, and Stevens, who would have struck down the MBE program.

**13.** I note that Judge MacKinnon accepts the premise that the distress sale program represents a considered congressional policy choice. *See* MacKinnon op. at 932–33.

The fact that Congress has acted does not, of course, mean that the distress sale policy is *ipso facto* constitutional. My colleagues are correct in asserting that even an Act of Congress is subject to searching scrutiny when constitutional values are implicated. *See* Silberman op. at 923–24; MacKinnon op. at 932–33. But while

the congressional judgment is not dispositive, it surely makes a difference. Congress has far broader powers than does an administrative agency; its findings of fact are entitled to greater respect; and, unlike the agency, it need not compile a formal record or issue an opinion. Moreover, section 5 of the fourteenth amendment entrusts Congress with the authority to implement equal protection guarantees. These factors do not obviate the need for judicial review, but they do shape the contours of our inquiry.

**14.** Although Congress was evidently aware of Shurberg's pending complaint, there is no suggestion that Shurberg was singled out for unfavorable treatment or that the congressional action was in any sense a vendetta against a particular individual. This case is thus plainly distinguishable from *News America Publishing, Inc. v. FCC,* 844 F.2d 800 (D.C.Cir.1988), which stressed that "[t]he Hollings Amendment strikes at Murdoch with the precision of a laser beam" and that "Murdoch and News America were more than mere 'catalysts' for congressional action aimed at a particular evil." *Id.* at 814, 815.

Judge Silberman also argues that Congress did not devote sufficient attention to the problem, and that the legislative history fails to reveal an adequate factual basis for the legislature's action. *Fullilove*, however, quite clearly rejected the notion that courts may inquire into the sufficiency of congressional deliberations. As Justice Stevens' dissent in that case pointed out, the set-aside provisions were mentioned in neither the House nor the Senate committee reports; on the floor of Congress "only a handful of legislators spoke and there was virtually no debate." *Fullilove*, 448 U.S. at 549–50 and n.25, 100 S.Ct. at 2811–12 and n.25 (Stevens, J., dissenting).[15] Those Justices who voted to uphold the program did not contest Justice Stevens' assertion that congressional debate had been scanty. Chief Justice Burger's opinion noted that "Congress, of course, may legislate without compiling the kind of 'record' appropriate with respect to judicial or administrative proceedings." *Id.* at 478, 100 S.Ct. at 2774. *See also id.* at 502–03, 100 S.Ct. at 2787 (Powell, J., concurring) ("The creation of national rules for the governance of our society simply does not entail the same concept of recordmaking that is appropriate to a judicial or administrative proceeding.... After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action in that area"); *id.* at 520 n.4, 100 S.Ct. at 2796 n.4 (Marshall, J., concurring in judgment). The clear thrust of *Fullilove* is that evidence of congressional deliberation (such as committee reports or lengthy floor debate) is not required. Rather, deliberativeness must be presumed so long as Congress had before it sufficient information for the formation of a considered opinion.[16] The distress sale policy, of course, had been in place for over nine years when Congress acted to preserve it: it can hardly be doubted that Congress had access to a sufficient store of information for the rendering of a considered judgment.[17] Given this factual background, my colleague's refusal to regard the statute as a considered congressional choice is simply judicial presumptiveness. Moreover, it runs directly counter to circuit precedent. In *National Treasury Employees Union v. Devine*, 733 F.2d 114 (D.C.Cir.1984), we considered an appropriations measure which provided that no federal funds could be expended for the implementation of certain Office of Personnel Management regulations. In holding the regulations to be barred, we stated:

> It is true that courts must act cautiously in interpreting appropriations measures, to avoid inferring substantive effects that were never intended. However, the Supreme Court has never suggested that this principle of statutory construction should be transformed into a rigid constitutional mandate, requiring courts to make a qualitative determination whether each house has given a measure *sufficient consideration* before voting in favor of it. Such an intrusion into Congress' legislative deliberations would pose serious separation-of-powers problems, and neither the language nor logic of the Constitution compels such an inquiry.

733 F.2d at 117 n. 8 (emphasis in original) (citation omitted).

**15.** Judge Silberman's approach, in fact, is strikingly similar to that of Justice Stevens in *Fullilove*. Since Justice Stevens' approach was accepted by no other member of the Supreme Court, we are powerless to adopt it here.

**16.** One commentator has written that "[b]ecause [legislators] are the direct representatives of the people, the law imposes no restrictions on them with respect to their use or nonuse of facts as a basis for legislating." Davis, *Facts in Lawmaking*, 80 Colum.L.Rev. 931 (1980). And Judge Silberman has cited no authority for the proposition that a court may scrutinize the decision-making process of Congress and invalidate laws to which "inadequate" attention has been paid.

**17.** Moreover, Congress had acted some years previously to mandate the use of racial preferences within the FCC's lottery system. I do not contend that the lottery mechanism is constitutionally indistinguishable from the distress sale program. Both, however, depend on the same core premises: that a station's programming will be significantly affected by the race of its owner, and that the public interest in diverse programming is served by measures which increase the heterogeneity of broadcast licensees.

Since the distress sale program was mandated by a considered congressional policy choice, I believe that the Supreme Court's recent decision in *Croson* is of limited relevance to the present dispute. Of the six Justices who comprised the *Croson* majority, four drew an express distinction between the expansive powers of Congress and the more limited powers of state and local governments. *See* 109 S.Ct. at 719 (Opinion of O'Connor, J.) ("That Congress may identify and redress the effects of society-wide discrimination does not mean that, *a fortiori*, the States and their political subdivisions are free to decide that such remedies are appropriate"); *id.* at 736 (Scalia, J., concurring) ("[I]t is one thing to permit racially based conduct by the Federal Government—whose legislative powers concerning matters of race were explicitly enhanced by the Fourteenth Amendment, see U.S. Const., Amdt. 14, § 5—and quite another to permit it by the precise entities against whose conduct in matters of race that Amendment was specifically directed, see Amdt. 14, § 1"). That distinction was hardly a new innovation: *Fullilove* stressed the distinctions between different public institutions and emphasized that Congress may exercise remedial powers of a scope that would be denied to any other state actor. *See also Bakke*, 438 U.S. at 309, 98 S.Ct. at 2758 (Opinion of Powell, J.) ("isolated segments of our vast governmental structures are not competent to make those decisions, at least in the absence of legislative mandates and legislatively determined criteria"); *cf. Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976).

## B. The Distress Sale Policy as a Means of Increasing Diversity in Programming

### 1. The Compelling Nature of the State Interest

To this point the Supreme Court has identified two governmental interests that may, under appropriate circumstances, be sufficiently compelling to justify the use of racial preferences: remedying past discrimination and enhancing diversity in higher education. Moreover, the governmental interest asserted here—the desire to ensure that television viewers have access to a diverse range of programming—seems closely analogous to the educational interest with Justice Powell found sufficient in *Bakke*.

The question presented here—whether the government's interest in educational diversity is closely analogous to its interest in preserving public access to a variety of broadcast fare—is admittedly a question on which reasonable people may differ. And it is a question to which the Supreme Court has thus far failed to provide a definitive answer. It is not, however, an open question within this circuit. This court expressly approved the analogy in *West Michigan*, stating that "[j]ust as the FCC rests its goal of attaining diverse programming on the First Amendment value 'that the widest possible dissemination of information is essential to the welfare of the public,' Justice Powell recognized that a state university could find support in the First Amendment for the goal of attaining a diverse student body...." 735 F.2d at 614 (citation omitted). The law within this circuit is that broadcaster diversity, like diversity within public institutions of higher education, is a sufficiently compelling governmental interest to justify the use of racial preferences. This precedent may legitimately be disregarded only if it has been undermined by subsequent decisions of the Supreme Court.

Judge Silberman contends that *Wygant* undermines the authority of *West Michigan*, since in his view the *Wygant* Court rejected the "role model" theory offered by the Jackson Board of Education. *See* Silberman op. at 922. In fact, however, only four Justices in *Wygant* rejected the role model theory; Justice White's concurrence focused exclusively on the fact that the plan involved layoffs.[18] One of the four

---

[18]. Justice White stated that "[w]hatever the legitimacy of hiring goals or quotas may be, the discharge of white teachers to make room for blacks, none of whom has been shown to be a victim of any racial discrimination, is quite a

also cautioned that "[t]he goal of providing 'role models' discussed by the courts below should not be confused with the very different goal of promoting racial diversity among the faculty." 476 U.S. at 288 n.*, 106 S.Ct. at 1854 n.* (Opinion of O'Connor, J.). The same distinction is central here. The distress sale policy rests on the assumption that viewers and listeners of *every* race will benefit from access to a broader range of broadcast fare, not that consumers will inevitably gravitate towards programming disseminated by licensees of their own race.

Judge Silberman also suggests that the Court in *Croson* rejected the pursuit of diversity as a permissible justification for affirmative action programs. My colleague relies heavily on the *Croson* plurality's insistence that racial preferences should be "strictly reserved for remedial settings." 109 S.Ct. at 721 (Opinion of O'Connor, J.);[19] *see* Silberman op. at 920. Of course, the underrepresentation of minorities within the broadcasting industry, and the resulting lack of diversity in programming, is the result of past racial discrimination. The effort to promote diversity is thus, in an important sense, an effort to remedy the effects of past discrimination. To say that diversity is the goal of the distress sale policy is simply to say that the intended beneficiary is the public (who will profit from exposure to a wider range of programming) rather than the minority broadcaster himself (who will gain increased economic opportunities). Judge Silberman's premise is that a program can be deemed "remedial" (as that term is used

in *Croson*) only if its beneficiaries are themselves past victims of discrimination. Though that is not an implausible reading of Justice O'Connor's language,[20] I do not believe that her *Croson* opinion compels the invalidation of diversity-oriented affirmative action programs. Given Justice O'Connor's apparent approval of Justice Powell's diversity rationale in her *Wygant* concurrence, *see* 476 U.S. at 286, 106 S.Ct. at 1853, I am hesitant to conclude, based on a brief, ambiguous reference in a case involving a quite different plan, that she has now abandoned that rationale entirely.[21]

Even if I read the *Croson* plurality as eliminating the diversity rationale as a permissible justification for state and local affirmative action programs, I would not conclude that the same restrictions should apply to Congress. The plurality's recognition of the broad remedial powers of Congress—in particular, its recognition that "Congress may identify and redress the effects of society-wide discrimination," *see* 109 S.Ct. at 719—militates against any easy transference of the limitations deemed appropriate for state and local entities. Because the *Croson* Court did not directly address the permissibility of the diversity rationale, and because that case dealt with the remedial powers of a local government rather than with the authority of Congress, I do not believe that *Croson* requires the rejection of the federal interest asserted here.

Certainly the state lacks the power to exercise day-to-day control over the pro-

different matter." 476 U.S. at 295, 106 S.Ct. at 1857.

**19.** The statement in *Croson* that racial classifications should be "strictly reserved for remedial settings," 109 S.Ct. at 721, represents the view of only four Justices and is therefore not a holding of the Court.

**20.** I must acknowledge that Justice Stevens, like Judge Silberman, appears to read Justice O'Connor's opinion as rejecting the diversity rationale. *See* 109 S.Ct. at 730 & n. 1 (Stevens, J., concurring).

**21.** Under Judge Silberman's view of *Croson,* all consideration of race by public universities as

an element of diversity would be rendered unconstitutional. Moreover, all nine Justices in *Bakke* agreed that Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, imposes restrictions at least as stringent as those established by the Constitution. *See Bakke,* 438 U.S. at 286–87, 98 S.Ct. at 2746 (Opinion of Powell, J.); *id.* at 328–40, 98 S.Ct. at 2767–73 (Opinion of Brennan, White, Marshall, and Blackmun, JJ.); *id.* at 416, 98 S.Ct. at 2812 (Opinion of Stevens, J.). Judge Silberman's prohibition, therefore, would perforce apply to all private universities which receive federal funds. I would hesitate, however, to infer such a sweeping change in the law governing university admissions policies based on a few ambiguous words of dicta in a plurality opinion.

gramming decisions of private broadcasters. But the federal supervisory power over broadcasting is nevertheless quite extensive—far greater, in fact, than its power over the construction industry. A federal agency, pursuant to the directives of Congress, has the sole authority to determine who may and who may not operate a broadcast facility. And precisely because the broadcaster will enjoy relatively unfettered freedom once his station commences operations, the government has both the right and the duty to exercise care in the initial decision to award a license. I think it is settled law that in choosing licensees the state may seek to further "the First Amendment goal of achieving 'the widest possible dissemination of information from diverse and antagonistic sources.' " *FCC v. National Citizens Committee for Broadcasting (NCCB)*, 436 U.S. 775, 795, 98 S.Ct. 2096, 2112, 56 L.Ed.2d 697 (1978) (quoting *Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945)). *See also FCC v. League of Women Voters of California*, 468 U.S. 364, 377, 104 S.Ct. 3106, 3116, 82 L.Ed.2d 278 (1984) ("Congress may ... seek to assure that the public receives through this medium a balanced presentation on issues of public importance that otherwise might not be addressed"); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Certainly the Constitution places limits on the methods which Congress may use to enhance diversity within the broadcasting media. But the legitimacy of the government's interest is undeniable.

Of course, to say that Congress has a legitimate interest in enhancing broadcast diversity does not mean, *ipso facto*, that the state's interest is sufficiently compelling to justify the use of a racial preference. And I recognize that Justice Powell's *Bakke* opinion focused on the distinctive characteristics of the academic environment. For those who are fortunate enough to attend a college or university, interaction with fellow students may be a principal means of access to information about the world.[22] But those who lack the background or the resources to pursue a university education may be largely dependent upon the broadcast media to expose them to influences and ideas beyond their immediate sphere of experience. The state's interest in ensuring that all its people have access to a wide and varied range of broadcast options seems to me to be every bit as compelling as its interest in creating a diverse student body within a public university.[23]

Even if this were an open question within the circuit, I would therefore conclude that the promotion of broadcast diversity is a compelling governmental interest, an interest closely analogous to the enhancement of diversity within the educational institutions operated by the state. For good or ill, a large portion of the American polity relies upon the broadcast media as a principal source of information about the world in which they live. Given the governmental role in selecting broadcast licensees, I believe that the state bears a responsibility

22. A university is not, however, a self-contained world: University students have access to the same range of broadcast fare (and often to cable services) which is available to the public generally. If the university has a compelling interest in exposing students to diverse ideas *in addition to* those which are available to the citizenry at large, then it is hard to see how the state could have a less weighty interest in ensuring diversity for those who lack access to university facilities.

23. In *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967), the Court stated: "Our Nation is deeply committed to safeguarding academic freedom which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment.... The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection,' *United States v. Associated Press*, 52 F.Supp. 362, 372." The citation to *Associated Press*—which justified antitrust regulation of the print media as a means of enhancing diversity— at least suggests that the Court saw a connection between the government's efforts to promote diversity of opinion inside and outside the classroom. Justice Powell quoted this passage from *Keyishian* in his *Bakke* opinion. *See* 438 U.S. at 312, 98 S.Ct. at 2759.

to allocate franchises in such a way as to further the ability of viewers and listeners to obtain access to diverse programming. I do not suggest that broadcast licensees stand in precisely the same relation to the FCC as students or teachers stand to the administrators of a public university. I do believe that the Commission, in selecting licensees who will serve the public interest, must ultimately be responsive to concerns which are in the truest sense educational.

Judge Silberman mixes apples and oranges in claiming that the FCC's abandonment of the fairness doctrine indicates that the enhancement of diversity on the airwaves is no longer a compelling interest. *See* Silberman op. at 921. The fairness doctrine, whatever its merits, is quite distinguishable from the distress sale policy: the fairness doctrine involved direct control over the content of programming. The distress sale policy, by contrast, seeks to diversify programming indirectly through a limited targeting of license opportunities. The FCC did not abandon the fairness doctrine because it believed that fostering debate on controversial issues of public importance was not part of its mission, but rather because it considered the *means* involved to be content-based control of speech.[24] The distress sale policy raises no such concerns.[25]

I cannot accept my colleague's denigration of the state interest involved here. In my opinion the government clearly has a compelling interest, sufficient to justify the careful use of racial preferences, in encouraging the dissemination of broadcast programming which reflects the nation's diversity. This view is compelled by circuit precedent and is fully consonant with the decisions of the Supreme Court.

### 2. *The Nexus Between Ownership and Programming*

Judge Silberman is openly skeptical about the effectiveness of any FCC policy that addresses program or viewpoint diversification through broadening ownership or control of the media. Of course, there is no *guarantee* that minority ownership and management will necessarily lead to minority-oriented programming or even to the expression of a discrete minority viewpoint on the airwaves. Similarly, there is no guarantee that minority students will intermingle with nonminority students or exchange viewpoints in a state university, or even that the particular minority students admitted will have typical or distinct "minority" viewpoints. *Cf. Bakke*, 438 U.S. at 311–13, 98 S.Ct. at 2759–60. These are predictive judgments of a sort which simply do not lend themselves to ironclad proof. It seems to me entirely foreseeable, however, that minority broadcasters—like minority students—will have distinct perspectives to convey. And it seems equally foreseeable that these perspectives will find expression in the licensee's program-

---

**24.** In its decision to eliminate the fairness doctrine, the Commission was principally motivated by its doubts concerning the doctrine's effectiveness, not by doubts as to the legitimacy of governmental efforts to enhance broadcast diversity. The Commission stated that "under the standard of review set forth in *Red Lion*, a *governmental regulation such as the fairness doctrine is constitutional if it furthers the paramount interest of the public in receiving diverse and antagonistic sources of information.* Under *Red Lion*, however, the constitutionality of the fairness doctrine becomes questionable if the chilling effect resulting from the doctrine thwarts its intended purpose." *Syracuse Peace Council*, 2 F.C.C.Rcd. 5043, 5052 (1987) (emphasis added).

In denying reconsideration of its order abrogating the fairness doctrine, the Commission stated: "As noted in the August order, the fair-

ness doctrine is clearly a content-based regulation of broadcast speech. Neither that order nor this reconsideration calls into question the constitutionality of our content-neutral, structural regulations designed to promote diversity." *Syracuse Peace Council (Reconsideration)*, 3 FCC Rcd. 2035, 2041 n. 56 (1988) (citation omitted).

**25.** My colleague's reliance on the FCC's abrogation of the fairness doctrine also ignores the fact that Congress has acted in this case. The statutory requirement that the distress sale policy be continued reflects a congressional determination that the public need for diversity in programming still warrants affirmative protection. If there were in fact a contradiction between discontinuation of the fairness doctrine and the decision to maintain the distress sale policy, this court would plainly be required to give precedence to the congressional judgment.

ming decisions.[26]

The ownership-programming nexus underlying the distress sale policy does not, however, rest on such assumptions alone, but on two decades of congressional, judicial and agency findings. Back in 1968, the Kerner Commission announced:

> The media report and write from the standpoint of a white man's world. The ills of the ghetto, the difficulties of life there, the Negro's burning sense of grievance, are seldom conveyed. Slights and indignities are part of the Negro's daily life, and many of them come from what he now calls the "white press"—a press that repeatedly, if unconsciously reflects the biases, the paternalism, the indifference of white America. This may be understandable, but it is not excusable in an institution that has the mission to inform and educate the whole of our society.

*Report of the National Advisory Commission on Civil Disorders* 203 (1968). Nine years later, the United States Commission on Civil Rights endorsed the Kerner Commission's view "that a mass medium dominated by whites will ultimately fail in its attempts to communicate with an audience that includes blacks."[27]

Several decisions of this court have also been premised on the reasonable belief that encouraging minority ownership can be expected to promote diversity of programming. *See, e.g., West Michigan, supra; Garrett v. FCC,* 513 F.2d 1056 (D.C.Cir. 1975); *TV 9, Inc. v. FCC,* 495 F.2d 929 (D.C.Cir.1973), *cert. denied,* 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974); *Citizens Communications Center v. FCC,* 447 F.2d 1201 (D.C.Cir.1971), *clarified,* 463 F.2d 822 (D.C.Cir.1972). Indeed, we have held that "it is upon ownership that public policy places primary reliance with respect to diversification of content, and that historically has proven to be significantly in-

fluential with respect to editorial comment and the presentation of news." *TV 9,* 495 F.2d at 938. I believe that these principles remain valid today.

Congress' conclusions about the nexus between minority ownership and programming diversity, however, are the most significant, for, as the Supreme Court has instructed us, the showing necessary to support an affirmative action program depends in part on the competence of the governmental unit making the finding. As early as 1982, Congress recognized the minority-ownership/diversity nexus, which is the basis for the distress sale policy. H.R. Conf.Rep. No. 765, 97th Cong., 2d Sess. 40 (1982) ("[t]he nexus ... has been repeatedly recognized"). In authorizing a lottery system for choosing among qualified broadcast license applicants, Congress directed the FCC to implement a minority-ownership preference, so that "this approach to enhancing diversity through such structural means will in turn broaden the nature and type of information and programming disseminated to the public." *Id.* at 43.

In 1987, Congress spoke even more clearly, directly addressing the distress sale policy itself. The FCC had proposed to Congress a "one-time study designed to elicit empirical evidence to determine whether there is a nexus between minority/female ownership and viewpoint diversity as required by the Constitution...." *1987 Hearings, supra,* at 77 (statement of Commissioner Fowler). Congress' response was that further study was unwarranted; the tie between minority ownership and programming diversity was sufficiently strong to support the constitutionality of the distress sale policy. "The committee believes the inquiry is unwarranted.... Diversity of ownership results in diversity of programming." S.Rep. No. 182, 100th Cong., 1st Sess. 76 (1987). The Act itself

---

**26.** The nexus is not limited to the broadcasting context, but has been documented in other communications industries as well. *See, e.g., Media and the First Amendment in a Free Society,* 60 Geo.L.J. 867, 896 (1972) (stating that ownership is the key variable affecting news content and editorial policy of a newspaper).

**27.** United States Commission on Civil Rights, *Window Dressing on the Set: Women and Minorities in Television* 2 (1977).

said that "none of the funds appropriated ... shall be used ... to continue a reexamination" of the distress sale policy. Pub.L. No. 100–202, 101 Stat. 1329, 1331 (1987). Judge Silberman fails to give this congressional judgment its due. He dismisses the entire episode with the cryptic note that the FCC ended its reconsideration "without issuing any conclusions," claiming that the aborted inquiry casts doubt on the causal link between increased minority ownership and programming diversity. Silberman op. at 907. He fails to see the forest: Congress terminated the inquiry because it firmly concluded for itself that the connection was there and no need for Commission reconsideration existed.[28]

The evidence supporting these findings has typically been anecdotal rather than statistical. *Cf. 1985 Fairness Report,* 102 F.C.C.2d 143 (1985) (FCC's belief that the fairness doctrine chilled speech is justified by reference to anecdotal rather than statistical evidence). In part this is because the subject does not lend itself to quantification. In part, though, it is because the dearth of minority broadcasters has made it quite difficult to draw empirical conclusions concerning the programming offered by minority-owned stations. Judge Silberman's approach to the case places Congress in an impossible bind; it makes the distress sale policy's constitutionality dependent on evidence which simply will not be available until minority ownership of broadcast stations has increased substantially.

Judge Silberman fails as well to take account of the first amendment limits placed upon Congress and the FCC, which preclude more direct efforts to enhance program diversity. Although the Commission cannot control directly the variety of programming that licensees afford the public, Judge Silberman nonetheless insists that the constitutionality of this congressionally mandated policy requires demonstrable proof of the connection between ownership and programming. Congress is between a rock and a hard place: it cannot under the first amendment directly ensure a certain kind of programming or viewpoint diversity, yet the panel overturns its entirely reasonable efforts aimed at diversity for want of proof that they will definitely produce the anticipated results.[29]

I also do not believe that the distress sale policy is rendered invalid by the fact that participating minority broadcasters are not required to prove that they are individual victims of prior discrimination. *See* Silberman op. at 915–16. Three Justices in *Croson* did stress the desirability of such fine-tuning, *see* 109 S.Ct. at 718 (Opinion of O'Connor, J.), but in no case has a majority of the Court held that individualized consid-

---

28. Clearly Congress had a sufficient basis for its belief that increased minority ownership of broadcasting facilities will enhance diversity of programming. In 1978, the Commission concluded "that diversification in the areas of programming and ownership—legitimate public interest objectives of this Commission—can be more fully developed through our encouragement of minority ownership of broadcast properties." *1978 Policy Statement* at 981. Four years later, recognizing "the ever-present 'dearth of minority ownership' in the telecommunications industry to be a serious concern," it reaffirmed and expanded the distress sale policy and other minority ownership-oriented policies. *See 1982 Policy Statement* at 852. Judge Silberman relies heavily on the Commission's recent doubts concerning the existence of the nexus. *See* Silberman op. at 921 (citing FCC's *Steele* Brief). Given the existence of conflicting views within the agency, it was plainly within the competence of Congress to find that the nexus exists.

Since the original congressional ban on reexamination of the distress sale policy, the Congressional Research Service has released a report which supports the conclusion that a nexus exists between minority ownership and programming. *See Minority Broadcast Station Ownership and Broadcast Programming: Is There a Nexus?* (Congressional Research Service 1988). Senator Hollings relied on this report in successfully arguing for a reenactment of the appropriations ban. *See* 134 *Cong. Rec.* S10,021 (daily ed. July 27, 1988).

29. Because "balancing the various First Amendment interests involved in the broadcast media ... is a task of great delicacy and difficulty," *Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee,* 412 U.S. 94, 102, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973), Judge Silberman's belittlement of Congress' clearly expressed mandate is particularly inappropriate. Under such circumstances, "we must afford great weight to the decisions of Congress and the experience of the Commission." *Id.*

eration is required.[30] In any event, such a requirement seems inapplicable to the present case. Since the distress sale policy is intended to serve as a method of enhancing broadcast diversity—not as a means of redressing injuries done to the minority broadcasters themselves—it does not seem particularly germane whether the individual who is awarded a license can establish that he has suffered from specific discriminatory acts. Any requirement that affirmative action plans bestow their benefits only on those who are themselves victims is therefore inapplicable to Congress' justification for the distress sale policy.

In fact, the promotion of minority ownership as an approach to program diversity

clearly meets the test of "narrow tailoring." The FCC has, over the years, experimented with several devices to further program diversification without directly regulating programming content. The distress sale policy was adopted only after specific findings by the FCC that equal employment opportunity rules[31] and ascertainment policies[32] alone were insufficient to accomplish significant minority participation in programming.[33] The Commission found that the market was neither able nor willing to provide the necessary degree of diversity in programming.[34] I therefore believe that the distress sale policy satisfies the *Croson* Court's requirement that racial preferences be employed

---

**30.** In the context of court-ordered race-conscious relief, six members of the Supreme Court agreed in *Local 28* that "preferential relief benefitting individuals who are not the actual victims of discrimination" may be required. 478 U.S. at 482, 106 S.Ct. at 3053.

**31.** The Supreme Court has praised the FCC's efforts in minority employment as a way of accomplishing programming diversity. "The Federal Communications Commission has adopted regulations dealing with the employment practices of its regulatees.... These regulations can be justified as necessary to enable the FCC to satisfy its obligation under the Communications Act of 1934 ... to ensure that its licensees' programming fairly reflects the tastes and viewpoints of minority groups." *NAACP v. FPC*, 425 U.S. 662, 670 n. 5, 96 S.Ct. 1806, 1812 n. 5, 48 L.Ed.2d 284 (1976) (citations omitted).

**32.** The FCC's "ascertainment" policy required licensees to contact community leaders and members of the general public, specifically including minorities and women, to obtain information about community interests so as to present programming responsive to those interests. *See Ascertainment of Community Problems by Broadcast Applicants*, 57 F.C.C.2d 418 (1976). As part of a conscious dismantling of command and control regulations—actions requiring specific conduct by licensees—the FCC has more recently cut back on ascertainment requirements. *See* Honig, *The FCC and Its Fluctuating Commitment to Minority Ownership of Broadcast Facilities*, 27 How.L.J. 859, 867 (1984).

**33.** In announcing the distress sale policy, the FCC concluded that "[w]hile the broadcasting industry has on the whole responded positively to its ascertainment obligations and has made significant strides in its employment practices, we are compelled to observe that the views of racial minorities continue to be inadequately

represented in the broadcast media." *1978 Policy Statement, supra*, at 980 (footnotes omitted).

**34.** The FCC cited research showing that audience survey data tends systematically to underestimate black or Spanish-speaking audiences and often fails to measure and report adequately their listening habits. *See Minority Ownership Taskforce Report* at 22–24 (1978). "The rating services have been accused of subjecting ethnic media to gross prejudices and generalizations. This problem has been traced, in large part, to the absence of minorities in decision-making positions with advertising agencies or the major corporate advertisers." *Id.* at 25. In light of the FCC's own doubts, Judge Silberman's reliance on a station owner's response to the demands of the marketplace to ensure diversity, *see* Silberman op. at 922, is unconvincing. The FCC's Taskforce Report rejected such reliance as unacceptable in view of its diversity mandate.

> Acute underrepresentation of minorities among the owners of broadcast properties is troublesome because *it is the licensee who is ultimately responsible for identifying and serving the needs and interests of his or her audience.* Unless minorities are encouraged to enter the mainstream of the commercial broadcasting business, a substantial proportion of our citizenry will remain under-served and the larger, nonminority audience will be deprived of the views of minorities.

*Minority Ownership Taskforce Report, supra*, at 1 (emphasis added). While Judge Silberman cites the deregulatory rulemakings of the past decade to support the proposition that market forces now are sufficient to create diverse programming, *see* Silberman op. at 922–23 (citing the FCC's *Steele* Brief), none of the cited rulemakings revisit, let alone directly call into question, the explicit findings of the Commission in its minority ownership rulings.

only after race-neutral methods have been found wanting. *See Croson*, 109 S.Ct. at 728; *see also* Silberman op. at 915.

The history of the FCC's efforts in this field thus demonstrates that the distress sale policy was adopted only after other means had proven unsuccessful in enhancing minority access to the mass media.[35] Despite the FCC's recent equivocation about the effectiveness of the distress sale policy, Congress has not equivocated at all but has directly mandated that the Commission stay the course. For twenty years, moreover, no one (neither the Commission nor the courts nor Congress) doubted the reasonableness of the ownership-programming connection. Now, the Commission[36] and my colleague entertain second thoughts and want more proof. Congress, however, remains steadfast in its belief that the nexus between diverse ownership and diverse programming exists, and I be-lieve that the record fully supports that congressional determination.

### 3. *The Significance of Racial Diversity*

The most problematic feature of the distress sale policy lies in the fact that its benefits are bestowed *solely* upon minority buyers. The distress sale policy is not a setaside: no pre-determined number of stations is reserved exclusively for minority ownership. It must nevertheless be acknowledged that distress sales reserve certain opportunities to minority purchasers alone, and that the Commission's approval or rejection of a proposed sale will be made without considering the qualifications of nonminority competitors. The plan therefore more closely resembles the admissions program struck down in *Bakke*, rather than the Harvard Plan, noted approvingly in Justice Powell's opinion, which provided that minority status would be an advantage but would not be an absolute requirement for any admissions slot.[37] Judge Silberman

---

**35.** Judge Silberman argues that the proliferation of new media outlets and technologies obviates the traditional "scarcity of the spectrum" rationale that supported the FCC's diversity of programming policies. *See* Silberman op. at 921. Even assuming some validity to its argument, the majority never comes to grips with the failure of sheer numbers of media alone to affect the structural barriers to increased *minority* ownership of broadcast properties. We know already that these same barriers operate just as acutely in cable and other media as they do in radio and television. Underrepresentation of minority voices in programming is not cured by greater numbers and varieties of mass media if they continue to be controlled by nonminority enterprises. *See* Hammond, *Now You See It, Now You Don't: Minority Ownership in an "Unregulated" Video Market Place*, 32 Cath.U.L.Rev. 633, 638, 662 (1983). Underrepresentation of minority views in television is particularly troubling. The impact of television on our daily lives, and those of our children, is unquestionably greater than that of print media.

> Unlike print, television does not require literacy. Unlike the movies, television is "free" ... and it is always running. Unlike the theater, concerts, movies, and even churches, television does not require mobility. It comes into the home and reaches individuals directly. With its virtually unlimited access from cradle to grave, television both precedes reading and, increasingly, preempts it.

United States Commission on Civil Rights, *Window Dressing on the Set: An Update* 44 (1979) (quoting Gerber & Gross, *Living With Television:*

*The Violence Profile,* 26 J.Comm. (Spring 1976) at 176).

**36.** In fact, it would appear that the Commission's doubts have been short-lived. As Judge Silberman acknowledges, *see* Silberman op. at 11, the FCC's brief in Winter Park Communications v. FCC, Nos. 85-1755 and 85-1756 (D.C. Cir., argued Nov. 21, 1988), supports the continued use of minority preferences within the FCC's comparative licensing procedures. Certainly the use of race in comparative hearings is distinguishable from the present case; and it is not clear whether the Commission, if given the choice, would retain the distress sale policy. Both policies, however, presume a connection between programming content and the race of a station owner; given the Commission's stance in *Winter Park*, it would appear that the FCC now believes that the nexus exists. In light of the Commission's most recent pronouncements, Judge Silberman's reliance on the FCC's earlier brief in *Steele, see* Silberman op. at 921, 922–23, appears imprudent.

**37.** This is also the principal distinction between the distress sale policy and the FCC's comparative licensing procedures. The *West Michigan* court emphasized that comparative hearings involve "a consideration of minority status as but *one factor* in a competitive multi-factor selection system that is designed to obtain a diverse mix of broadcasters." 735 F.2d at 613 (emphasis in original). The court stated, however, that "[i]n giving special weight to [this] factor[ ] we in no way imply that [it] would be essential to the constitutionality of a government affirmative action program." *Id.* at 614.

suggests that this factor alone is sufficient to invalidate the program. I do not believe, though, that governing precedents require this result.

To begin with, it should be noted that Justice Powell was the only member of the *Bakke* Court who perceived a constitutional distinction between an affirmative action plan which reserved a specified number of slots for minority candidates and a plan which employed race as a plus-factor in admissions decisions. The other four Justices who reached the constitutional question expressly denied that any such constitutional distinction exists. *See Bakke,* 438 U.S. at 378–79, 98 S.Ct. at 2793 (Opinion of Brennan, White, Marshall, and Blackmun, JJ.). Furthermore, subsequent decisions of the Supreme Court have made it clear that the Constitution does not prohibit every affirmative action plan which reserves particular opportunities exclusively for minority applicants.

*Fullilove,* after all, upheld a plan which reserved a specified percentage of government business for minority contractors. Justice Powell voted to sustain the plan, and the basis on which he distinguished the case from *Bakke* is highly instructive. Justice Powell did not rely on a distinction between affirmative action plans designed to promote diversity and plans intended to remedy prior discrimination. Rather, he emphasized the broad powers of Congress: "I [do not] conclude that use of a set-aside always will be an appropriate remedy or that the selection of a set-aside by any other governmental body will be constitutional [citing *Bakke* ]. The degree of specificity required in the findings of discrimination and the breadth of discretion in the choice of remedies may vary with the nature and authority of a governmental body." *Fullilove,* 448 U.S. at 515–16 n. 14, 100 S.Ct. at 2793–94 n. 14 (Powell, J., concurring).

Nor do the Court's opinions in *Wygant* support the proposition that Judge Silberman advances today. The Court struck down the challenged affirmative action plan, with Justices Powell, O'Connor, and White writing opinions in support of the judgment. No Justice suggested, however, that the *Wygant* plan could be invalidated solely on the ground that it employed a numerical formula to determine the portion of the teaching staff to be reserved for minorities. In more recent cases involving court-ordered remedies for specific discriminatory practices, the Court has upheld the use of numerical quotas where less severe steps have proven unavailing. *See supra* 934 n. 1.

In light of subsequent decisions, I read *Bakke* to hold, at most, that an affirmative action plan which uses a "plus-factor" approach is preferable to a plan reserving specified opportunities for minorities, *if* the two plans will be equally effective in achieving their remedial goals. In the present case, however, I believe that there are ample grounds for concluding that a plan utilizing a "plus-factor" approach would not be sufficient. The dramatic statistical underrepresentation of minorities noted by the FCC and Congress, *see Minority Ownership Taskforce Report* (Commission in 1978 notes one percent minority ownership); *1987 Hearings* at 17 (Congress noting "mere 2 percent" ownership) (statement of Sen. Lautenberg), underscores why policies aimed merely at encouraging general diversity have proven inadequate. The Commission's general pursuit of diversified broadcasting has failed miserably in achieving meaningful minority representation. *1978 Policy Statement, supra,* at 980, 982. Significantly, the FCC made no similar findings of underrepresentation of various "professions" or "religions," which Judge Silberman groundlessly claims are equally good targets for a diversity preference. *See* Silberman op. at 921. A narrowly focused program is justified both by the particular importance of racial equality and by the lack of success of less carefully targeted efforts.

It is also important to point out that the FCC has simultaneously followed the "plus-factor" approach to licensing by affording enhancement credits for minority ownership and management in comparative hearings. Both Congress and the FCC, however, have found that this technique alone simply does not do the job:

It is clear that the current comparative hearing process has not resulted in the award of significant numbers of licenses to minority groups. *Many minority applicants are simply unable to participate* in comparative hearings which often take a considerable period of time and require substantial economic resources.

H.R.Conf.Rep. No. 765, 97th Cong., 2d Sess. 44 (1982) (emphasis added). Thus, where diversity of ownership has not proven practically attainable through a multi-factored evaluation of the "total" applicant, as may work in student admissions, it does not seem unreasonable to target previously identified financial barriers to minority access.

## C. *Effect Upon Nonminority Applicants*

Past Supreme Court decisions, as the majority points out, have evaluated affirmative action schemes by assessing the burdens they impose on innocent nonminorities. Those burdens have been measured in different ways. In *Fullilove*, for example, the Chief Justice, in finding the 10% minority set-aside for construction contracts constitutional, focused on its relatively small impact on total procurement opportunities. *See Fullilove*, 448 U.S. at 484–85 & n. 72, 100 S.Ct. at 2777–78 & n. 72 (Opinion of Burger, C.J.).[38] In *Wygant*, the plurality repeatedly emphasized that a plan incorporating hiring goals for minorities imposed a lesser burden on nonminorities than a layoff preference,[39] a distinction that Justice Powell found persuasive in *Local 28* as well. *See Local 28*, 478 U.S. at 488, 106 S.Ct. at 3057 (Powell, J., concurring).

These standards, it seems to me, recognize two distinct ways in which an affirmative action plan may be said to impose excessive burdens on innocent nonminorities. The *Fullilove* standard focuses on the burden placed on nonminority applicants *as a group:* the statistical inquiry ensures that minorities will not be allocated an exorbitant portion of the opportunities in a given sphere. The *Wygant* standard focuses on the burdens imposed on particular nonminority individuals. The distress sale policy satisfies both these standards.

The distress sale policy imposes minimal burdens on nonminority license applicants as a group. By its very terms, it may be invoked at the Commission's discretion only with respect to a small fraction of all broadcast licenses (those designated for revocation or renewal hearings on the basis of basic qualification issues), and only when the licensee chooses to sell out at a distress price rather than go through with the hearing. Unlike the University of California admissions plan found unconstitutional in *Bakke*, 438 U.S. at 289, 98 S.Ct. at 2747 (Opinion of Powell, J.), no specific number of licenses is set aside for allocation to minorities through the distress sale mechanism. Instead, the distress sale policy merely offers an alternative and largely unpredictable procedural route for license applications. The circumstances in which distress sales arise are rare and only a small number are approved; as of the briefing of this case, the distress sale policy had resulted in the transfer of only thirty-three stations to minority-controlled businesses in seven years. These distress sales represent 0.28% of all broadcast stations in the United States,[40] far below the

---

**38.** The Chief Justice noted that it was "not a constitutional defect in [the minority business enterprise set-aside provision] that it may disappoint the expectations of nonminority firms," 448 U.S. at 484, 100 S.Ct. at 2777, especially given that the 10% minimum minority participation translated into only 0.25% of the annual expenditure for construction work in the United States. *Id.* at 484–85 n. 72, 100 S.Ct. at 2777–78 n. 72.

**39.** The *Wygant* plurality reasoned that "[i]n cases involving valid *hiring* goals, the burden to be borne by innocent individuals is diffused to a

considerable extent among society generally. Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose." 476 U.S. at 282, 106 S.Ct. at 1851 (emphasis in original).

**40.** *See* Brief amicus curiae of National Black Media Coalition, the League of United Latin American Citizens, and the NAACP, at 33 (filed July 15, 1985). The FCC also noted the small number of distress sale assignments when it recently sought comments on revising the policy. *See* Notice of Inquiry, 50 Fed.Reg. at 42,048 n. 6 (1985).

10% of annual public works appropriations directed to minority businesses in *Fullilove.*

Thus, the distress sale policy imposes far less severe burdens upon nonminorities as a group than did *Fullilove*'s MBE set-aside. As in *Fullilove,* nonminority firms remain free to compete for the vast majority of licensee opportunities available. Furthermore, even when the Commission considers a distress sale, it does not refuse to entertain nonminority petitions for access to the license in question. Interested nonminority parties can oppose both the licensees' election of the distress sale procedure and the specific transaction proposed to the Commission. "A distress sale ... is a form of extraordinary relief and depends on the facts and circumstances of the individual petition." *Faith Center, Inc.,* 82 F.C.C.2d 1, 35 (1980).[41]

Nor does the distress sale policy impose an unacceptable burden on particular nonminority individuals such as Shurberg. The Supreme Court has looked most skeptically at affirmative action programs involving layoffs because firings inevitably involve a greater disruption of settled expectations. *See Wygant,* 476 U.S. at 282–83, 106 S.Ct. at 1851 (Opinion of Powell, J.) ("Denial of a future employment opportunity is not as intrusive as loss of an existing

job").[42] Since the distress sale policy involves entry into a market, it is far more analogous to "hirings" than to "firings." The interest of a potential applicant in obtaining a license through comparative hearings where the current licensee's fitness is in doubt is even more speculative than an applicant's interest in a potential job and certainly lacks the legitimate expectation of continued employment of someone already working. The current licensee's troubles create a lucky-strike-extra situation for potential applicants: unexpectedly, a valuable license becomes available and the former licensee's broadcasting property dramatically decreases in value. Because of the unique and unpredictable nature of such situations, a distress sale can hardly be said to disrupt the settled expectations of potential licensees.

Plainly the distress sale policy imposes disadvantages on innocent nonminority applicants, and I do not intend to belittle their hardships. A broadcast license is a valuable property; only a few become available; and the licenses are not fungible.[43] Nevertheless, I do not believe that Shurberg's injury can plausibly be compared to the hardship suffered by one who, like the senior teachers in *Wygant,* is deprived of an existing source of livelihood.[44] Shur-

Judge MacKinnon correctly notes that neither Congress nor the Commission has established a numerical limit on the number of stations that may be transferred pursuant to the distress sale policy. *See* MacKinnon op. at 930. Experience over an extended period of time, however, has belied any notion that distress sales will account for a substantial percentage of the country's broadcast outlets. Against this backdrop it would seem perverse to invalidate the policy based on a theoretical possibility that the program might some day be overused.

**41.** The Commission, in fact, refused to allow distress sale treatment for two other Faith Center stations and nonminority firms filed applications for both licenses. *Faith Center, Inc.,* 82 F.C.C.2d 1 (1980), *recons. denied,* 86 F.C.C.2d 891 (1981).

**42.** *Compare United Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (holding voluntarily adopted racial quotas permissible under Title VII) and *Local 93, Int'l Ass'n of Firefighters v. Cleveland,* 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (approving

hiring and promotion preferences in consent decree) *with Firefighters Local 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (invalidating racial quota that required layoffs).

**43.** I recognize that Shurberg may have a difficult time acquiring another television station. In this respect, however, the distress sale policy is no different from the use of race in comparative licensing procedures, a practice which has been repeatedly upheld by this court.

**44.** Writing for the *Wygant* plurality, Justice Powell noted that "[e]ven a temporary layoff may have adverse financial as well as psychological effects. A worker may invest many productive years in one job and one city with the expectation of earning the stability and security of seniority.... Layoffs disrupt these settled expectations in a way that general hiring goals do not." 476 U.S. at 283, 106 S.Ct. at 1851. Plainly Shurberg has not suffered the sort of injury which Justice Powell associated with layoffs. Justice Powell himself analogized "hiring" plans to school admissions preference schemes,

berg claims only that as a result of the distress sale it was denied participation in a single comparative hearing in which it *might* have been awarded the license. And its exclusion from that hearing forecloses "only one of several opportunities," *see Wygant*, 476 U.S. at 283, 106 S.Ct. at 1837 (Opinion of Powell, J.). Shurberg has been rendered no worse off than it was before Faith Center's fortuitous misconduct;[45] it has simply been denied a chance at a windfall.

It should also be noted that neither Shurberg nor any other nonminority applicant is denied *financial* participation in enterprises that qualify for distress sale treatment by reason of the racial composition of their owners or managers. As a matter of fact, in order to lessen the financial obstacles to increased minority ownership, the FCC will accept applications for sales to limited partnerships, in which management and control reside primarily with qualified minority general partners but substantial financial rewards flow to nonminority limited partners who have provided the necessary capital. *See 1982 Policy Statement, supra,* at

853–55.[46] In sum, the near-monopoly exercised by nonminorities over broadcast media—they control approximately 98% of all broadcast licenses—and the very limited circumstances in which the distress sale policy can be invoked, suggest that the burden the policy places on nonminority applicants is acceptable.[47]

### D. *Remedying Past Discrimination*

As I noted earlier, *see supra,* pp. 941–43, it is somewhat deceptive to speak of a sharp distinction between the government's desire to promote broadcast diversity and its desire to remedy past discrimination. Certainly it is appropriate to distinguish between the attempt to further public access to varied programming and the attempt to advance the economic interests of minority broadcasters. But the effort to promote broadcast diversity is itself, in a broad sense, a "remedial" program: it seeks to address the lasting effects of our nation's long history of racial discrimination. I will acknowledge, however, that the term "remedial" is sometimes used (as Judge Silberman uses it, *see* Silberman op.

---

stressing that the foreclosing of an opportunity does not cause the same kind of injury as the deprivation of something the innocent party already has. *See Wygant,* 476 U.S. at 283 n. 11, 106 S.Ct. at 1851 n. 11. Justice White's concurrence, which provided the fifth vote to strike down the *Wygant* plan, rested exclusively on this distinction. 476 U.S. at 294–95, 106 S.Ct. at 1857. *See supra,* p. 941 n. 18.

**45.** Judge MacKinnon attaches constitutional significance to the fact that Faith Center's misconduct was unrelated to racial discrimination. *See* MacKinnon op. at 931. Surely this can make no difference. When racial preferences are used in the distribution of scarce resources, the Constitution does not require that the resources themselves must be the product of past discrimination. Clearly the government contracting opportunities at issue in *Fullilove* did not become available because of any discriminatory act.

**46.** Judge Silberman does not see how this alternative "affect[s] [Shurberg's] constitutional claim." Silberman op. at 918 n. 23. It is obvious, however, that the distress sale policy does allow nonminorities to share in the admittedly substantial financial benefits, *see* Silberman op. at 916, created by a license revocation situation, *see supra* at 937 note 9, and thus its burden is

lighter than the burden of a hypothetical program reserving all profits to minorities.

**47.** My colleagues err in focusing only on the individual burden borne by Shurberg (which they exaggerate), forgetting the Supreme Court's admonition that innocent parties may sometimes be asked to bear the burden of affirmative action programs. *See Wygant,* 476 U.S. at 280–81, 106 S.Ct. at 1850 (Opinion of Powell, J.) ("[a]s part of this Nation's dedication to eradicating racial discrimination, innocent persons may be called upon to bear some of the burden of the remedy"). An absolutist prohibition on any such transfer would call into question virtually all of the affirmative action programs at universities because in most cases some nonminority applicant loses his opportunity to enter the college of his choice. Similarly, it places in doubt affirmative action programs in the workplace because often an unhired nonminority applicant may not have any other opportunity to ply his trade in the same community. These are serious burdens for individuals, but they have not been held to invalidate otherwise legitimate affirmative action programs. My colleagues' approach suggests—erroneously in my view—that affirmative action is permissible only when nothing very important is at stake, when such a superabundance of opportunity exists that no one need go without.

at 912) to refer only to programs designed to benefit members of the previously victimized race.[48] I do wish to offer a few brief observations concerning programs of this sort.

The Court in *Croson*, while sharply limiting the power of state and local governments to institute affirmative action programs, acknowledged the expansive authority of Congress to mandate racial preferences. Justice O'Connor's plurality opinion recognized that "Congress may identify and redress the effects of society-wide discrimination," 109 S.Ct. at 719; *see also id.* at 736–37 (Scalia, J., concurring). The three dissenters, who would extend broad remedial authority to other public entities, would surely not deny it to Congress. I read *Croson* as reaffirming a broad congressional authority to employ race-based remedies to ameliorate the position of previously disadvantaged racial groups. Congress is not restricted to addressing problems caused by its own prior discrimination, nor is it required to identify particular instances of discrimination as a predicate for remedial action.

In the present case, I have focused exclusively on the goal of enhancing broadcast diversity. This is because Congress, in mandating continued implementation of the distress sale policy, relied exclusively on the diversity rationale. There is simply no indication that Congress was motivated, even in part, by a desire to improve the lot of minority broadcasters. My emphasis on the diversity rationale in this case should not, however, obscure my strong conviction that Congress retains broad authority to employ race-based measures in other areas to enhance the economic situation of those who have previously been the victims of lasting and pervasive discrimination.

IV. CONCLUSION

The majority has struck down a program mandated by Congress, one that is part of a broader and constantly evolving effort to ensure diversity in programming through diversity in ownership. The congressional decision was hardly an uninformed choice: Congress acted on the basis of nearly a decade of experience with the distress sale policy. Judge Silberman's principal error lies in his failure to give due weight to the considered judgment of Congress. That error is compounded by his denigration of the public interest in programming diversity and his failure to fully credit the precedents of this circuit.

Congress, despite the agency's misgivings, has ordered the continuation of a limited minority access scheme designed to promote diversification in broadcasting through the elimination of identified structural barriers that have traditionally burdened minority ownership. Its distress sale policy is narrowly tailored to address the critical entry barriers to minority participation in media ownership while imposing only minimal burdens on innocent third parties. I do not believe that so modest and targeted a program furthering such a compelling aim violates the Constitution. I therefore respectfully dissent.

ON PETITIONS FOR REHEARING

Before: WALD, Chief Judge, SILBERMAN, Circuit Judge, MacKINNON, Senior Circuit Judge.

ORDER

*PER CURIAM.*

Upon consideration of the petitions for rehearing of appellee and intervenor it is ORDERED, by the Court, that the petitions are denied.

Chief Judge WALD would grant the petitions for rehearing.

A statement of Senior Circuit Judge MacKINNON is attached.

**48.** Judge Silberman suggests that I am unclear as to whether the distress sale policy is in fact a "remedial" program. *See* Silberman op. at 914 n. 13. The confusion, I would submit, stems from the ambiguous nature of the term "remedial." The distress sale program is not "remedial" in the narrow sense in which that term is sometimes used: its purpose is not to *compensate* particular minority individuals for past injustices by providing them with increased economic opportunities in broadcasting. It is, however, "remedial" in a broader sense: it seeks to address (or remedy) a societal problem (the underrepresentation of minorities in the broadcast field, and the consequent lack of diverse programming) which has been caused by past racial discrimination. I therefore believe that the Supreme Court's repeated references to the broad remedial powers of Congress bolster congressional authority to implement this program as a means of enhancing diversity. *See supra,* pp. 941–43.

954

MacKINNON, Senior Circuit Judge:

I vote to deny rehearing by the panel and the suggestion for rehearing *en banc* for the reasons set forth below.

From existing decisional law it must be concluded that any racial or group preference is inherently suspect, must be subject to close and careful scrutiny and can only be upheld to justify an award to promote programming diversity if it is one of several factors that entered into the decision. *J.A. Croson Co. v. City of Richmond,* — U.S. —, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (O'Connor, J.), 109 S.Ct. at 735 (Scalia, J.) (1989) (citations to the slip opinion). In other words, racial or group preference violates equal protection if, as here, it is the only basis for a federal agency preferring one applicant over another. As Justice Powell stated in his opinion, *University of California Regents v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978):

"[P]referring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the constitution forbids."

Bakke at 307, 98 S.Ct. at 2757 (Powell, J.). *Cf. Johnson v. Transportation Agency,* 480 U.S. 616, 638, 107 S.Ct. 1442, 1455, 94 L.Ed.2d 615 (1987) (Title VII analysis).

The standards of the Federal Communications Commission's distress sale policy here in question provide that certain minority groups shall have an absolute preference over all other citizens in qualifying for a broadcast license that is designated for hearing. The preferred minority groups are defined and restricted to those who are:

"black, Hispanic surnamed, American Eskimo, Aleut, American Indian and Asiatic American extraction," 68 FCC2d at 781 n. 8 (1978).

Even all non-minority women are excluded. The preferred group in this case is: "Hispanic surnamed." With all the intermarriages, having a Hispanic surname is no guarantee that a person is "Hispanic" or a minority to any substantial degree—though this opinion makes nothing of this point. In my opinion there is no possibility that an *absolute* group preference can be held to be constitutional under the equal protection standard implicit in the 5th Amendment.[1]

---

1. The dissent cites Justice Scalia's statement in his concurring opinion in *City of Richmond v. J.A. Croson Co.,* — U.S. —, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) which notes that Congress, pursuant to Section 5 of the 14th Amendment, possess augmented legislative powers "concerning matters of race." Statement of dissent denying rehearing *en banc* at 958–959 *Shurberg Broadcasting of Hartford, Inc. v. Federal Communications Commission,* No. 84–1600 (quoting *City of Richmond v. J.A. Croson Co., supra,* Scalia, J., 109 S.Ct. at 736). This citation implies that Congress' by virtue of Section 5 of the 14th Amendment has augmented legislative powers which extend beyond the power to enact race conscious legislation to remedy prior group discrimination, and extends to authorize legislation designed to promote diversity. In this respect the dissent is troubling for the far reaching consequences it may sow. Clearly, the *Croson* decision does not warrant such an assumption. In *Croson,* the Court considered Richmond's affirmative action program which was designed to remedy prior racial discrimination in the city. *Croson* 109 S.Ct. at 713; 109 S.Ct. at 735 (Scalia, J.). Justice Scalia's reference to the Congress' "enhanced powers" under Section 5 of the 14th Amendment must be interpreted as addressing legislation designed to *remedy* prior discrimination. Similarly, Chief Justice Burger's opinion in *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), outlined Congress' powers under the 14th Amendment in the context of legislation designed to remedy prior racial discrimination:

Here we deal, as we noted earlier, not with the *limited remedial powers* of a federal court, for example, but with the *broad remedial powers* of Congress. It is fundamental that in no organ of government, state or federal, does there repose a more comprehensive *remedial power* than in Congress, expressly charged by the Constitution with the competence and authority to enforce equal protection guarantees.

*Fullilove* at 483, 100 S.Ct. at 2777 (Burger, C.J.) (emphasis added). The dissent seeks, without discussion or citations to authority, to rely on Section 5 of the 14th Amendment as a positive grant of legislative power to Congress to enact race conscious programs designed to promote diversity absent any evidence of prior racial discrimination.

The implied assertion of the dissent that a legislative objective other than the remedying of past discrimination is entitled to heightened deference pursuant to Section 5 of the 14th Amendment is alarming because it has no logical stopping point. Judge Silberman has also expressed doubts as to whether Congress is entitled to enhanced deference under the 14th Amendment outside the remedial context. Silberman at 923. Moreover, a plurality of the Supreme Court stated that race conscious programs should be "strictly reserved for remedial settings." *Croson* 109 S.Ct. at 721 (O'Connor, J.); at 736 (Scalia, J.); *See* Silberman at 920. To accord Congress heightened deference under the 14th Amendment outside remedial settings would grant the Legislative Branch a broad li-

*Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

With the case in its present posture nothing would be gained by rehearing. The Commission has been absolutely prohibited by Congress from making any change or even determining the facts to justify the validity of the program. In addition, the Commission has vacillated from one position to another like a teeter-totter and when it filed its opinion in this case was in one of its 2 to 1 reversal moods due to two unfilled Commission vacancies. These two Commissioners stated that the program is constitutional. However, the Commission's earlier brief to the *en banc* court in *Steele v. FCC,* 770 F.2d 1192 (D.C.Cir.1985), *vacated and rehearing en banc granted,* Order of Oct. 31, 1985, *remanded,* Order of October 9, 1986 (FCC Brief at 15), stated that the Commission's racial and gender preference policies, which would include the distress sale program, were unconstitutional. The Commission's *Steele* Brief on Rehearing En Banc stated:

## I. THE FCC'S CURRENT POLICY OF GRANTING RACE AND GENDER PREFERENCES CONFLICTS WITH CONSTITUTIONAL STANDARDS.

The racial and gender preference policies employed by the FCC in comparative licensing proceedings since 1978 are discriminatory classifications by government that are inherently suspect, presumptively invalid and subject to stringent scrutiny under the equal protection guarantee implicit in the due process clause of the Fifth Amendment. *See Wygant v. Jackson Bd. of Educ.* [476 U.S. 267, 273, 106 S.Ct. 1842, 1846], 90 L.Ed.2d 260, 268 (1986); *Lehr v. Robertson,* 463 U.S. 248, 265–66 [103 S.Ct. 2985, 2995–96, 77 L.Ed.2d 614] (1983).

Properly balanced programming diversity of viewpoint in mass media is an acceptable goal, but the Commission in its long history of awarding broadcast licenses has never thwarted that objective by unconstitutional-ly discriminating against minorities. The objective of programming diversity whether considered as satisfying the 5th Amendment, or as authorized by the 14th Amendment, must meet some modicum of *equal* protection.

The dissent states at n. 3 that if this case was reheard "on the merits" by the court *en banc* and the court was equally divided the FCC's decision would be upheld. I fail to understand the significance of this speculation. As the court is presently constituted, *en banc* consideration of this case would not ordinarily result in an equally divided court. The *en banc* court would include the senior circuit judge who participated in the original panel, which, based on positions presently expressed, would result in a 6–5 vote affirming the reasoning of the majority decision of the panel. *See Boeing Company v. Shipman,* 411 F.2d 365, 367 (5th Cir.1969); *Luna v. Beto,* 395 F.2d 35, 37 (5th Cir.1968); *Allen v. Johnson,* 391 F.2d 527 (5th Cir.1968); *cf. Tavoulareas v. Piro,* 817 F.2d 762 (D.C.Cir.1987) (En Banc) (two Senior Circuit Judges participating in rehearing *en banc* due to their participation in the original three judge panel.). Thus, only delay would be the most likely result from granting rehearing *en banc.*

Dennis R. Patrick, as Chairman of the Federal Communications Commission, in his dissenting opinion, has set forth the material facts and the law in an admirable opinion. The dissent would denigrate the soundness of the Chairman's opinion because he has subsequently resigned. The soundness of a legal decision is not diminished by the resignation or death of an official. Chief Justice Marshall's opinions and those of all prior judges still survive as precedents. The evaluation of the legal reasoning in Chairman Patrick's dissent is entitled to be evaluated on the basis of its legal merits to the same extent as the dissent in this case. Because Chairman Patrick's excellent opinion succinctly covers the entire background and the law applicable to each phase of this case, it de-

cense to classify citizens on the basis of race pursuant to the Amendment designed to do away with such racial classification. *Of course,* this case is limited by the 5th Amendment, but

some degree of "equal protection" must still be satisfied. I fail to see that an *absolute* preference can be upheld under the equal protection implications of the 5th Amendment.

serves more recognition than it has received, and, so far as relevant, is set forth in the following Appendix.[2]

## APPENDIX
### DISSENTING OPINION OF CHAIRMAN PATRICK OF THE FEDERAL COMMUNICATIONS COMMISSION IN *SHURBERG*.

\* \* \*

"The Commission's minority preference policies have a tortured past. The Commission initially took the position that minority preferences should be granted only after the minority applicant clearly demonstrated that program and viewpoint diversity would be fostered through minority ownership. After being directed by the D.C. Circuit to presume a nexus between minority ownership and program diversity,[1] the Commission developed various preferences designed to promote minority ownership, including the distress sale policy at issue in *Shurberg*, the comparative preference policy and the tax certificate policy. *See Policy Statement on minority Ownership of Broadcast Facilities*, 68 F.C.C.2d 979 (1978). The Commission later extended the comparative preference policy to females. *See Mid–Florida Television Corp.*, 69 F.C. C.2d 607, 652 (1978). The constitutionality of that policy was challenged in *Steel v. FCC*, 770 F.2d 1192 (D.C.Cir.1985), *vacated and rehearing en banc granted*, Order of Oct. 31, 1985, *remanded* Order of Oct. 9, 1986. At that point, the Commission believed that "both the gender and racial preference schemes conflict with equal protection standards under the Constitution."

Supplemental Brief for the Federal Communications Commission at 13, *Steele v. FCC*, No. 84–1176 (D.C.Cir.). The Commission unanimously concluded, based on recent Supreme Court decisions applying equal protection analysis, that racial classifications may not be based on the assumption alone, without a factual predicate, that integrated minority owners will result in increased programming and viewpoint diversity. *Id.* As a result the Commission urged the court to permit us to undertake a comprehensive inquiry into the legal and factual predicate of our preference policies to determine whether a nexus truly does exist between minority ownership and program diversity. The Commission thereafter undertook such a study designed to provide a fuller record and to gather the empirical data necessary to support retention of our preference scheme. *Notice of Inquiry* in MM Docket No. 86–784, FCC 86–549, 1 FCC Rcd. 1315 (1986). Prior to the completion of this study, however, Congress decreed that the FCC expend no funds in fiscal year 1988 to complete its research or to change its preference policies.[2] In compliance with this congressional mandate, the Commission closed its rulemaking, without issuing any findings or conclusions, and reestablished all preference policies.

In *Shurberg*, each of the three separate opinions treats *West Michigan* differently. Judge Silberman questions *West Michigan*'s initial conclusion that there is a compelling government interest in increasing diversity of programming and goes on to conclude that it may, in any event, be undermined by the Supreme Court's recent

---

**2.** The fact that Chairman Patrick favored rehearing *en banc* in this case and *Winter Park* was not stated because it is not relevant here. He supported rehearing *en banc* for *Shurberg* only if *Winter Park* was included. However, *Winter Park* is distinguishable on two material grounds. It involved (1) a comparative hearing and (2) the minority preference was only a *plus factor*. In *Shurberg* minority preference is an *absolute preference*. This case is not to be contrasted with a case which involved race as only one factor in a comparative licensing procedure.

**1.** *TV 9, Inc. v. FCC*, 495 F.2d 939 [929], (D.C.Cir. 1973), *cert. denied*, 419 U.S. 986 [95 S.Ct. 245, 42 L.Ed.2d 194] (1974).

**2.** *See Making Further Continuing Appropriations for Fiscal Year 1988 and for Other Purposes*, Pub.L. No. 100–202 (signed Dec. 22, 1987). The appropriations legislation prohibits the Commission from using funds "to repeal, to retroactively apply changes in, or to continue a reexamination of" the Commission's policies premised on racial, ethnic or gender classification, except to: (1) close its proceeding investigating the preference policies; (2) reinstate prior policy; and (3) lift any suspension imposed on implementing the policies pending its investigation.

decision in *Croson.* Judge MacKinnon's opinion does not address *West Michigan per se* but insists that preference policies must be narrowly tailored, while Judge Wald concludes that at least some of the conclusions in *West Michigan* have *not* been undermined by subsequent Supreme Court decisions.

Recent Supreme Court precedents collectively make clear that racial and gender classifications are inherently suspect and will be subject to close and careful scrutiny.[3] Most significantly, after *Croson,* the standard of review required for *any* governmental classification based on race is strict scrutiny. *City of Richmond v. J.A. Croson Co.,* 57 U.S.L.W. 4132, 4139 [—— U.S. ——, ——, 109 S.Ct. 706, 720, 102 L.Ed.2d 854] (Part III–A) and 4146 [——, 109 S.Ct. at 735] (Scalia, J. concurring).

The first stage of equal protection analysis under strict scrutiny requires a determination as to whether there is a compelling government objective. The Supreme Court has only identified two compelling interests for race-based policies. First, such minority preference policies may be implemented to remedy past discrimination. *Fullilove,* 448 U.S. at 475 [100 S.Ct. at 2773].[4] Second, at least Justice Powell in *Bakke* believed that, for educational institutions, academic diversity is a compelling government interest.[5] *Bakke,* 438 U.S. at 311–15 [98 S.Ct. at 2759–61] (opinion of Powell, J.).

From this second justification, the D.C. Circuit in *West Michigan* extrapolated to find "program diversity" in broadcasting a compelling interest. This premise, set out in *West Michigan,* relies on Justice Powell's opinion in *Bakke* that a diverse educational environment is a compelling goal that may be constitutionally promoted by certain admissions policies which recognize race as one of several factors. As racial diversity is only one aspect of a truly diverse student body, Justice Powell believed that a university could use race as one factor in a multi-factor admissions decision.[6]

Similarly, if one assume program diversity to be a compelling goal, race is but one factor which may bear on diversity of view-

---

**3.** *See e.g., City of Richmond v. J.A. Croson Co.,* 57 U.S.L.W. 4132 [—— U.S. ——, 109 S.Ct. 706, 102 L.Ed.2d 854] (U.S. Jan. 23, 1989); *Wygant v. Jackson Board of Education,* [476 U.S. 267, 106 S.Ct. 1842] 90 L.Ed.2d 260 (1986); *Fullilove v. Klutznik,* 448 U.S. 448 [100 S.Ct. 2758, 65 L.Ed. 2d 902] (1980); *Regents of the University of California v. Bakke,* 438 U.S. 265 [98 S.Ct. 2733, 57 L.Ed.2d 750] (1978). *See also Mississippi University for Women v. Hogan,* 458 U.S. 718 [102 S.Ct. 3331, 73 L.Ed.2d 1090] (1982).

**4.** The Commission has never claimed that its preference policies are intended to remedy prior discrimination against minorities or to provide remedial benefits. It could be argued that Congress has separately adopted our policies as its own, with the justification that its policies are remedial. But Congress did not justify its funding decisions remedial. As my fellow Commissioners agree, Congress relied solely on a diversity rationale. FCC Petition or Rehearing at n. 1.

**5.** It is unclear after *Croson* whether Justice Powell's diversity rationale would be endorsed by the present Court. A plurality of the Court in that case quite clearly stated that classifications based on race should be "strictly reserved for remedial settings." *Croson,* 57 U.S.L.W. at 4139 [—— U.S. at ——, 109 S.Ct. at 721], *see also id.* at 4145 [——, 109 S.Ct. at 735] (Scalia, J., concurring). And Justice O'Connor, who had indicated some sympathy for Justice Powell's diversity rationale, *Wygant,* 476 U.S. at 286 [106 S.Ct. at 1852] (O'Connor, J., concurring), appears to have rejected that rationale in *Croson.* Justice Stevens interpreted Justice O'Connor's opinion as such a rejection, *Croson,* 57 U.S.L.W. at 4144 n. 1 [—— U.S. at —— n. 1, 109 S.Ct. at 730 n. 1] (Stevens, J., concurring in part), as has Judge Silberman, *Shurberg,* Silberman opin. at 919–921. While Judge Wald agrees as to the substance of Justice Stevens' interpretation of the O'Connor opinion, *Shurberg,* Wald opin. at 942 n. 20 (dissenting), she herself would read that same opinion differently. With all due respect to Judge Wald, I must defer to the interpretation of *Croson* rendered by a member of the Supreme Court. Thus, in light of the Court's decision in *Croson,* whether the academic diversity rationale remains as a compelling government interest for race-based policies is an open question. Certainly then, extensions of that rationale cannot be supported.

**6.** The plan before the *Bakke* court, however, employed a racial set-aside, which did not account for other diversity factors. As Justice Powell wrote in *Bakke,* "preferring members of any one group for no reason other than race or ethic origin is discrimination for its own sake. This the Constitution forbids." *Bakke,* 438 U.S. at 307 [98 S.Ct. at 2757]. The Court thus struck that plan down as unconstitutional.

point.[7] Because minority status is the exclusive criterion for use of the distress sale policy, I fail to see why that policy passes even Justice Powell's test. Outside the remedial context, the Supreme Court has *never* upheld a preference policy based solely on race, and has specifically rejected the use of minority set-asides as a means of promoting diversity. *Bakke*, 438 U.S. at 314–18 [98 S.Ct. at 2760–63].

Citing *Fullilove*, my fellow Commissioners see no reason why the court should not extend its findings in the remedial context to the diversity arena. I submit that one does not necessarily lead to the other. It is clear after the Supreme Court's decision in *Croson* that race-based measures are subject to the highest degree of scrutiny. Where evidence of past discrimination exists, the Court may well tolerate race-based *remedial* measures. But where the most nebulous goal of diversity is at issue, the most that even Justice Powell would permit is the consideration of race as one of several factors. There is no basis to think the Court would allow more.

Ensuring that minority perspectives can be aired in a diverse broadcast marketplace is an important policy goal which I support. But our station licensing and transfer policies must, above all else, guarantee equal protection of the laws to all Americans. As such, our race-conscious policies must be subjected to the most rigorous review to insure fidelity to this principle.

\* \* \*

Before WALD, Chief Judge, ROBINSON, MIKVA, EDWARDS, RUTH B. GINSBURG, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG and SENTELLE, Circuit Judges.

### ON SUGGESTIONS FOR REHEARING *EN BANC*

### ORDER

PER CURIAM.

The suggestions for rehearing *en banc* of appellee and intervenor have been circu-

lated to the full court. The taking of a vote was requested. Thereafter, a majority of the judges of the Court in regular active service did not vote in favor of either suggestion. Upon consideration of the foregoing it is

ORDERED, by the Court *en banc*, that the suggestions are denied.

Chief Judge WALD and Circuit Judges ROBINSON, MIKVA, EDWARDS and RUTH B. GINSBURG would grant the suggestions.

A statement of Chief Judge WALD, joined by Circuit Judges ROBINSON, MIKVA, EDWARDS and RUTH B. GINSBURG, is attached.

Former Circuit Judge STARR did not participate in this matter while a member of the Court.

WALD, Chief Judge, joined by ROBINSON, MIKVA, EDWARDS and RUTH B. GINSBURG, Circuit Judges, dissenting from denial of rehearing *en banc*:

My dissent from the panel's disposition of this case sets forth my reasons for concluding that the distress sale policy is a constitutional exercise of congressional power. For several reasons, I regard this case as sufficiently important to warrant *en banc* reconsideration.

First, the continued use of the distress sale policy has been mandated by an Act of Congress. The panel opinions in this case rely heavily on the Supreme Court's decisions in *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) and *City of Richmond v. J.A. Croson Co.*, —— U.S. ——, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), both of which involved affirmative plans initiated by local authorities. Of the six Justices who comprised the *Croson* majority, however, four

---

7. As I have previously noted, however, the Commission has been prohibited from determining whether race *is* a factor in viewpoint diversity, that is, whether there is a nexus between minority ownership and programming.

drew an express distinction between the expansive powers of Congress and the more limited powers of state and local governments.  *See* 109 S.Ct. at 719 (Opinion of O'Connor, J.) ("That Congress may identify and redress the effects of society-wide discrimination does not mean that, *a fortiori*, the States and their political subdivisions are free to decide that such remedies are appropriate"); *id.* at 736 (Scalia, J., concurring) ("[I]t is one thing to permit racially based conduct by the Federal Government—whose legislative powers concerning matters of race were explicitly enhanced by the Fourteenth Amendment, *see* U.S. Const., Amdt. 14, § 5—and quite another to permit it by the precise entities against whose conduct in matters of race that Amendment was specifically directed, *see* Amdt. 14, § 1").  *Croson* certainly did not resolve the substantial questions posed by congressional programs which mandate the use of racial preferences.  In fact, the *Croson* Court's curtailment of state and local affirmative action programs makes the issue of congressional authority all the more important.  This issue alone merits *en banc* review.

Second, the agency itself, despite its prior misgivings, has now indicated clearly

that it supports the distress sale policy—a fact which was not free from doubt at the time of the panel's decision.[1]  Portions of the panel opinions also cast doubt upon other FCC policies designed to increase minority participation in broadcast ownership as a means of enhancing programming diversity.  These policies include the consideration of race as one element in comparative licensing procedures—a practice only recently reaffirmed by this Court in *Winter Park*.  Substantial uncertainty now exists concerning the scope of the Commission's authority to consider race in its licensing decisions.  *En banc* rehearing is especially desirable in view of the fact that this court is the exclusive forum for review of the FCC's licensing policies.

Finally, the panel's disposition of this case creates considerable doubt as to whether the pursuit of diversity remains a viable justification for affirmative action programs in *any* setting.  This aspect of the panel opinions has constitutional ramifications stretching well beyond the broadcasting context;  clearly it calls into question the constitutionality of affirmative action programs in student admissions at public universities.[2]  A decision with such

1.  Judge MacKinnon attaches great significance to the fact that the agency's decision to seek rehearing was made by a 2–1 vote.  My colleague provides lengthy excerpts from FCC Chairman Dennis Patrick's dissent from the Commission's position to petition for *en banc* review.  Since Chairman Patrick was the lone dissenter, and since he has resigned from his post on the Commission, effective upon the appointment of his successor, his views are hardly the best indicator of the agency's current position.

Moreover, Chairman Patrick's opposition to rehearing of this case was hardly unequivocal.  The Chairman stated:

In light of the importance and complexity of these issues, particularly given recent Congressional actions and the varying opinions in *Shurberg* and [*Winter Park Communications, Inc. v. FCC*, 873 F.2d 347 (D.C.Cir.1989)], I would petition the D.C. Circuit to hear *Shurberg en banc* and support a petition for rehearing on *Winter Park*.  Both cases could be considered together and the court could give us definitive guidance.  But I cannot support my fellow Commissioners' approach of requesting only partial enlightenment in this area.

Dissenting Statement of Chairman Dennis R. Patrick at 3.

Nor do the agency's recent doubts concerning the distress sale policy impugn the Commission's current support.  After all, the FCC's prior enforcement of the fairness doctrine did not invalidate its recent decision that the doctrine should be repealed.  *See Syracuse Peace Council v. FCC*, 867 F.2d 654 (D.C.Cir.1989).  The Commission's prior doubts simply reflect the fact that this is a complex and difficult area of the law—hardly an argument against *en banc* review.

2.  The original panel produced three different views on this issue.  Judge Silberman expressed doubt as to whether the diversity rationale for racial preferences remains viable in light of *Croson*, even in the context of higher education.  *See* Silberman op. at 919–20.  Judge MacKinnon declined to reach the question.  *See* MacKinnon op. at 930 n. 11.  I expressed the view that the pursuit of diversity is a sufficiently important interest to justify the use of racial preferences.  *See* Wald op. at 941–42.  Certainly the panel opinions do not foreclose all diversity-based plans in other contexts, but they are likely to spawn considerable uncertainty and confu-

sweeping implications is surely an appropriate subject of *en banc* reconsideration.

For the foregoing reasons, I dissent from the denial of rehearing *en banc*. The denial of review, by an equally divided court,[3] has the effect of invalidating a congressional enactment—as well as a longstanding, vigorously supported agency program—designed to address the dearth of minority voices within the nation's broadcast media. The Congress and the FCC deserve the consideration of the full court on such a serious matter.

sion among public administrators in a wide range of settings—most notably in education.

Moreover, all nine Justices in *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), concluded that Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, imposes restrictions at least as severe as those established by the Constitution. *See Bakke,* 438 U.S. at 286–87, 98 S.Ct. at 2746–47 (Opinion of Powell, J.); *id.* at 328–40, 98 S.Ct. at 2767–73 (Opinion of Brennan, White, Marshall, and Blackmun, JJ.); *id.* at 416, 98 S.Ct. at 2812 (Opinion of Stevens, J.). If public university admissions programs which take account of race are constitutionally proscribed, that proscription would also apply to private universities receiving federal funds.

**3.** I would note that when an *en banc* court is equally divided *on the merits,* the decision of the agency is affirmed. *See* Handbook of Practice and Internal Procedures, United States Court of Appeals for the District of Columbia Circuit at 68 (1987).